James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
 CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Christopher J. Keller
Andrei V. Rado
Alan I. Ellman
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
(212) 907-0700

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>MERCK & CO., INC. and RICHARD T. CLARK,<br><br>Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Genesee County Employees' Retirement System ("Plaintiff"), by way of Complaint

against has Defendants Merck & Co., Inc. ("Merck" or the "Company") and Richard T. Clark,

says:

## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.      This is a federal class action on behalf of all persons who purchased or otherwise acquired Merck securities between July 24, 2006 and March 28, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Merck is one of the largest pharmaceutical companies in the world.  Over the past few years, Merck enjoyed strong profit growth, reflected in a growing stock price that peaked at $60 per share during the Class Period, for total market capitalization of $130.2 billion.

3.      This action alleges that Merck failed to release the results of a study that showed that Vytorin, an expensive cholesterol drug, offered no benefits over generic drugs selling for a fraction of Vytorin's price. The trial was completed in April 2006, but the results of the study were provided nearly two years later, and only after articles questioned the unusually long delay and U.S. Congressmen wrote to Merck questioning whether the delay was legitimate. The belatedly disclosed trial results showed that Vytorin provided no benefit over similar generic drugs costing a fraction of the price.  When the full study results were released on Sunday, March 30, 2008, Merck's stock price fell from $44.51 on March 28, 2008 to a close on March 31, 2008 (the next trading day) of $37.95 on extremely heavy volume, a one-day decline of approximately 15%.

4.      Vytorin is a cholesterol-lowering medication that is a combination of two other drugs, Zetia and Zocor. Vytorin is co-marketed by Merck and Schering-Plough Corp. ("Schering").  Merck and Schering designed a clinical trial, named ENHANCE, to test whether Vytorin was more effective than much cheaper "statin" drugs in preventing progression of atherosclerosis (plaque buildup) in the carotid artery, a major risk factor for heart attacks and

strokes.  The study was designed to test the effectiveness of Vytorin against simvastatin, the generic form of Zocor.

5.     On Sunday, March 30, 2008, the full ENHANCE trial results were finally disclosed to the market.  The *New England Journal of Medicine*, which published the ENHANCE results, took the unusual step of printing two editorials which recommended doctors only turn to Zetia and Vytorin after they had exhausted all other options.  Additionally, a panel of experts issued a unanimous statement calling on cardiologists to rein in the use of Zetia and Vytorin, and urged doctors to turn back to statins like Lipitor and Zocor.

6.     The study did not meet its primary goal of showing that Vytorin was more effective than the much cheaper simvastatin alone in preventing progression of atherosclerosis in the carotid artery.  Doctors had been prescribing Vytorin or Zetia on the theory that the drugs would reduce atherosclerosis more than generic drugs, thereby justifying Vytrin's hefty price premium.  The ENHANCE study left doctors with no reason to prescribe Vytorin over generic cholesterol drugs, such as simvastatin, that sell for a third of the cost.  Indeed, The ENHANCE study also showed that patients on Vytorin suffered more heart attacks, cardiovascular deaths and heart procedures than those taking simvastatin, although because of the small size of the study, those differences were not statistically significant and may be due to chance.

7.     It became clear that the unusually long delay in the release of the study results was purposeful and undertaken to avoid releasing bad results that would harm sales of Vytorin. In an email released by U.S. Senator Chuck Grassley on March 31, 2008, Dr. John Kastelein, the lead investigator of the study, wrote to Schering executives on July 6, 2007 regarding the delay of the results: "I can tell you if this is the case, our collaboration is over.  **This starts smelling like extending the publication [of the study] for no other [than] political reasons and I**

**cannot live with that**." The next day in another email, Dr. Kastelein indicated that as a result of the delay, "**you will be seen as a company that tries to hide something and I will be perceived as being in bed with you!**" (emphasis added).

8.     Despite the negative results of the ENHANCE trial, which defendants knew about, Merck kept selling billions of dollars of Vytorin and touting the expected growth of Vytorin sales. These positive statements about Vytorin's growth were materially false and misleading because defendants failed to disclose that the results of the ENHANCE trial were withheld because they were negative. It was also misleading for the Company to report stellar sales from Vytorin without disclosing that this revenue stream would not continue and was jeopardized by study results that they knew would have a severely negative impact on sales of the drug.

9.     The circumstances surrounding the delay of the study results are being investigated by several state Attorneys General, including New York's and Connecticut's, as well as Representatives on the federal House Committee on Energy and Commerce and Senators from the Senate Finance Committee.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). The Company is incorporated and headquartered in this District, and many of

the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff Genesee County Employees' Retirement System is headquartered in Flint, Michigan.  As is set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Merck at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant Merck is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, NJ 08889.  The Company is a global research-driven pharmaceutical company.

16.     Defendant Richard T. Clark ("Clark") is, and was at all relevant times, Chairman, President and Chief Executive Officer ("CEO") of Merck.

17.     During the Class Period, Clark, as senior executive officer and/or director of Merck, was privy to confidential and proprietary information concerning Merck, its operations, finances, financial condition and present and future business prospects.  Clark also had access to materially adverse non-public information concerning Merck, as discussed in detail below. Because of his positions within Merck, Clark had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees

thereof and via reports and other information provided to him in connection therewith.  Because of his possession of such information, Clark knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     Clark is liable as a direct participant in the wrongs complained of herein.  In addition, Clark, by reason of his status as senior executive officer and/or director, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his positions of control, Clark was able to and did, directly or indirectly, control the conduct of Merck's business.

19.     Clark, because of his positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Clark was provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Clark had the opportunity to commit the fraudulent acts alleged herein.

20.     As senior executive officer, chairman and as controlling person of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, Clark had a duty to promptly disseminate accurate and truthful information with respect to Merck's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Merck's common stock would be

based upon truthful and accurate information.  Clark's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     Clark is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Merck's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding the results of the ENHANCE trial, its failure to show any statistically significant difference between Vytorin and other cheaper drugs, and the business, operations and management and intrinsic value of Merck's securities; and (ii) caused Plaintiff and members of the Class to purchase Merck's common stock at artificially inflated prices, which declined dramatically when the truth was disclosed.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements Made During the Class Period

22.     The Class Period begins on July 24, 2006.  On that date, Merck published a press release announcing earnings results for the second quarter of 2006, ending June 30, 2006.  This press release contained statements regarding the success of the Company's Vytorin and Zetia product sales:

> ZOCOR, Merck's statin for modifying cholesterol, achieved worldwide sales of $990 million in the second quarter, representing a decrease of 14% over the second quarter of 2005. Sales for the first six months were $2.1 billion, a 9% decrease compared to the first six months of 2005. Merck's U.S. marketing exclusivity for ZOCOR expired on June 23, 2006, and the Company's previously signed authorized generic agreement with Dr. Reddy's Laboratories went into effect. Merck continues to offer branded ZOCOR and to manufacture simvastatin for branded ZOCOR, VYTORIN, the Company's investigational compound MK-0524B and Dr. Reddy's authorized generic.
>
> As reported by the Merck/Schering-Plough partnership, global sales of ZETIA and VYTORIN in the aggregate reached

$973 million for the second quarter as compared to $507 million for the same period last year. Combined new prescriptions attained more than 15% of the U.S. lipid-lowering market, according to the most recent monthly IMS Health data.

Global sales of ZETIA, the cholesterol-absorption inhibitor also marketed as EZETROL outside the United States, reached $476 million in the second quarter, an increase of 51% compared with the second quarter of 2005. Also in the second quarter, ZETIA was approved by the FDA for co-administration with fenofibrate, offering a new treatment alternative for patients with mixed hyperlipidemia. Sales for the first six months were $891 million, an increase of 38% over the comparable 2005 period.

Global sales of VYTORIN, also developed and marketed by the Merck/Schering-Plough partnership, reached $497 million in the second quarter. VYTORIN, marketed outside the United States as INEGY, is the first single cholesterol treatment to provide LDL cholesterol lowering through dual inhibition of cholesterol production and absorption. Sales for the first six months were $876 million.

In the second quarter, Merck/Schering-Plough announced new data from two clinical trials. Data presented at the International Symposium on Atherosclerosis meeting showed that VYTORIN was significantly more effective than Crestor in reducing LDL cholesterol across all study dose comparisons and an analysis of the data showed that, when averaged across all study doses, VYTORIN brought more patients at high risk of cardiovascular disease to LDL cholesterol levels less than 70 mg/dl compared to Crestor. Also in June, new data released at the American Diabetes Association's (ADA) 66th Annual Scientific Sessions showed that at the recommended usual starting doses VYTORIN was superior to Lipitor in the lowering of LDL cholesterol in patients with type 2 diabetes.

23.    On August 7, 2006, Merck filed its Form 10-Q for the second quarter of 2006. The Company reiterated the information about Vytorin published in its July 24, 2006 press release.

24.    The Company's Form 10-Q filed on August 7, 2006 also contained Sarbanes-Oxley required certifications, signed by defendant Clark, who certified the following:

- 8 -

1.      I have reviewed this quarterly report on Form 10-Q of Merck & Co., Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of Merck & Co., Inc. (the "Company"), hereby certifies that the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

25.    On October 20, 2006, Merck published a press release announcing earnings results for the third quarter of 2006, ending September 30, 2006.  The press release touted Merck's strong financial results, led in part by the performance of Vytorin:

Combined global sales of ZETIA and VYTORIN, as reported by the Merck/Schering-Plough partnership, exceeded $1.0 billion for the third quarter.

Global sales of ZETIA, the cholesterol-absorption inhibitor also marketed as EZETROL outside the United States, reached $502 million in the third quarter, an increase of 41% compared with the third quarter of 2005. Sales for the first nine months were $1.4 billion, an increase of 39% over the comparable 2005 period.

Global sales of VYTORIN, marketed outside the United States as INEGY, reached $527 million in the third quarter. Sales for the first nine months were $1.4 billion. On Oct. 5, the Merck/Schering-Plough partnership announced that the FDA had approved the inclusion of new data in the product label showing that VYTORIN, a cholesterol-absorption inhibitor combined with simvastatin, is

- 10 -

> more effective than Crestor at lowering LDL cholesterol at all
> doses compared, ranging from the usual starting recommended
> doses (VYTORIN 10/20 mg, Crestor 10 mg) to the maximum
> approved doses (VYTORIN 10/80 mg, Crestor 40 mg). VYTORIN
> now has been shown in clinical studies to provide greater LDL
> cholesterol lowering efficacy versus Lipitor, Crestor and ZOCOR
> at all study dose comparisons.

26.     In the Company's October 22, 2006 earnings conference call, defendant Clark emphasized the importance of Vytorin, saying, "I am pleased to report that Merck's strong performance in 2006 has continued right through the third quarter. Let me take a few moments to review the highlights of the quarter, which are led by the performance of Singulair, Vytorin and Zetia, our vaccines, as well as our ongoing cost management initiatives." Clark added: "The combined sales of Zetia and Vytorin topped $1 billion in the third quarter, the first time the combined sales of these products have exceeded that major milestone in one quarter. I should add that the strong growth of both of these products has been consistent through 2006."

27.     On November 7, 2006, Merck filed its Form 10-Q for the third quarter of 2006. The Company reiterated the information about Vytorin published in its October 20, 2006 press release. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, which were signed by defendant Clark.

28.     On January 30, 2007, Merck reported full-year and fourth-quarter 2006 earnings results "that reflected solid sales growth and strong results from the Merck/Schering-Plough partnership":

> Combined global sales of ZETIA and VYTORIN, as reported by
> the Merck/Schering-Plough partnership, reached $1.1 billion for
> the fourth quarter, representing growth of 46% over fourth quarter
> 2005. Sales for the year were $3.9 billion, a 60% increase over full
> year 2005.

Global sales of ZETIA, the cholesterol-absorption inhibitor also marketed as EZETROL outside the United States, reached $536 million in the fourth quarter, an increase of 37% compared with the fourth quarter of 2005. Sales for the year were $1.93 billion, an increase of 38% over full year 2005.

Global sales of VYTORIN, marketed outside the United States as INEGY, reached $553 million in the fourth quarter, an increase of 56% compared to the fourth quarter of 2005. Sales for the year were $1.96 billion, an increase of 90% over full year 2005.

29. On the Company's January 30, 2007 earnings conference call, defendant Clark again focused on the importance of Vytorin, stating: "I would like to take just a few moments to walk you through some of the highlights. In 2006, our products including Singulair, Vytorin, Zetia and our vaccines delivered impressive sales growth."

30. On February 28, 2007, Merck filed its Form 10-K for fiscal year 2006 and the fourth quarter of 2006, signed by defendant Clark. The Company reiterated the information about Vytorin published in its January 30, 2007 press release. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, which were signed by defendant Clark.

31. The statements in ¶¶ 22-30 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a) Defendants failed to disclose that the results from the ENHANCE trial were being delayed because they were negative;

(b) that the valuable income stream from Vytorin sales was in jeopardy, which would have a materially negative effect on the Company's business overall.

32. On April 19, 2007, Merck reported results for the first quarter of 2007, ending on March 30, 2007. The Company stated in its press release that the performance of key products including Vytorin drove its results:

Combined global sales of ZETIA and VYTORIN, as reported by the Merck/Schering-Plough partnership, reached $1.2 billion for the first quarter, representing growth of 47% over the first quarter of 2006. Global sales of ZETIA, marketed as EZETROL outside the United States, reached $544 million in the first quarter, an increase of 31% compared with the first quarter of 2006. Global sales of VYTORIN, marketed outside the United States as INEGY, reached $624 million in the first quarter, an increase of 65% compared with the first quarter of 2006.

33.     On Merck's April 19, 2007 earnings conference call, defendant Clark continued to tout Vytorin: "Both ZETIA and VYTORIN, which we market in partnership with Schering-Plough, also performed very well this past quarter. They posted a combined $1.2 billion in sales, a 47% increase from the first quarter of 2006."

34.     On the April 19, 2007 conference call, the following exchange took place regarding the ENHANCE study results:

**George Grofik, Citigroup -** *Analyst*

And secondly, if you can give us an update on the timing and venue of the presentation of enhanced [*sic*] study results for VYTORIN? Thank you.

**Graeme Bell, Merck & Co., Inc. -** *Executive Director of IR*

With regard to enhanced [*sic*], as we have indicated the analysis that's still ongoing, we are going into that information and we will pick an appropriate scientific forum in order to disseminate the enhanced data when we are ready to do that ….

35.     On May 8, 2007, Merck filed its Form 10-Q for the first quarter of 2007.  The Company reiterated the information about Vytorin published in its April 19, 2007 press release. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, which were signed by defendant Clark.

36.     On July 23, 2007, Merck reported results for the second quarter of 2007, ending on June 30, 2007.  The Company stated that its results were driven by the continued strong performance of key products including Vytorin:

> Combined global sales of ZETIA and VYTORIN, as reported by the Merck/Schering-Plough partnership, reached $1.3 billion for the second quarter, representing growth of 30% over second quarter 2006. Global sales of ZETIA, marketed as EZETROL outside the United States, reached $578 million in the second quarter, an increase of 21% compared with the second quarter of 2006. Global sales of VYTORIN, marketed outside the United States as INEGY, reached $686 million in the second quarter, an increase of 38% compared with the second quarter of 2006. Both VYTORIN and ZETIA achieved all-time highs in new and total prescription share during the second quarter.

37.     On the July 23, 2007 earnings conference call, defendant Clark commented: "Vytorin and ZETIA achieved all-time highs in both new and total prescription share in the quarter, posting combined global sales of $1.3 billion, an increase of 30% compared to the second quarter of 2006."

38.     On August 8, 2007, Merck filed its Form 10-Q for the second quarter of 2007. The Company reiterated the information about VYTORIN published in its July 23, 2007 press release.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, which were signed by defendant Clark.

39.     On October 22, 2007, Merck reported "double-digit revenue and earnings per share growth for the Third-Quarter 2007." In commenting on the results, defendant Clark stated, "Our third-quarter results reflect the continued progress Merck is making to deliver on our strategy.  Merck again delivered strong results, including 12 percent sales growth and double-digit earnings-per-share growth, fueled by the performance of SINGULAIR, JANUVIA,

GARDASIL, VARIVAX, VYTORIN and ZETIA."  In discussing the specific financial results of

Vytorin, the release issued by the Company stated,

> "Combined global sales of ZETIA and VYTORIN, as reported by
> the Merck/Schering-Plough partnership, reached $1.3 billion for
> the third quarter, representing 26 percent growth compared with
> the third quarter of 2006.  Global sales of ZETIA, marketed as
> EZETROL outside the United States, reached $607 million in the
> third quarter, an increase of 21 percent compared with the third
> quarter of 2006.  Third-quarter global sales of VYTORIN,
> marketed outside the United States as INEGY, reached $693
> million, an increase of 32 percent compared with the third quarter
> of 2006.  Both ZETIA and VYTORIN achieved all-time highs in
> total prescription share during the third quarter.  The Company
> records the results from its interest in the Merck/Schering-Plough
> partnership in equity income from affiliates."

40.    During the third quarter conference call, held on October 22, 2007, Chief

Financial Officer Peter Kellogg provided more specifics regarding the Merck/Schering-Plough

partnership, explaining that Q3 revenues of Vytorin were $693 million; $526 million was in the

U.S., an increase of 22% over the prior year.  Kellogg concluded, "with our year-to-date

performance and our guidance for the full year, it is clear that the products are driving a healthy

top-line, despite lapping the ZOCOR expiry.  We anticipate continued strong performance from

our key franchises in the remainder of this year."

41.    On November 1, 2007, Merck filed its Form 10-Q for the third quarter of 2007.

The Company reiterated the information about Vytorin published in its October 22, 2007 press

release.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications,

substantially similar to the certifications contained in ¶ 24, which were signed by defendant

Clark.

42.    The statements in ¶¶ 32-41 were materially false and misleading when made

because they misrepresented and failed to disclose the following adverse facts which were

known to Defendants or recklessly disregarded by them:

- 15 -

(a)     Defendants failed to disclose that the results from the ENHANCE trial were being delayed because the results were negative;

(b)     that the valuable income stream from Vytorin sales was in jeopardy, which would have a materially negative effect on the Company's business overall.

43.     On November 19, 2007, Merck/Schering-Plough jointly provided an update on the status of the ENHANCE trial, stating:

> [A]n independent panel of clinical and biostatistics experts was convened on Friday, November 16, 2007 to offer advice about the prospective analysis of the ENHANCE trial. ENHANCE is a multinational, randomized, double-blind, trial that examines the effects of the highest approved dose of VYTORIN/INEGY (10 mg ezetimibe + 80 mg simvastatin) versus the highest approved dose of simvastatin 80 mg alone in patients with Heterozygous Familial Hypercholesterolemia (HeFH). Patients with this uncommon genetic condition usually have very high cholesterol levels. HeFH occurs in approximately 0.2 percent of the population.
>
> The independent panel recommended focusing the primary endpoint to the common carotid artery to expedite the reporting of the study findings. Merck/Schering-Plough now anticipates that these results of the ENHANCE study will be presented at the American College of Cardiology meeting in March 2008.
>
> While the clinical portion of the ENHANCE study is complete, the study remains blinded and the data are now being analyzed. The rigorous study design and analytical process specified in the study protocol require examination of more than 40,000 scans of the arterial intima-media thickness (IMT) of the carotid and femoral arteries collected in eighteen multi-national study sites. This has been time consuming and taken longer than originally anticipated because during the analysis, observations of variability in some of the data were detected as part of the validation/data review procedures. Such potentially confounding observations are not unusual in studies of this kind.
>
> The primary objective of the ENHANCE trial is to measure the change in the intima media thickness at three points of the carotid artery (the internal carotid, carotid bulb and the common carotid), at the beginning of the study and at two years. The ENHANCE trial employs a novel non-invasive methodology to assess the intima-media thickness using digital single-frame ultrasound

imagery of the arteries.  This technique was pioneered by Professor John Kastelein, the lead investigator of the ENHANCE study.

"It is critically important for researchers to take the appropriate time and rigor to conduct clinical trials, analyze data and report study results.  The ENHANCE trial is complex and is being conducted with great care," said John Kastelein, M.D., Ph.D., professor of medicine and chairman, Department of Vascular Medicine, Academic Medical Center, Amsterdam, Netherlands.  "We view the experts panel's recommendation to narrow the primary endpoint to the common carotid artery as helpful, and we will continue to expedite the completion of ENHANCE and reporting of its results, while ensuring the integrity of the data."  Kastelein added, "We anticipate that results of the ENHANCE study will be presented at the American College of Cardiology meeting in 2008, dependent upon successful completion of the data analysis."

44.     On November 21, 2007, the *New York Times* reported that the delay in releasing the results of the clinical trials has "led to a growing chorus of complaints from cardiologists," prompting Merck and Schering-Plough to promise to publish a portion of the results next March. Dr. Allen J. Taylor, chief of cardiology at Walter Reed Army Medical Center, said: "There's clearly some rightful interest in what the results are.  You've got millions of people treated with the drugs." As noted in the article, together, "ZETIA and VYTORIN have grabbed nearly 20 percent of the American market for cholesterol-lowering drugs, because of aggressive marketing from Merck and Schering-Plough that highlights ZETIA's uniqueness among cholesterol medicines."

45.     On December 4, 2007, Merck provided updated guidance for its results for the full year 2007 and 2008.  The Company reaffirmed its full-year 2007 non-GAAP (generally accepted accounting principles) earnings per share (EPS) guidance range of $3.08 to $3.14, excluding certain items and anticipated a 2007 GAAP EPS range of $1.45 to $1.51. Subsequently, the Company held a conference call to discuss their updated guidance which defendant Clark stated, "confirms that many of our topline and productivity goals are making

great progress, and [the Company] remains on track to achieve our 2010 targets." In drawing attention to two specific line items in the 2008 guidance, Clark noted that with respect to product gross margin: "Based on our stated 2008 financial guidance of 77 to 78%, we anticipate return in PGM to pre-ZOCOR levels in 2008, a year earlier that we initially projected." There was no discussion of the change recommended by the independent panel of experts or the inability to make a presentation at the March 2007 American Heart Association meeting.

46.     On December 11, 2007, the *Wall Street Journal* Healthblog reported that a Congressional committee was investigating Merck and Schering-Plough for their delay in releasing the results of the ENHANCE trial.  The letter from Representatives John D. Dingell and Bart Stupak asked the companies to provide their records to the committee by December 25. In addition, they expressed concern that while the ENHANCE trial was completed in April 2006, the study "itself was not registered with ClinicalTrials.gov until October 31, 2007 ... and the endpoint indicated in the ClinicalTrials.gov website appears to differ from the endpoint described in the initial study design."  In response to a question from the Healthblog, a Schering-Plough spokeswoman said that "we have clarified today that we decided not to" change the endpoint, although the Company had not formally received the letter from Congress.

47.     On January 3, 2008, the *Wall Street Journal* Healthblog reported that Schering-Plough's CEO Fred Hassan, spoke for 45 minutes at Morgan Stanley's "Pharmaceutical CEOs Unplugged" conference, 35 minutes of which was devoted to the controversy around the disclosure of the ENHANCE trial results.  Hassan downplayed the importance of the trial, stating "[it is] not a large trial" and is "in a very, very special population with very, very high doses.... I don't know why this would have any impact on mainstream use."

48.     After the long-awaited release of information, on January 14, 2008, Merck and Schering announced the results of the ENHANCE trial.  The release disclosed that the primary endpoint was the mean change in the IMT measured at three sites in the carotid arteries between patients treated with Vytorin (ezetimibe/simvastatin) versus patients treated with Zocor (simvastatin) alone over a two year period.  The finding was that there was no statistically significant difference between treatment groups on the primary endpoint.  Additionally, the overall incidence rates of treatment-related adverse events were similar.  The release announced that the full results would be presented at the March 2008 American College of Cardiology ("ACC") meeting.

49.     Also on January 14, 2008, the ACC issued a release on its interpretation of the ENHANCE trial results, advising that "major clinical decision" not be based on the ENHANCE data alone, though the "study deserve serious thought and follow-up," concluding, "there should be no reason for patients to panic."

50.     In response to this partial disclosure of the ENHANCE results (the actual statistical information and other details were not released at that time), the price of Merck stock decreased from $59.26 to $57.67.  The price continued to fall over the next week, hitting a low during trading on January 25, 2008 of $42.32.

51.     In an effort to stop the decreasing stock price of both Merck and Schering-Plough, on January 25, 2008, Merck and Schering-Plough jointly responded to "Issues Raised About ENHANCE Clinical Trial," in which they "strongly objected to mischaracterizations" about the trial stating "while the ENHANCE trial was time consuming and took longer than originally anticipated to complete, our companies acted with integrity and good faith in connection with the trial.  We took numerous actions to assure the quality of the reading of the ultrasound images."

The release went on to quote Peter S. Kim, president of Merck Research Laboratories, "We stand behind VYTORIN and ZETIA and stand behind our science that has brought these cholesterol-lowering medication to millions of people around the world." The release continued:

### Regarding the ENHANCE trial

The ENHANCE study involved 720 patients with a rare form of inherited high cholesterol known as Heterozygous Familial Hypercholesterolemia (HeFH) that affects less than 0.2 percent of the population.  This imaging trial looked at the effects of ezetimibe/simvastatin versus simvastatin on the intima media thickness (IMT) measured at three sites in the carotid arteries (the right and left common carotid, internal carotid and carotid bulb) between patients treated with ezetimibe/simvastatin 10/80 mg versus patients treated with simvastatin 80 mg alone over a two-year period.

As indicated in the January 14, 2008 announcement, in ENHANCE, there was no statistically significant difference in the mean change in the primary measure of the study, between the maximum approved doses of ezetimibe/simvastatin and simvastatin alone.  ENHANCE was not an outcomes trial; that is, it did not attempt to measure whether the combination of ezetimibe and simvastatin reduced the risk of heart attacks or strokes more than simvastatin alone.  The IMPROVE-IT study, an ongoing outcomes trial, is being conducted to answer that question in patients with acute coronary syndrome.

In ENHANCE, ezetimibe/simvastatin achieved significantly greater LDL cholesterol reduction compared to simvastatin alone.

ENHANCE began in October 2002 and the last patient visit occurred in April 2006.  Following the last patient visit, the study required the meticulous examination of approximately 30,000 ultrasound images of the carotid arteries and 10,000 ultrasound images of the femoral arteries.

The ENHANCE trial employed a novel non-invasive methodology to assess IMT using digital single-frame ultrasound imagery of the arteries.  Examination of these images was a challenging process and the data analysis took significantly longer than expected. Numerous steps were taken in 2006 and 2007 to address quality issues and finalize the data analysis.

Until December 31, 2007, the study remained blinded; that is, neither the patients nor the researchers nor the companies knew the group of patients that received each therapy.  On that date, statisticians for Schering-Plough Research Institute first became unblinded.  Additional personnel at the companies were made aware of the findings during the first two weeks of January, 2008.

On January 14, 2008, the companies announced the results of the primary endpoint and other results.

An abstract has been submitted on the ENHANCE trial to the American College of Cardiology with the expectation that the data will be presented and discussed in an appropriate scientific context at their annual meeting in March, 2008.

The companies look forward to participating in rigorous scientific debates on this important issue in the months ahead.  "We are committed to conducting clinical research with the highest integrity and quality, and reporting the results as quickly as possible," said Dr. Koestler.

"We remain committed to the advancement of the study of high LDL cholesterol, its relationship to heart disease, and the availability of effective therapies in the interest of patients and healthcare providers everywhere," said Dr. Kim.

To further clarify issues surrounding the timeline of the ENHANCE study, a chronology of events is attached.

**Additional background about the ENHANCE trial**

ENHANCE was a multinational, randomized, double-blind, active comparator trial that used digitized single-frame ultrasound technology for imaging purposes.  There were 357 HeFH patients randomized to ezetimibe/simvastatin 10/80 mg and 363 HeFH patients to simvastatin 80 mg.  The study collected approximately 30,000 carotid artery and 10,000 femoral artery images from these patients.  HeFH is characterized by markedly elevated plasma concentrations of LDL cholesterol; typically well above the 95th percentile for age and sex.

Single-frame ultrasound images were analyzed from the right and left carotid arteries at three sites (the common carotid, the internal carotid and the carotid bulb) and at numerous time points (baseline, 6, 12, 18 and 24 months).  Images from the right and left common femoral arteries were analyzed at these same time points as well.

52.    The statements in this press release were false and misleading because the Company did not act in good faith and the delay in the results occurred because the results were bad.  Moreover, the fact that the results were blinded does not mean that the researchers could not tell whether the study was a success because the point of the study was to show statistical significance between the treatment and non-treatment arm.  Thus, researchers could know that the study was a failure if there were no statistical differences in the data, without knowing which data went with the treatment or non-treatment arm, and it was misleading for the Company to represent that it was impossible to know the study results before they were unblinded.

53.    While the January 25, 2008 joint release was able to slow the decrease in the Merck stock price by downplaying the importance of the ENHANCE trial results and claiming that they could not have known the results before December 2007, on January 30, 2008, Merck issued 2007 fourth quarter earnings which also temporarily stemmed the decrease in the Merck stock price.  In the release, the Company reported the following:

- Worldwide sales were $24.2 billion for full-year 2007, an increase of 7 percent over full-year 2006.  For the fourth quarter of 2007, worldwide sales were $6.2 billion, an increase of 3 percent over the fourth quarter of 2006.

- Net income for full-year 2007 was $3,275.4 million compared with $4,433.8 million in the full year of 2006

- Combined global sales of ZETIA and VYTORIN, as reported by the Merck/Schering-Plough partnership, reached $1.5 billion for the fourth quarter of 2007, representing 34 percent growth compared with the fourth quarter of 2006.  Combined annual worldwide sales during 2007 were $5.2 billion, an increase of 34 percent compared with the prior year.  Global sales of ZETIA, marketed as EZETROL outside the United States, reached $679 million in the fourth quarter, an increase of 27 percent compared with the fourth quarter of 2006.  Sales for the year were $2.4 billion, an increase of 25 percent over full-year 2006.  Fourth-quarter and full-year 2007 global sales of VYTORIN, marketed outside the United States as INEGY, reached $776 million and $2.8 billion, an increase of 40 percent and 42 percent, respectively, compared with similar periods in 2006.  The Company records the results from its interest in the Merck/Schering-Plough partnership, which totaled $538 million and $1.8 billion in the fourth quarter and full year of 2007, respectively, in equity income from affiliates.

54.     Also on January 30, 2008, Merck held its fourth quarter earnings conference call. In the beginning of the call, defendant Clark noted:

> I am pleased that today we have another solid set of results with growing revenue and non-GAAP EPS to talk about.  The momentum Merck has gained through out consistent performance over the prior seven quarters is seen in our strong quarter in overall results.  We delivered those results notwithstanding an uncertain short-term economic outlook and the impact of major patent expirations.  I want to thank everyone at Merck for helping to get the Company back on track and out performing in terms of innovation, execution of our new commercial model, and delivering shareholder value.

55.     In addressing the ENHANCE trial, defendant Clark represented that the Company had acted in good faith, attempted to minimized the importance of the ENHANCE study, and stated that the full results would be discussed in a scientific context at the March 2008 meeting of the ACC:

> There are a couple of points I would like you to take away from this subject today.  First of all, Merck stands behind the safety and efficacy profiles of both ZETIA and VYTORIN.  Next, we acted with integrity and with faith in connection with the clinical trial. Third, let's keep this trial in perspective.  ENHANCE was not powered or designed to assess cardiovascular clinical event outcomes.  As many know, we have a large clinical outcomes trial underway called IMPROVE-IT.
>
> IMPROVE-IT trial is intended to measure clinical event dates in more than 10,000 patients with acute coronary syndrome. IMPROVE-IT is examining ezetimibe/simvastatin 1040 versus simvastatin 40, and the relationship between LDL lowering and overall reduction in cardiovascular mobility and mortality in this patient population.  Fourth and perhaps most overlooked in the ENHANCE trial., VYTORIN significantly lowered LDL cholesterol compared to simvastatin alone.
>
> As the FDA noted last week in a news conference, elevated LDL cholesterol is very well established risk factor for heart disease. These important findings are also reflected in the National Cholesterol Educational Panel guidelines that continue to identify LDL cholesterol as a primary target for lipid modifying therapy, and that recommended lower target goal levels for LDL over time.

Clinical studies, which are included in VYTORIN's prescription information, had demonstrated that VYTORIN lowers patient's LDL cholesterol more than the TORVASTATIN or [inaudible] or simvastatin at the doses study.   Many patients with elevated cholesterol cannot achieve their cholesterol treatment goals with diet and exercise.  Many of those patients also cannot achieve their treatment goals with statins alone.

As we said, we plan to discuss the ENHANCE data in a proper scientific context at the American College of Cardiology Meeting in March.  Again, let me emphasize that operating with the highest standard of ethics and scientific integrity are the utmost personal importance to me, and are the foundation of this company.  We will continue to work hard to respond to any allegations to the contrary.  At the same time, Merck will not for a second lose focus of our overarching message and that is improving [inaudible].

56.     Clark's representations about the ENHANCE trial were false and misleading for the reasons detailed in ¶¶ 31 and 42.  Moreover, contrary to Clark's attempts to minimize the impact of the ENHANCE trial, the trial was critical. If Vytorin was not proven more effective than a generic statin, there would be little reason for doctors to prescribe the much more expensive medication.

### The Truth Emerges

57.     On Sunday, March 30, 2008, the ENHANCE trials results were finally disclosed to the market with an ensuing onslaught of news and media reports.  The *New England Journal of Medicine*, which published the ENHANCE results on Sunday, took the unusual step of printing two editorials which recommended doctors only turn to Zetia and Vytorin after they had exhausted all other options.   Additionally, a panel of experts issued a unanimous statement calling on cardiologists to rein in the use of Zetia and Vytorin, and urged doctors to turn back to statins like Lipitor and Zocor.

58.     In addition, Senator Chuck Grassley, in another letter to defendant Clark and Schering CEO Hassan, disclosed email communications which clearly indicated an intent by

Defendants to convince doctors to prescribe Vytorin, at the expense of patients' health and pocketbooks. Defendants knowingly embarked on a "49 Plan" which was designed to "wine and dine" doctors after the initial release of the disappointing results. This campaign had a budget of $3.5 million.

59.     Additionally, emails show that defendants were accused by Dr. John P. Kastelein -- the lead outside investigator on the ENHANCE trial-- of delaying the results because they were bad. An email from Dr. Kastelein dated July 6, 2007, to Dr. Rick Veltri, a vice president at the Schering-Plough Research Institute and John Strony, another Schering executive, stated as follows:

> "Is it correct that [Schering-Plough] has decided not to present at AHA, **but to await the two other, completely unvalidated, endpoints, which analysis is going to take us straight into 2008**??!!??"

> "If this is true, [Schering-Plough] must have taken this decision without even the semblance of decency to consult me," he wrote, according to the letter released by Sen. Grassley. "I can tell you if this is the case, our collaboration is over. **This starts smelling like extending the publication [of the study] for no other [than] political reasons and I cannot live with that**."

> The next day in another email, the investigator indicated that as a result of the delay, "**you will be seen as a company that tries to hide something and I will be perceived as being in bed with you!**" (emphasis added.)

60.     As a result of these disclosures, Merck's stock price fell from $44.51 on March 28, 2008 to a close on March 31, 2008 (the next trading day) of $37.95 on extremely heavy volume, a one-day decline of approximately 15%. On March 31, 2008, the Dow Jones Industrial Average rose 46.5 points and the S&P 500 rose 7.5 points.

61.     Media accounts stated that the drop in Merck's stock price was caused by the disclosure of the full ENHANCE trial results. For example, *Bloomberg* reported that Merck

"sank in New York trading after heart doctors said millions of people taking the cholesterol pills Vytorin and Zetia should switch to older, cheaper drugs that work as well," and that the 15% decline was "the biggest drop since Sept. 30, 2004, when it withdrew its painkiller Vioxx." *Marketwatch.com* reported that shares of Merck "hit the skids on Monday, retreating in the wake of the release of additional clinical data that showed their cholesterol drug Vytorin was not any more effective in battling heart disease that a cheaper generic."

## SCIENTER ALLEGATIONS

62.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Merck, their control over, and/or receipt and/or modification of Merck's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Merck, participated in the fraudulent scheme alleged herein.

63.     Defendants were personally motivated to engage in the wrongdoing herein in order to sell their personally-held Merck stock at prices that were artificially inflated by Merck's false statements. Defendant Clark sold $2 million of his shares in May 2007; he did not have **any** previous selling activity since 2002. CFO Judy Lewent sold $10 million of her shares in July and August 2007.  In total, insiders grossed $26 million worth of shares during the Class Period.

## LOSS CAUSATION

64.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by plaintiff and the Class.  During the Class Period, plaintiff and the Class purchased securities of Merck at artificially inflated prices and were damaged when the price of Merck common stock declined when the misrepresentations made it to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. Specifically, Merck's stock began to decline on January 14, 2008, with the release of the preliminary ENHANCE results, continued to decline as the market digested the news and the uproar surrounding the news, and then declined dramatically on March 31, 2008, when the full ENHANCE results were released.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Merck publicly traded securities during the Class Period July 24, 2006 through and including March 28, 2008 (the "Class").  Excluded from the Class are Defendants.

66.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Merck has over 2 billion shares of stock outstanding, owned by thousands of persons, with on average daily trading volume in excess of 1 million shares during the Class Period.

67.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the prices of Merck's publicly traded securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

68.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

69.     Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

71.     At all relevant times, the market for Merck's common stock was an efficient market for the following reasons, among others:

(a)     Merck common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Merck filed periodic public reports with the SEC and the NYSE;

(c)     Merck regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Merck was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

72.     As a result of the foregoing, the market for Merck common stock promptly digested current information regarding Merck from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Merck common stock during the Class Period suffered similar injury through their purchase of Merck common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

73.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Merck who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of
### the Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Merck common stock.  Plaintiff and the Class would not have purchased Merck common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered economic damages in connection with their purchases of Merck common stock during the Class Period when the truth was disclosed, causing the value of Merck's stock to decline dramatically.

**COUNT  II**
**Violation of Section 20(a) of**
**the Exchange Act Against Defendant Clark**

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     Clark acted as controlling person of Merck within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of his positions as officer and/or director of Merck, and his ownership of Merck stock, Clark had the power and authority to cause Merck to engage in the wrongful conduct complained of herein.  By reason of such conduct, Clark is liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By: _____/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated:  May 5, 2008

- 31 -

Christopher J. Keller
Andrei V. Rado
Alan I. Ellman
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
(212) 907-0700

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury as to all issues so triable.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By: _____/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated:  May 5, 2008

Christopher J. Keller
Andrei V. Rado
Alan I. Ellman
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
(212) 907-0700

- 33 -