| | |
|---|---|
| Jay W. Eisenhofer | Salvatore J. Graziano |
| Daniel L. Berger | Adam H. Wierzbowski |
| John C. Kairis | Laura H. Gundersheim |
| Jeff A. Almeida | Sean O'Dowd |
| Diane T. Zilka | BERNSTEIN LITOWITZ |
| GRANT & EISENHOFER P.A. | BERGER & GROSSMANN LLP |
| 1201 N. Market Street | 1285 Avenue of the Americas |
| Wilmington, DE  19801 | New York, NY  10019 |
| Telephone:  (302) 622-7000 | Telephone:  (212) 554-1400 |
| Facsimile:  (302) 622-7100 | Facsimile:  (212) 554-1444 |

*CO-LEAD COUNSEL FOR THE CLASS*                    *CO-LEAD COUNSEL FOR THE CLASS*

| | |
|---|---|
| James E. Cecchi | Stephen A. Weiss |
| CARELLA, BYRNE, CECCHI | Christopher A. Seeger |
| OLSTEIN, BRODY & AGNELLO | SEEGER WEISS LLP |
| 5 Becker Farm Road | 550 Broad Street |
| Roseland, NJ  07068-1739 | Newark, NJ  07102 |
| Telephone:  (973) 994-1700 | Telephone:  (973) 639-9100 |
| Facsimile:  (973) 994-1744 | Facsimile:  (212) 584-0799 |

*CO-LIAISON COUNSEL FOR THE CLASS*               *CO-LIAISON COUNSEL FOR THE CLASS*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE MERCK & CO., INC. VYTORIN/ZETIA SECURITIES LITIGATION | Civil Action No. 08-2177 (DMC) (JAD) |

**LEAD PLAINTIFFS' REPLY TO DEFENDANTS' LIMITED OPPOSITION TO MOTION FOR LEAVE TO FILE THE FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................................... 1

II. COUNTER-STATEMENT OF FACTS ................................................................................ 4

    A.    CW 1's Sudden Change Of Heart Is Based On Her Fear Of Merck Retaliation, And There Is No Evidence Of Wrongdoing ............................................... 4

    B.    CW 3 Testified That Virtually All Of The Statements Attributed To Him Were Entirely Accurate ........................................................................................................ 7

    C.    The Statements Attributed To CW 5 Are Accurate And Supported By Substantial Evidence ..................................................................................................................... 8

III. ARGUMENT ..................................................................................................................... 10

IV. CONCLUSION………………………………………………………………………..12

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*City of Livonia Emples. Ret. Sys. v. The Boeing Company*,
   2011 U.S. Dist. LEXIS 22347 (N.D. Ill. Mar. 7, 2011) ........................................................... 10

*In re Sony Corp. SXRD Rear Projection TV Mktg.*,
   268 F.R.D. 509 (S.D.N.Y. 2010) ..................................................................................... 10, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 11 .............................................................................................................. 1, 10, 11

Fed. R. Civ. P. 15(a) ............................................................................................................... 1

Lead Plaintiffs Stichting Pensioenfonds ABP, International Fund Management, S.A. (Luxemburg), the Jacksonville Police and Fire Retirement System, and the General Retirement System of the City of Detroit (collectively referred to as "Lead Plaintiffs"), by their undersigned attorneys, submit the following reply to Defendants' Limited Opposition to Plaintiffs' Motion for an Order granting leave to file the First Amended Consolidated Complaint for Violation of the Federal Securities Laws (hereafter, the "Amended Complaint").

## I. INTRODUCTION

Defendants submitted a "limited" opposition to Lead Plaintiffs' motion for leave to amend arguing that Lead Plaintiffs "should be required to strike from the proposed Amended Complaint all statements attributed to 'confidential witnesses' that have been disavowed, or for which they lack adequate support." Def. Mem. at 11. Under Defendants' incorrect view, Lead Plaintiffs should be required to amend their complaint each time a witness is deposed and says something allegedly inconsistent with an allegation in the complaint. The Federal Rules provide otherwise. Lead Plaintiffs do not have a "blank check" to amend the Complaint after each deposition even if there were merit to Defendants' baseless assertions regarding the testimony of confidential witnesses ("CWs"). Fed. R. Civ. P. 15(a). To the contrary, the Scheduling Order in this case provides the timeline for proposed amendments, and Lead Plaintiffs adhered to it.

More importantly, Lead Plaintiffs have a good faith basis and evidentiary support for all of the allegations in the Amended Complaint (*see* Fed. R. Civ. P. 11(b)(3)), including allegations relating to the CWs, and they believe that further evidentiary support will be gathered in discovery, which (as Defendants acknowledge) has just recently commenced with respect to CWs.

Defendants raise no legitimate factual or legal grounds to oppose Lead Plaintiffs' motion. Instead, Defendants have attempted to use Lead Plaintiffs' motion as an opportunity to raise a

host of false and irresponsible allegations of misconduct relating to CWs, which has little to do with the present motion for leave to amend. Indeed, half of Defendants' 10-page memorandum is devoted to discussing the fact that CW 1 disavowed the statements attributed to her in the original Complaint despite the fact that they acknowledge that all allegations relating to CW 1 (consisting of 6 sentences) *were already removed* from the Amended Complaint. While Defendants claim that this should have been done sooner, they ignore the fact that it was their foot-dragging in document discovery (which was supposed to be substantially completed in advance of the original date set for any motions to amend the pleadings on November 1, 2010, but which dragged on through the end of April 2011) that caused the repeated need to extend the date for the submission of Lead Plaintiffs' Amended Complaint. *See* Dkt 97 [Stipulated Amendment to Pretrial Scheduling Order, moving date to amend to January 3, 2011]; Dkt 116 [Third Stipulated Amendment to Pretrial Scheduling Order, moving date to amend to April 29, 2011]; Dkt 221 [Fifth Stipulated Amendment to Pretrial Scheduling Order, moving date to amend to June 3, 2011]. Under these circumstances, Lead Plaintiffs were not under any obligation to amend any sooner than they did, given the potential for prejudicing their entire case through a premature amendment designed only to remove a few immaterial sentences or phrases attributed to a CW.

      Besides raising false accusations unsupported by the record with respect to CW 1 – which are now also irrelevant to the Amended Complaint – the remainder of Defendants' "limited" opposition is spent taking incomplete, out-of-context deposition quotes from just two other CWs (CW 3 and CW 5) in a tortured effort to demonstrate that these CWs have recanted and rejected the statements attributed to them in the Amended Complaint. Defendants' semantic gymnastics notwithstanding, these CWs did not recant. Defendants are well-aware that these CWs, as well as other CWs already deposed, substantially (if not completely) *affirmed the truth*

of the allegations in the original Complaint attributed to them, or did not recall the specifics of their voluntary conversations with Lead Plaintiffs' investigators which took place more than 3 years ago. This is hardly surprising, and any minor contradiction or inconsistency between the CW's current testimony and their statements made to Lead Plaintiffs' investigators years ago, can be attributed to the confidential sources' changing recollections based on fear of Merck retribution (with respect to CW 1), the leading, and at times misleading, questions of Defense counsel (with respect to CW 3), or a lack of recollection (with respect to CW 5). Again, none of this is particularly shocking or unusual in a case such as this.

Moreover, most of the CWs, including CW 1, have not even been deposed.[1] Those who have been deposed have substantially confirmed the truth of the allegations in the Complaint attributed to them. Through their present amendment, moreover, Lead Plaintiffs have already accomplished what Defendants seek by removing all factual allegations attributed to CW 1 (based on her strenuous complaints, and even though the actual allegations attributed to her may prove to be true) and by removing a single, immaterial phrase attributed to CW 3. No other CWs, including CW 5, have provided any basis for Lead Plaintiffs to further amend the complaint.

In light of the above and as will be explained in detail below, Defendants have provided no substantive reasons why Lead Plaintiffs' motion should be denied. To the contrary, their "limited" opposition rests on little more than their own tortured reworking of the record in an

---

[1] Notably, Defendants have deposed only four CWs. Two of the Merck CWs had scheduled deposition dates that were taken off calendar by Defendants. Defendants informed Lead Plaintiffs that they will not seek to depose one of these CWs. No other CW deposition in the Merck case is presently scheduled, including CW 1, despite the close of discovery on August 1, 2011.

effort to create an issue where none exists. To borrow from the language of Defendants, their motion goes too far, and says too much.

## II. COUNTER-STATEMENT OF FACTS

As part of their thorough investigation of the fraud committed by Merck in suppressing the negative clinical trial results of ENHANCE, Lead Plaintiffs' investigators sought out former employees and witnesses who might be willing to provide relevant knowledge. *See* Declaration of Jeff Almeida in support of Lead Plaintiffs' Reply to Defendants' Limited Opposition ("Almeida Decl.") (submitted herewith) at ¶ 2. There is no evidence, aside from Defendants' unsupported speculation and untested hearsay, that any information was obtained involuntarily or under false pretenses. *See* Def. Memo. at 3. Indeed, *all* of the CWs deposed to date have testified specifically that they were fully apprised that the purpose of the interview was for use in litigation, and that the investigator was acting on behalf of "plaintiffs" in this litigation. *See* Almeida Decl. at Ex. A (Amaru Dep. Tr. at 13: 14 - 15: 2; 56: 17 – 59: 20; 74: 1 – 75: 13); Ex. B (Scarborough Dep. Tr. at 36: 24 – 37: 17; 45: 24 – 46: 10); Ex. C (Skelly Dep. Tr. at 28; .33: 7-17); Ex. D (Bond Dep. Tr. 125: 3-17). Indeed, when CW 3 (Amaru) was asked how he felt about "plaintiffs using you as a confidential witness in this case," CW 3 testified:

> I'm happy to help out. You know my – my biggest personal concern is just, you know, time is money for me. And, yes, I don't mind being, as far as – thinking about it now, I don't mind helping out.

*Id.* at 59: 9-20.

### A. CW 1's Sudden Change Of Heart Is Based On Her Fear Of Merck Retaliation, And There Is No Evidence Of Wrongdoing

CW 1 presents a special case. Even though she was friendly and cooperative with independent investigators during her original *two* interviews, she was unusually angry and irate when subsequently contacted by Lead Plaintiffs' counsel in August 2010 to assess whether she

4

cared if Lead Plaintiffs disclosed to her name to counsel for Merck. Almeida Decl. at ¶ 3. CW 1 stated very clearly during this conversation that she absolutely wanted to preserve her confidentiality because in her present position at a medical marketing firm (where she started in January 2009, several months after her cooperative initial investigative interview in August 2008) she depended heavily in her business on Merck and her former colleagues and connections at Merck. *Id.* at ¶¶ 4-5. She told Lead Plaintiffs' counsel very clearly that she feared that disclosure of her identity would destroy those relationships, and would compromise her business and employment. *Id.*. Lead Plaintiffs' counsel informed her that they could endeavor to keep her identity confidential through the submission of an affidavit executed by her, but expressly provided "no promises or assurances because we have to do what the Court tells us to do" in terms of disclosing her identity.[2] *See* Almeida Decl. at ¶ 5; *see also*, Gordon Aff. at Ex. 8.

Upon reviewing the *first draft* of the affidavit, CW 1 expressed concerns about statements in the affidavit and statements that were being attributed to her in the litigation, but stated "[i]f I can edit this [affidavit]…then I can sign it." Almeida Decl. at ¶ 6; Gordon Aff. at Ex. 10 (NM_00021). Defendants make the very serious and false allegation (against a member of the Bar of this Court) that Lead Plaintiffs' counsel "pressed CW 1 to sign a false affidavit" and "urg[ed] witnesses to sign affidavits that contained false statements." Def. Mem. at 7, 10. This is grossly inaccurate and irresponsible. Almeida Decl. at ¶ 7. Only after CW 1 specifically told counsel for Lead Plaintiffs during a telephone call that she had *a substantial fear of retaliation by*

---

[2] Notably, for all those CWs who expressed no concerns for their confidentiality on account of fears of Merck retaliation or otherwise, in response to Defendants' explicit request Lead Plaintiffs simply disclosed the names to Defendants. *See* Gordon Aff. At Ex. 5 (Letter, dated Aug. 16, 2010, disclosing the names of the 6 CWs who did not specifically request confidentiality). Thus, contrary to the false picture presented by Defendants, the Lead Plaintiffs were not attempting forever shield the identities of the CWs. In fact, Lead Plaintiffs sought specifically to *disclose* the names and only attempted to preserve confidentiality when expressly requested to do so by the CWs.

*Merck* and after she further stated that she was certain she spoke truthfully to the investigator, did Lead Plaintiffs' counsel send CW 1 a *draft* affidavit which was based on the information contained in her investigative report (which report was prepared contemporaneously with the telephone interviews of CW 1). *Id.* at ¶¶ 5-6.  When CW 1 told Lead Plaintiffs' counsel that the draft affidavit contained inaccuracies and questioned if she could edit the document, Lead Plaintiffs' counsel told CW 1 specifically:

> ***You can edit the affidavit*** but I would suggest sending it to me before you sign that [sic] I can review it.  The key parts are that you have some fear of retaliation given your present job and you spoke the truth when speaking to investigators a year or two ago.  ***Beyond that, it can be changed and should be changed to make it as accurate as possible.***

Gordon Aff. at Ex. 10 (NM_00020).  CW 1, in fact, *did edit the affidavit to make it accurate, and endorsed it by affixing her electronic signature.*  Compare *Id.* at Ex. 8 (NM_00034-36) with Ex. 9 (NM_00028-30); *see also* Almeida Decl. at ¶ 6 & Ex. L.  The affidavit, however, was never submitted and CW 1's identity was disclosed pursuant to Defendants' request and based on the state of law on disclosing the identities of CWs in litigation.

Subsequent to the disclosure of CW 1's identity, but prior to her deposition (which was recently taken off calendar by Defendants), Lead Plaintiffs submitted the Amended Complaint which removed the six sentences of allegations attributed to her.  Lead Plaintiffs continue to believe, however, that the original allegations attributed to CW 1 in ¶¶ 169 and 503 of the original Complaint are factually accurate and supported by substantial evidence.  In this regard, CW 1 never questioned a single word attributed to her in ¶ 169, and never provided specifics as to her concerns with ¶ 503 – the most CW 1 said was that it "is incorrect…or at a minimum completely taken out of context."  Almeida Decl. at ¶¶ 8-9; Gordon Aff. at Ex. 10.  Based on this, and the fact that the statements attributed to CW 1 have very little bearing on the ultimate

proofs in this case, Lead Plaintiffs removed *all* allegations attributed to CW 1, believing them to be more trouble than they were worth given CW 1's dramatically changed temperament.

      **B.    CW 3 Testified That Virtually All Of The Statements Attributed To Him Were Entirely Accurate**

Defendants misstate CW 3's testimony. CW 3 testified that everything attributed to him with the exception of one short (and immaterial) phrase was accurate and truthful. Indeed, the only way Defendants were able to get CW 3 to testify about purported inaccuracies was to have him misread the Complaint and mislead him regarding what statements were actually being attributed to him. The only portion of the original Complaint mentioning CW 3 was ¶ 311, which stated as follows:

> 311. In addition to its false and misleading DTC marketing campaign, Merck also targeted doctors and other medical professionals with its false and misleading marketing message. According to Confidential Witness #3 ("CW 3"), who was a Merck "Executive Specialty Sales Representative" specializing in Merck's cardiovascular drug franchise and who directly sold Vytorin for several years before leaving Merck in mid-2007, Merck salespeople were specifically trained with scripts to pound home the "lower is better" marketing message when providing details to doctors on the benefits of Vytorin. CW 3 said that when his/her doctors asked about Vytorin's efficacy, which was often, s/he would assure them that the results of ENHANCE would be available soon, and assured them it was the best cholesterol drug on the market.

Dkt 24 (Complaint)

Defendants' counsel misled CW 3 (over objections by Lead Plaintiffs' counsel) to believe that the first, introductory sentence in this paragraph was being attributed to him, and CW 3 correctly denied saying anything of the sort. However, when the actual portions of ¶ 311 attributed to CW 3 were read to CW 3 – namely all of the statements after "According to Confidential Witness #3…" – he confirmed repeatedly that they were accurate, with one limited and immaterial exception. *See* Almeida Decl. at Ex. A (Amaru Dep. Tr. 61:12 – 68:24; 83:23 – 87:10; 47:14). With respect to that one limited exception, CW 3 testified that he would *not* have

7

said to physicians that the results of ENHANCE would be available "soon"; rather, he might have only told physicians that "I could not give them a date when, I might have said they are working on it." *Id.* at 44: 20 – 45: 5. Other than this small discrepancy between his testimony and the allegations in ¶ 311 of the original Complaint – which, again, was corrected in the Amended Complaint (*see* Amended Complaint ¶ 308) – CW 3 affirmed the absolute truth of everything attributed to him in ¶ 311.

### C. The Statements Attributed To CW 5 Are Accurate And Supported By Substantial Evidence

Defendants further state that CW 5 (Dr. Gene Bond) denied statements attributed to him in the Complaint. Def. Mem. at 9. To the contrary, CW 5 confirmed the truth of most of allegations attributed to him during his deposition testimony. With respect to those fragments of testimony highlighted by Defendants (*id.*), CW 5 either (a) confirmed they are true, (b) expressed a lack of memory and certainty on the specifics, or (c) the fragments are otherwise corroborated and confirmed to be true from other evidence in this case.

*First*, Defendants state that the Complaint "misleadingly indicates that [CW 5] lacked direct access to the trial databases." *Id.* at 9. There is nothing whatsoever misleading about this statement. Paragraph ¶ 176 of the original Complaint stated that "[CW 5] did not have direct access to any of the databases" and CW 5 testified as follows: "Q: So it's true that in ENHANCE you did not have direct access to the database, correct? A: That's correct." Compare Dkt 24 (Complaint) with Gordon Aff., Ex. 18, at 131: 16-19.

*Second*, while CW 5 disavowed that he told investigators that when he needed information he "was forced to request the relevant data from Dr. Strony," he actually only testified that he "did not recall the specifics of this" but stated "I don't believe I used [the word forced]." Gordon Aff., Ex. 18 at 132. Otherwise, CW 5 confirmed that when he wanted data he

8

would indeed request it, including from Dr. Strony.  *Id.*  Further, documentary evidence in this case, gathered after the investigative report and the filing of the original Complaint, corroborates the fact that CW 5 was denied information that he requested, became "very concerned it has taken this long," and only after the intervention of John Strony on his behalf did CW 5 receive the data he was requesting.  Almeida Decl. at Ex. E (Pl. Ex. 77).  Accordingly, it certainly appears to be true, whether Dr. Bond recalled it three years later at his deposition or not, that he was denied information and data he requested, and that he was indeed "forced" to get Dr. Strony involved before receiving the data.  Regardless, this quibbling over the word choice is hardly a material matter that requires amendment in the first place.

*Finally*, Defendants' statement that CW 5 disagreed with the statement that Dr. Strony was "intimately involved in analyzing the ENHANCE data" is overblown.  All of the evidence and testimony in this case confirms that Dr. Strony was indeed "intimately involved" in this capacity, and immediately after the testimony misleadingly quoted by Defendants out of context, Dr. Bond stated "[a]gain, I don't know what I said in this interview now some time four years ago or whatever."[3]  *See* Almeida Decl. at Ex. D (Bond Dep. Tr. at 132-133); *see also id.*, Ex. F (Pl. Ex. 82, showing Dr. Strony's extensive and intimate analysis of ENHANCE study data); Ex. G (Pl. Ex. 79, same); Ex. H (Pl. Ex. 98, same); Ex. I (Pl. Ex. 99, same); Ex. J (Pl. Ex. 65, same); Ex. K (Musliner Dep. Tr. at 26:24 – 27:21; 111 - 113, testifying that Dr. Strony supervised the day-to-day running of the ENHANCE trial as "clinical monitor" and was "intimately" involved in data monitoring and management issues).

---

[3]  Defendants chopped off this portion of CW 5's answer in order to mislead the Court about what CW 5 actually testified.

### III.    ARGUMENT

Defendants' legal grounds to support their limited opposition are weaker and more contrived than their factual grounds.  Defendants do not state they are prejudiced by Lead Plaintiffs' proposed amendment (because they are not), and do not cite a single relevant case involving the denial of a motion for leave to amend.  Instead, Defendants argue that Lead Plaintiffs' Amended Complaint, with respect to the CWs only, is "too little, too late."  Def. Memo. at 10.  They contend it is "too late" because CW 1's contributions to the original Complaint were not removed sooner.  *Id.*  This argument fails.  Lead Plaintiffs' could and would have amended sooner with respect to CW 1 (specifically, on November 2010, the original deadline) if Defendants had complied with their document discovery obligations in a timely fashion.  Defendants' arguments also fails because regardless of some delay there is no showing of prejudice.  Indeed, none of the allegations of CW 1 were material to the survival or success of the original Complaint.  Neither the Court nor Lead Plaintiffs mentioned CW 1's allegations in connection with the motion to dismiss briefing, hearing, or decision.  Thus, this case is easily distinguishable from the two Rule 11 authorities relied upon by Defendants, both of which involved the late addition of dubious CW allegations which were necessary and material to plaintiffs' efforts to revive dismissed complaints.  *See City of Livonia Emples. Ret. Sys. v. The Boeing Company*, CA No. 09 C 7143, 2011 U.S. Dist. LEXIS 22347, at *9-14 (N.D. Ill. Mar. 7, 2011) (finding that reconsideration of motion to dismiss was warranted because the confidential witness allegations "were critical to the survival of the second amended complaint" and dismissal was appropriate because "the two orders denying dismissal relied on false information concerning [the CW's] position and his personal knowledge."); *In re Sony Corp. SXRD Rear Projection TV Mktg.*, 268 F.R.D. 509, 511-512 (S.D.N.Y. 2010) (where dubious and misleading

allegations of CWs were added to revive a dismissed complaint and were relied upon heavily by counsel to show scienter in arguments to the Court).[4]

Defendants' next argument, that Lead Plaintiffs do "too little" because the Amended Complaint does not go far enough in removing CW allegations, is similarly without merit. This argument hinges on easily refutable challenges to the veracity of statements attributed to CW 3 and CW 5 (addressed above), and to Defendants' pure speculation that all other CWs are disavowing the truth of statements attributed to them. As set forth above, Lead Plaintiffs stand by the accuracy of the statements in the Amended Complaint attributed to CW 3, CW 5, and all other CWs. Defendants' arguments otherwise are baseless, and thus there are no legal or factual grounds to support even this "limited" opposition.

---

[4]   *In re Sony Corp.* is also cited in an extremely misleading fashion by Defendants to suggest that a delay of 12 weeks before removing statements in a complaint that were disavowed by CWs was too long, warranting a reprimand. This is incorrect, and *In re Sony Corp.* is entirely inapplicable on that point here. *In re Sony Corp.* was decided in the context of Rule 11, and what drew the reprimand was not the delay of 12 weeks in a general sense, but the fact that the delay was long after Rule 11's 21-day safe-harbor period. *See id.* at 521 (holding specifically that a reprimand was in order for "refusing to strike allegations that were unsupported … until long after the lapse of the safe harbor period. *Rule 11* and its safe harbor provision are expected to be strictly observed by all attorneys and responded to in a forthright manner without foot-dragging.").

## IV.   CONCLUSION

Defendants' "limited" opposition is without merit, based on an incomplete, false and misleading record, and has no bearing whatsoever on Lead Plaintiffs' motion. For these reasons, Lead Plaintiffs respectfully request that their Order granting leave to file the First Amended Consolidated Complaint for Violation of the Federal Securities Laws be granted in full.

|  |  |
|---|---|
|  | CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC<br>*Liaison Counsel for Plaintiffs* |
| Dated:  June 28, 2011 |  |
|  | By:   /s/ James E. Cecchi<br>        JAMES E. CECCHI |

SEEGER WEISS LLP
Stephen A. Weiss
Christopher A. Seeger
550 Broad Street
Newark, NJ  07102
(973) 639-9100
*Co-Liaison Counsel for Plaintiffs*

| | |
|---|---|
| BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP<br>Salvatore J. Graziano<br>Adam H. Wierzbowski<br>Laura H. Gundersheim<br>Sean O'Dowd<br>1285 Avenue of the Americas<br>New York, NY  10019<br>Telephone:  (212) 554-1400<br>*Co-Lead Counsel for Plaintiffs* | GRANT & EISENHOFER P.A.<br>Jay W. Eisenhofer<br>Daniel L. Berger<br>John C. Kairis<br>Diane Zilka<br>Jeff A. Almeida<br>485 Lexington Avenue<br>New York, NY  10017<br>(646) 722-8500<br>*Co-Lead Counsel for Plaintiffs* |

LABATON SUCHAROW LLP
Christopher J. McDonald
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
*Counsel for Named Plaintiff Genesee County Employees' Retirement System*

*OF COUNSEL:*

DIAZ REUS, LLP
Alexander Reus
Bank of America Tower
 at International Place
100 S.E. Second Street, Suite 2600
Miami, Florida 33131
Telephone (305) 375-9220
Facsimile (305) 375-8050