# Exhibit A

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - -

| | |
|---|---|
| IN RE: SCHERING-PLOUGH CORPORATION/ENHANCE SECURITIES LITIGATION | : :CIVIL ACTION NO. :08-397(DMC)(JAD) |

| | |
|---|---|
| IN RE: MERCK & CO., INC. VYTORIN/ZERIA SECURITIES LITIGATION | : :CIVIL ACTION NO. :08-2177(DMC)(JAD) |

| | |
|---|---|
| IN RE: SCHERING-PLOUGH CORP. ENHANCE ERISA LITIGATION | : :CIVIL ACTION NO. :08-1432(DMC)(JAD) |

- - -

VIDEOTAPED DEPOSITION OF

JOSEPH AMARU

- - -

JUNE 1, 2011

- - -

Joseph Amaru

**Page 2**

Videotape deposition of JOSEPH AMARU, taken pursuant to notice, was held at the offices of CompHealth Associates, Inc., 10 Norden Place, Suite 200, Norwalk, Connecticut 06855, beginning at 10:30 a.m., on the above date, before Amanda Dee Maslynsky-Miller, a Certified Realtime Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

**Page 3**

APPEARANCES:

FOR THE SECURITIES PLAINTIFFS:

JEFF A. ALMEIDA, ESQUIRE
GRANT & EISENHOFER, PA
1201 North Market Street
Wilmington, Delaware 19801
(302) 622-7000
Jalmeida@gelaw.com

FOR THE DEFENDANT MERCK/SCHERING-PLOUGH:
ANDREW G. GORDON, ESQUIRE
DANIEL J. JUCEAM, ESQUIRE
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON, LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3697
agordon@paulweiss.com
djuceam@paulweiss.com
- and -

VIA TELEPHONE:
JULIA A. DERISH, ESQUIRE
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON, LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3697
jderish@paulweiss.com

**Page 4**

APPEARANCES (continued)

FOR THE DEFENDANT MERCK/SCHERING-PLOUGH:

VIA TELEPHONE:
MONICA PERRETTE, ESQUIRE
LOWENSTEIN SANDLER, PC
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500
Mperrette@lowenstein.com

FOR THE UNDERWRITER DEFENDANTS:

JEFFREY J. GREENBAUM, ESQUIRE
SILLS, CUMMIS & GROSS, P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
Jgreenbaum@sillscummis.com

ALSO PRESENT:  Robert Sweig, Videographer

**Page 5**

- - -
INDEX
- - -

Testimony of: Joseph Amaru
                              PAGE
By Mr. Gordon                  10
By Mr. Almeida                 83

- - -
EXHIBITS
- - -

NO.         DESCRIPTION             PAGE

Exhibit 233  Subpoena of
             Joseph Amaru            48

Exhibit 234  5/16/11 Letter from
             Amaru to Juceam         50

Previously Marked Exhibits

Defendants'
Exhibit 7   Complaint                60

Joseph Amaru

Page 10

1         - - -
2         EXAMINATION
3         - - -
4   BY MR. GORDON:
5       Q.  Good morning, sir.  Could
6   you state your name and address for the
7   record, please?
8       A.  Joseph Amaru.  16
9   Whippoorwill Road, Bethel, Connecticut,
10  06801.
11      Q.  Let me just take a second
12  and introduce myself.  My name, as I
13  mentioned, is Andrew Gordon.  And I'm
14  with Paul Weiss, and we represent Merck
15  and Schering-Plough and certain of the
16  defendants in this litigation.
17          Are you familiar with this
18  litigation?
19      A.  Very vaguely.
20      Q.  How are you familiar with
21  it?
22      A.  I asked before what this was
23  about, and it's a securities case about
24  Vytorin.  That's all I know.

Page 11

1       Q.  Have you spoken to anybody
2   at any point in time about this
3   litigation?
4       A.  Somebody called me
5   originally to ask me a few questions and,
6   then he called -- somebody else called
7   again.  And that was it.
8       Q.  And when you said "somebody"
9   called you to ask you a few questions,
10  did you get a name of the person who
11  called you?
12      A.  I don't remember his name.
13      Q.  But it was a gentleman --
14      A.  He seemed pretty official, I
15  don't know who he was.  I asked him a lot
16  of questions at the time, but this was
17  months ago.
18      Q.  And do you recall any of the
19  questions he asked you?
20      A.  The only thing I can
21  remember, he was asking about -- you
22  know, I can't be exactly sure.  It was
23  about Vytorin, and I couldn't give you
24  any specifics about the questions.  I

Page 12

1   just know it was about Vytorin.
2       Q.  And do you recall any of the
3   answers that you gave or what you told
4   him generally?
5       A.  No, I don't recall my
6   answers.  I know what they would be, that
7   I know.
8       Q.  What do you mean by that?
9       A.  Well, because the same
10  answers I would present to him I'll
11  present to you today, because I had very
12  defined responsibilities with Merck and
13  follow that to the letter.
14      Q.  So we'll come back to your
15  tenure at Merck.
16          Did the person who called
17  you identify yourself --
18      A.  There were two phone calls.
19      Q.  Okay.
20      A.  Are you talking about the
21  first or the second?
22      Q.  Were they both with the same
23  person?
24      A.  I don't know.  I thought

Page 13

1   they were, but I can't -- I'm not sure.
2       Q.  So let's focus.
3           This first call, you don't
4   recall when it was, do you?
5       A.  Just months ago, months and
6   months ago.  Three months, six months.  I
7   can't be sure.
8       Q.  And you spoke generally, you
9   answered some questions about Vytorin?
10      A.  Yes.
11      Q.  And you don't recall the
12  person's name with whom you spoke?
13      A.  No, I don't.
14      Q.  And did the person identify
15  himself?
16      A.  He did.
17      Q.  And did he tell you why he
18  was calling?
19      A.  Yeah.  I'm sure I asked a
20  lot of questions about that, who I was
21  speaking to and what I was getting
22  involved with here and all.
23          So he did ask me -- he did
24  tell me who he was, yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Joseph Amaru

Page 14

1  Q. And do you recall -- I know
2  you don't remember the name, but do you
3  recall anything generally about the
4  person you spoke with?
5  A. No. No. The first guy
6  seemed very nice.
7  Q. Did they tell you they were
8  a lawyer, an investigator?
9  A. I don't remember, I'm sorry.
10 Q. No, that's okay.
11     Did they tell you who they
12 were representing or why they were
13 calling?
14 A. You know, I can't be 100
15 percent sure who he represented.
16 Q. What is your --
17 A. What is my recollection?
18 Q. Your best recollection.
19 A. He just told me there was a
20 case about Zetia and Vytorin and wanted
21 to ask me a few questions. And I said
22 who are you? He identified himself. I
23 felt satisfied that he was legit, and I
24 knew I was going to be honest with my

Page 15

1  answers, so I didn't have much problems
2  answering his questions.
3  Q. And then there was a second
4  call?
5  A. Yes.
6  Q. And I take it your
7  recollection is no better about that call
8  than the first call?
9  A. Well, the second call, he
10 was reading back to me my answers. And,
11 to my recollection, it wasn't the answers
12 I had originally given. Because I had
13 very defined responsibilities, so I would
14 have a very defined answer to anything
15 that came up with this.
16     And I just felt that what he
17 was saying wasn't what I had said. I
18 don't know how he put it in different
19 context or whatever, but I didn't feel it
20 was right. And I actually tried to
21 divorce myself from the proceeding,
22 saying, listen, that's not what I said.
23 I really don't want to be involved with
24 this.

Page 16

1  Q. And when you say "divorce"
2  yourself from the proceedings, what do
3  you mean?
4  A. I mean, I felt what you're
5  saying to me now I know is not what I
6  would have said the first phone call. So
7  since you're not being completely honest
8  with what I had thought I had said and my
9  intentions here, I felt, you know, this
10 is -- I really don't want to be involved
11 with this, because you're not -- you're
12 not playing fair here.
13 Q. Okay. So we'll come back to
14 your responsibilities.
15     But other than those two
16 calls, do you recall any other
17 conversations you've had about the
18 litigation?
19 A. Just with Mr. --
20 Q. Juceam?
21 A. -- Dan here.
22 Q. Setting up this deposition?
23 A. Right. Right.
24 Q. Currently -- let me step

Page 17

1  back and get some background, if you
2  don't mind.
3      Let me just say one thing
4  before we begin. I'm going to be asking
5  you a series of questions today. And I
6  only have two basic requests. One is,
7  for the sake of the court reporter, if
8  you let me finish my question before you
9  answer; and you have to answer audibly,
10 shaking the head, nodding doesn't do much
11 for the court reporter.
12     Is that all right?
13 A. Sure. Have I been okay with
14 that so far?
15 Q. You just passed.
16     And then the second thing
17 is, if you don't understand anything I'm
18 asking, just tell me, and I'll try to
19 re-jigger the question and make it more
20 understandable.
21     My wife will tell you that
22 that is not a great skill, but I'll try.
23 A. Right.
24 Q. You currently work where,

5 (Pages 14 to 17)

Joseph Amaru

Page 42

1  other -- other drugs, it did -- the
2  physicians would do it on their own. And
3  with HIV people were dying, so physicians
4  would try anything to help out. So the
5  physicians would go off label.
6      But we -- Merck was emphatic
7  about staying on label. That -- the
8  physicians had their own studies that
9  they were doing, but we couldn't go
10 there.
11     Q. When you met with doctors
12 and were talking about Zetia and/or
13 Vytorin, would you ever use the phrase
14 lower is better?
15     A. Yes.
16     Q. And what is your
17 understanding of the -- that phrase.
18     A. My understanding of that
19 phrase, if you lower -- they did have
20 studies that if you lowered cholesterol,
21 or LDL, you would lower incidence of, to
22 my recollection, heart attacks and
23 cardiovascular disease and they --
24 that -- and there was a -- you know, I'm

Page 43

1  going to say cardiovascular disease.
2      Q. And did you think there was
3  anything untrue about telling physicians
4  that lower was better?
5      A. I attended lots of seminars,
6  independent and from a multitude of
7  sources outside -- you know, just from
8  going to all scientific meetings,
9  speaking with physicians, what was in the
10 literature. Lower was better.
11     But they didn't -- they
12 didn't know how low to go. They felt
13 that there should be some LDL in your
14 system, but they couldn't -- had yet to
15 determine what the magic number was that
16 would be perfect. They would talk about
17 babies were even born with LDL, so they
18 thought that might be a good -- well,
19 something to look at.
20     Q. So I take it there was
21 nothing untrue about saying that there
22 were studies that showed that lower was
23 better?
24     A. Right.

Page 44

1      Q. Now, I believe you said
2  doctors -- well, strike that.
3      Did doctors ask questions
4  about Vytorin?
5      A. Sure.
6      Q. Do you recall anything that
7  they asked?
8      A. Well, they would ask about
9  when are you coming out with a -- that
10 was the outcomes trial, an outcomes
11 trial. There were no outcomes.
12     Q. Right.
13     A. So now that I think back, I
14 remember we had surrogate trials. But
15 outcomes is when they could definitively
16 say about it. I believe Zocor did, and I
17 know some other -- Lipitor does, they
18 have a lot of studies. I know Zocor did,
19 but Zetia did not and Vytorin did not.
20     Q. Okay. What did you tell
21 them when they asked about outcomes
22 trial?
23     A. I'd say, I have no outcomes
24 trial, and I could not give them a date

Page 45

1  when. I might have said they're working
2  on it. But I really could not go beyond
3  that, and that's why I always stayed away
4  from that, so as not to get myself in
5  trouble.
6      Q. Right. And I take it --
7      A. You know, I don't even think
8  I would say they're working on that,
9  because I would have -- I would have
10 towed the company line, you know, we
11 don't have the studies, they're working
12 on it -- I might have said they're
13 working on some studies, I don't know
14 what they are, I don't have any
15 information on it so I can't comment on
16 it. I might have gone that far and
17 then -- but that would have been the
18 company line, then.
19     Q. How about any other
20 questions you can recall?
21     A. Oh, questions?
22     Q. About Vytorin.
23     A. I'd tell them how much it
24 lowered -- they would ask about side

12 (Pages 42 to 45)

Golkow Technologies, Inc. - 1.877.370.DEPS

effects, they would ask about mechanism of action, they would ask about dosing, they would ask about drug interactions.
Q. And I take it whatever they asked, you'd give truthful responses?
A. Right. The idea was to memorize the product information and that was your job.
Q. How about ENHANCE, did they ask questions about ENHANCE?
A. You know, most of the physicians realized that we were not allowed to talk about an ongoing study before it was published. So most of them would -- would honor that and not go any deeper.
Maybe out of the hundreds of physicians I spoke, some would -- might press me on it, and that's one of the reasons why I always -- just personally decided not to learn about it so I could never get myself into trouble. So even when they asked me, when is it coming out, I would have to give my truthful

answer is, I really don't know.
Especially being in pharmaceuticals for so long, because now I had 15 years in the business, things go wrong all along the line. Even when a drug comes out, they take it off the market because they found something. So I -- one of my life's lessons is you don't -- you live in certainties, you don't live in projections.
Q. Did you ever tell doctors, in words or substance, that Vytorin was the best cholesterol drug on the market?
A. I would think I did. It was the best.
Q. I take it you believe that to be a true statement?
A. I did believe that to be truthful. It was the best product to lower your LDL. And I had the studies to prove it.
Q. Do you recall what studies you had?
A. No, I can't remember. I

don't think they had names that I can -- I don't think they had names.
Q. Okay. But I take --
A. We had tons of studies, though.
Q. Right.
A. Lots of studies.
Q. I take it you had information that would back up --
A. Sure.
Q. -- your claim?
A. Had to. Had to.
Q. Now, I've asked you about this litigation. And I -- first, as a housekeeping matter, I want to mark an exhibit which is the subpoena that was served on you in this litigation.
- - -
(Whereupon, Exhibit-233, Subpoena of Joseph Amaru, was marked for identification.)
- - -
MR. GORDON: I'll mark this as Exhibit -- Defendant's Exhibit

233.
BY MR. GORDON:
Q. And while you're flipping through, Exhibit 233 is a subpoena to Joseph Amaru that was served in this matter.
Do you recognize this document?
A. I recognize Page 1; Page 2 looks pretty familiar; Page 3 looks familiar; Page 4 definitely looks familiar; Page 5 looks familiar; 6 kind of.
I'm sure I read through this. But this last page does not look familiar to me.
Q. Right. These last two pages --
A. I got that right.
Q. -- would have been the -- just indicating that you were served.
A. Who is Eric Bruen?
Q. He's the person who served you with the subpoena.

Joseph Amaru

Page 54

1  Q. And I take it you have no
2  information, one way or the other, about
3  the claims as to whether or not Merck was
4  forthcoming with information in a timely
5  fashion?
6  A. I would not have the
7  information, because it was always --
8  because Merck was pretty, really -- the
9  information they gave me, they would not
10 release any information to me until the
11 study was done.
12      So I don't know how many
13 people were in it, I don't know who the
14 lead investigator was, I don't know where
15 the trial was being conducted. I
16 couldn't tell you the parameters of the
17 study. I couldn't tell you if it was
18 surrogate or outcomes.
19 Q. And I take it you couldn't
20 tell us anything about when people
21 learned the results or whether they
22 released the results in a timely and
23 forthcoming matter?
24 A. I could not tell you

Page 55

1  anything about that. I was gone by the
2  time -- when the study came out. When I
3  was there, there was just -- the ENHANCE
4  study was coming. And that was the only
5  information they gave. The information
6  was, the ENHANCE study is coming, we'll
7  give you information when we can, we
8  can't right now, therefore, do not
9  discuss it. It's not an approved piece
10 of information.
11 Q. Give me one second. We
12 don't have to go off.
13      - - -
14      (Whereupon, a discussion off
15      the record occurred.)
16      - - -
17 BY MR. GORDON:
18 Q. Now, you told us about a
19 conversation -- or two conversations you
20 had earlier about --
21 A. Yes.
22 Q. -- this litigation.
23      Do you recall whether or not
24 Mr. Almeida was the person who called

Page 56

1  you?
2  A. I can't tell you, I don't
3  know.
4  Q. I'm just going to try some
5  names.
6      Dan Berger?
7  A. You know, I'm in the names
8  business, I come across so many names.
9  And I'm having trouble keeping --
10 Q. It's not going to --
11 A. -- the names straight.
12 Q. -- help if I give you a
13 list?
14 A. You know, I couldn't -- you
15 can try some names, but I don't think
16 it's going to work.
17 Q. Okay. Did the -- did the
18 person, at the very least, say to you
19 that they were going to -- that they were
20 calling you on behalf of the plaintiffs
21 in the litigation?
22 A. You know, I really can't --
23 I really don't remember. I kind of think
24 that it was for the plaintiff, yeah.

Page 57

1  Q. Did they tell you what the
2  purpose of the call was?
3  A. I don't remember.
4  Q. Okay. Were you informed --
5  A. It was just to get
6  information.
7  Q. Were you informed that that
8  information or that your statements might
9  be used in a public filing with the
10 court?
11 A. Yes, they did.
12 Q. And what did you tell them
13 about that?
14 A. I don't want to get involved
15 in this, something to that effect.
16 Q. Did they ask you for your
17 permission?
18 A. You know, it all started
19 getting very hazy. What my rights were,
20 what my role was going to be in this,
21 what was -- just ask me a question, what
22 was an official question. I don't
23 think -- there was never anything that
24 said, this is off the record, I never

15 (Pages 54 to 57)

Joseph Amaru

Page 58

```
 1   heard that.
 2           But it was very, as I
 3   recall, kind of a friendly conversation
 4   of fact-finding -- fact-finding kind of
 5   thing. So, I'll -- you know, I'll help
 6   you find the facts, I have no problem
 7   with that.
 8           Then he said would I be -- I
 9   asked would I be called to court. They
10   said, well, we're going to -- well, we
11   have this confidential witness and you
12   can try -- as I recall, he said you could
13   try to be a confidential witness but
14   there's no guarantees. I said, all
15   right. All right.
16           But I -- I think I did say I
17   prefer to be confidential and I prefer
18   not to -- I really don't have -- didn't
19   have a lot of information, since I wasn't
20   there when the ENHANCE trial came out and
21   just what I told you today.
22       Q.  Did you tell them that you
23   didn't want your statements being used in
24   public documents?
```

Page 59

```
 1       A.  I don't think I would have
 2   said that.
 3       Q.  They did tell you that you
 4   were going to be a confidential witness?
 5       A.  Cannot -- I think I
 6   requested it, but I can't -- I have to
 7   admit, it was fuzzy; it was fuzzy at the
 8   time and it's just as fuzzy today.
 9       Q.  How do you feel about the
10   plaintiffs using you as a confidential
11   witness in this case?
12           MR. ALMEIDA: Objection.
13           MR. GORDON: You can answer.
14           THE WITNESS: I'm happy to
15       help out. You know, my -- my
16       biggest personal concern is just,
17       you know, time is money for me.
18       And, yes, I don't mind being, as
19       far as -- thinking about it now, I
20       don't mind helping out if I can.
21   BY MR. GORDON:
22       Q.  I take it when you say
23   "helping out," you're not trying to help
24   out one side or the other?
```

Page 60

```
 1       A.  No. I have to be perfectly
 2   honest.
 3       Q.  You're going to call it like
 4   you see it?
 5       A.  I have to do it that way,
 6   otherwise I get myself -- that's the way
 7   I live, because this way you can't get
 8   yourself into trouble.
 9       Q.  Did anybody ever send you a
10   copy of the Complaint?
11       A.  No.
12       Q.  Okay.
13       A.  I don't think so.
14       Q.  Let me show it to you.
15       A.  That's the Complaint?
16       Q.  Yes.
17       A.  I never saw that.
18       Q.  It's been marked as
19   Defendants' Exhibit 7.
20           And I take it from your
21   answer you -- you have never seen this
22   before?
23       A.  No.
24           Am I in here?
```

Page 61

```
 1       Q.  I'm going to show you and
 2   we'll see.
 3       A.  All right.
 4       Q.  So I take it this is the
 5   first time you're seeing this document?
 6       A.  Yes, sir.
 7       Q.  Okay. Take a look at
 8   Paragraph 311, which appears on Page 126.
 9           Are you there on Paragraph
10   311?
11       A.  Up here, yes.
12       Q.  It says, In addition to its
13   false and misleading DTC marketing
14   campaign, Merck also targeted doctors and
15   other medical professionals with its
16   false and misleading marketing message.
17   According to Confidential Witness Number
18   3, who is a Merck executive specialty
19   sales representative, specializing in
20   Merck's cardiovascular drug franchise and
21   who directly sold Vytorin for several
22   years before leaving Merck in mid 2007,
23   Merck salespeople were specifically
24   trained with scripts to pound home the
```

16 (Pages 58 to 61)

Joseph Amaru

Page 62

1  lower is better marketing message when
2  providing details to doctors on the
3  benefits of Vytorin. CW3 said that when
4  his/her doctors asked about Vytorin's
5  efficacy, which was often, she/he would
6  assure them that the results of ENHANCE
7  would be available soon and assured them
8  it was the best cholesterol drug on the
9  market.
10      Do you see that?
11     A.   Yes, I do.
12     Q.   Do those statements look
13  familiar as statements you would have
14  made?
15     A.   They're not statements I
16  would have made.
17     Q.   Let's take it sentence by
18  sentence.
19     A.   Certainly.
20     Q.   So the first sentence says,
21  Merck also targeted doctors and other
22  medical professionals with its false and
23  misleading marketing message.
24     A.   Wait a second. Where are

Page 63

1  you?
2      MR. ALMEIDA: Objection.
3  BY MR. GORDON:
4      Q.   The first -- first sentence
5  of Paragraph 311.
6      A.   In addition, it starts?
7      Q.   In addition to its false and
8  misleading DTC marketing campaign, Merck
9  also targeted doctors and other medical
10  professionals with its false and
11  misleading marketing message.
12      Do you see that?
13     A.   I see that.
14     Q.   Okay. Let me ask you first,
15  do you know what a DTC marketing campaign
16  is?
17     A.   Direct-to-consumer.
18     Q.   Okay. Were you involved in
19  any direct-to-consumer marketing
20  campaigns for Vytorin?
21     A.   I don't think I would have
22  been, no. No. We would not -- in fact,
23  they had changed the rules over time and
24  when this came -- when -- by this time we

Page 64

1  were told not to discuss our drugs with
2  consumers.
3       But when I started there
4  eight years previously, you were allowed
5  to, and we would talk to patients in the
6  waiting room about it. But then at some
7  point it changed. And so I remember
8  being very strict, you know, patients
9  would ask me about, direct to -- ask me
10  about things, and I can't speak to you, I
11  have to speak to the doctor. And I was
12  very comfortable with that.
13     Q.   Now, this paragraph alleges
14  that Merck also targeted doctors and
15  other medical professionals with its
16  false and misleading marketing message.
17      Do you see that?
18     A.   I saw that.
19     Q.   Okay. Did you ever say to
20  anybody, in words or substance, that you
21  believed that Merck's messaging to
22  doctors and other medical professionals
23  was false or misleading?
24      MR. ALMEIDA: Objection.

Page 65

1       THE WITNESS: Answer the
2  question?
3       MR. ALMEIDA: Yes.
4       MR. GORDON: Yes.
5       THE WITNESS: I'm
6  flabbergasted that I would have
7  said anything like that. I would
8  never, ever say that Merck did
9  false, misleading. That's not me,
10  that's not Merck.
11  BY MR. GORDON:
12     Q.   I take it you don't believe
13  that it is true that Merck targeted
14  doctors and other medical professionals
15  with false and misleading marketing
16  messages?
17     A.   Correct.
18     Q.   Then it goes on to say that,
19  According to Confidential Witness Number
20  3, who was a Merck executive specialty
21  sales representative, specializing in
22  Merck's cardiovascular drug franchise,
23  and who directly sold Vytorin for several
24  years before leaving Merck in mid 2007,

17 (Pages 62 to 65)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 66

1  Merck salespeople were specifically
2  trained with scripts to pound home the
3  lower is better marketing message when
4  providing details to doctors on the
5  benefits of Vytorin.
6        Okay. So let me first ask,
7  because you have been identified as
8  Confidential Witness Number 3, were you a
9  Merck executive specialty sales
10 representative specializing in Merck's
11 cardiovascular drug franchise?
12    A.  Yes.
13    Q.  And did you directly sell
14 Vytorin for several years before leaving
15 Merck in mid 2007?
16    A.  Yes.
17    Q.  And did you say, in words or
18 substance, that Merck salespeople were
19 specifically trained with scripts to
20 pound home the lower is better marketing
21 message when providing details to doctors
22 on the benefits of Vytorin?
23    A.  Yes.
24    Q.  That is true?

Page 67

1     A.  Uh-huh.
2     Q.  Okay. And then it goes on
3  to say, Confidential Witness Number 3
4  said that when his/her doctors asked
5  about Vytorin's efficacy, which was
6  often, he would assure them that the
7  results of ENHANCE would be available
8  soon and assure them it was the best
9  cholesterol drug on the market.
10       Do you see that?
11    A.  I see that.
12    Q.  Okay. And did doctors that
13 you called upon ask you about Vytorin's
14 efficacy often?
15    A.  Yes, they did ask about
16 efficacy.
17    Q.  And when they did that,
18 would you assure them that the results of
19 ENHANCE would be available soon?
20    A.  Absolutely not.
21    Q.  Did you ever say that?
22    A.  Absolutely not. And I can
23 tell you why.
24    Q.  Tell me why.

Page 68

1     A.  Because the word efficacy
2  right there --
3     Q.  Yeah.
4     A.  Would -- we had efficacy
5  studies. The efficacy was that you
6  lowered LDL 50 percent. That's all I had
7  to do. I did not have to go off script.
8  The script was, lower is better, here is
9  our official marketing piece, here is the
10 prescribing information. There's
11 absolutely no reason to go to ENHANCE.
12    Q.  Did you ever assure any
13 doctors that the results of ENHANCE would
14 be available soon?
15    A.  You know, I would not -- I
16 could not commit to that, because I
17 didn't know when that study was coming
18 out. And so I would never, ever say that
19 because I would not know when that study
20 was coming out.
21       And I've been in
22 pharmaceuticals and the fact of the
23 business, you never know when it's going
24 to get approved. It may never come out.

Page 69

1     Q.  You had indicated earlier
2  that in the second call they read back
3  some things back to you that were
4  statements you made and you tried to
5  correct it?
6     A.  Something like this, and
7  that really got me mad.
8     Q.  And when you say "something
9  like this," you mean what's in Paragraph
10 311 and where you pointed out it was not
11 accurate?
12    A.  Yes. And I said there was
13 no way I would have ever said false and
14 misleading. I would never have said that
15 about Merck.
16    Q.  And I take it that's because
17 you never made any false or misleading
18 statements?
19    A.  That's true, too.
20    Q.  And Merck, to your
21 knowledge, its salespeople did not make
22 false or misleading statements to the
23 public or medical professionals?
24    A.  We were specifically

Case 2:08-cv-02177-DMC -JAD   Document 162-2    Filed 07/01/11   Page 12 of 14 PageID: 4995

Joseph Amaru

Page 74

1  Somebody called you up, I
2  take it out of the blue?
3  A. Out of the blue.
4  Q. Okay. And they -- did they
5  tell you they were looking into the case
6  or anything?
7  A. You know, I have to admit --
8  Q. Just can't remember?
9  A. -- I'm fuzzy. I said, who
10 are you? What's this about? You know, I
11 asked him a lot of questions.
12 Q. And he asked you questions,
13 you gave some answers?
14 A. Right.
15 Q. And do you recall whether
16 the person said they were a lawyer or an
17 investigator?
18 A. I don't recall.
19 Q. Okay. But they definitely
20 identified themselves?
21 A. Definitely identified
22 themselves. I had a name at the time, I
23 had a company, I had a reason for the
24 call.

Page 75

1  Q. Would you have written that
2  down anywhere or taken any notes or
3  anything like that?
4  A. No.
5  Q. Okay. Any --
6  A. It was just a friendly
7  fact-finding conversation at the time.
8  Q. Right.
9  A. And he said it might lead, I
10 think, to something else. And I tried to
11 become very -- get as much information as
12 I could, what was I getting involved in
13 here.
14 Q. Right.
15 A. You know, so I tried to find
16 out as much as I could. But I don't -- I
17 can't remember any specifics about that.
18 Q. And then the second call
19 occurred.
20    And do you recall whether or
21 not it was the same person or not?
22 A. You know, I thought it was
23 the same person.
24 Q. Okay. And do you recall

Page 76

1  whether they identified themselves as --
2  in that call as a lawyer or an
3  investigator?
4  A. I can't recall how he
5  identified himself.
6  Q. And did they tell you what
7  the purpose of that second call was?
8  A. I think he said he wanted to
9  review my statements, for one.
10 Q. And he read you --
11 A. He read me the statement.
12 Q. -- basically what's in
13 Paragraph 311?
14 A. I don't know if he read me
15 that. But to paraphrase, the sentiment
16 was the same.
17 Q. And you told him, in words
18 or substance, that was not correct?
19 A. Yes, I did.
20 Q. And do you recall what words
21 you used?
22 A. I said, I never said that.
23 Q. Okay.
24 A. I -- this is wrong.

Page 77

1  Paraphrased, I never said that.
2  Q. And did the person on the
3  other end of the phone call react at all?
4  A. No, he was kind of calm
5  about it.
6  Q. Did they say they would
7  change it or --
8  A. Never said that. Never
9  asked me if I wanted -- you know, he
10 might have. I don't know if he did or
11 not. But my feeling at that time was,
12 you took what I said and you distorted
13 it, because I never would have said this,
14 so I don't want to speak to you anymore
15 and ended the conversation.
16 Q. And did they react at all to
17 that? They just --
18 A. No special reaction.
19 Q. Did they give you any
20 assurances they wouldn't use it, given
21 what you told them about its falsity?
22 A. No.
23 Q. Do you remember anything
24 else about that second call?

20 (Pages 74 to 77)

Joseph Amaru

Page 82

1  Merck Schering-Plough targeted doctors
2  and other medical professionals with its
3  false and misleading marketing message?
4      A.  That's correct. I do not
5  believe that Merck Schering-Plough
6  targeted doctors and other healthcare
7  professionals with false and misleading
8  information, at no time.
9      MR. GORDON: I have no
10 further questions, subject to Mr.
11 Almeida's follow-up.
12     MR. ALMEIDA: I'll ask a few
13 questions.
14     MR. GORDON: Do you want to
15 switch?
16     MR. ALMEIDA: I don't think
17 it's necessary. It might be
18 better for the video. Do you want
19 to just swap mics, I guess?
20     MR. GREENBAUM: Before we
21 begin, I have no questions at this
22 time. I'm reserving my right to
23 cross.
24         - - -

Page 83

1      (Whereupon, a discussion off
2  the record occurred.)
3         - - -
4      MR. GORDON: Now Jeff has
5  every mic that exists in this
6  place, but I take it you can hear
7  me? It's fine.
8      MR. ALMEIDA: There should
9  be a mic over there. I left mine
10 over there.
11         - - -
12        EXAMINATION
13         - - -
14 BY MR. ALMEIDA:
15     Q.  Thanks. Mr. Amaru, again, I
16 introduced myself to you before, my name
17 is Jeff Almeida from Grant and
18 Eisenhofer, and I just have a few
19 questions for you. First I'd like you to
20 look again at Paragraph 311 of the
21 Complaint.
22     A.  Okay.
23     Q.  Now, the defendants were
24 asking you sentence by sentence whether

Page 84

1  you thought these --
2      A.  Those gentlemen?
3      Q.  Correct, I'm sorry, Mr.
4  Gordon.
5          He was asking you sentence
6  by sentence whether the statements in
7  this paragraph were true or false. And
8  he began with the first sentence of
9  that -- of that paragraph.
10         If I were to tell you to
11 assume that the first sentence in that
12 paragraph is not at all being attributed
13 to you or something that you said, could
14 you point out to me any other spots in
15 that paragraph that you disagree with?
16     A.  I'd like to go through it
17 pretty much --
18     Q.  Sure, please.
19     A.  I don't believe I would have
20 said false and misleading DTC marketing
21 campaign. In my heart --
22     Q.  What I'm -- what I'm trying
23 to say is that if you ignore that
24 sentence and believe -- because what was

Page 85

1  the intent here is that that sentence is
2  not attributed to you.
3      A.  Okay.
4      Q.  The parts that are
5  attributed to you are under that, that
6  begin with, According to Confidential
7  Witness 3.
8          Do you see that?
9      MR. GORDON: I will just
10 object.
11     MR. GREENBAUM: Objection.
12 Please let the witness finish his
13 answer.
14     MR. GORDON: I take it --
15     MR. ALMEIDA: You guys
16 started objecting. I'm letting
17 him finish.
18     MR. GREENBAUM: You
19 interrupted his last answer.
20     THE WITNESS: Okay. All
21 right. So what I think I was
22 saying before, I don't think --
23 that first sentence I did not say.
24 I would never say false and

22 (Pages 82 to 85)

Joseph Amaru

Page 86

1   misleading marketing message. I
2   categorically deny that.
3       The next sentence, According
4   to Confidential Witness Number 3,
5   I was an executive specialty sales
6   rep. I did specialize in Merck's
7   cardiovascular drug franchise. I
8   did directly sell Vytorin for
9   several years before leaving Merck
10  in mid 2007. That's all correct.
11  Merck salespeople were
12  specifically trained with scripts
13  to pound home the lower is better
14  marketing message. That is true.
15  When providing details to doctors
16  on the benefits of Vytorin. That
17  is true. When -- CW 3 said that
18  when his/her doctors asked about
19  Vytorin efficacy, which is
20  often -- this is true -- he/she
21  would assume that the results of
22  ENHANCE would assure them that the
23  results of ENHANCE would be
24  available soon.

Page 87

1       That wasn't our response.
2   Our response would be, here is our
3   efficacy. There was a marketing
4   piece that was based on
5   prescribing information. So I
6   would not have said that.
7       And assure them it was the
8   best cholesterol drug on the
9   market. That I would have said,
10  yes, because I did believe it was.
11  BY MR. ALMEIDA:
12      Q.  Okay. So the part I had you
13  focus on, from -- beginning with
14  "according" to the last word in that
15  paragraph, "market," the one part in that
16  couple of sentences that you have a
17  problem with is the assurance that the
18  results of ENHANCE would be available,
19  quote/unquote, soon, right?
20      A.  Right. I would not have to
21  bring up ENHANCE to talk about efficacy
22  It was not necessary.
23      Q.  Okay. If I told you that
24  this interview, the first interview that

Page 88

1   you had, took place in August of 2008, is
2   it possible that in August 2008 you made
3   that statement to the investigator you
4   were having the friendly conversation
5   with?
6       A.  My -- my belief, it is not.
7   Because it's not -- I would say no.
8       Q.  Okay.
9       A.  No.
10      Q.  The next question I have is,
11  you testified -- you answered some
12  questions today about how -- how you
13  believe that Merck was a very ethical
14  company and always followed regulations
15  and those sorts of things, right?
16      A.  Yes.
17      Q.  You also testified, however,
18  that you didn't have any role in the
19  ENHANCE trial itself, correct?
20      A.  True.
21      Q.  And you didn't have contact
22  with the scientists who were running the
23  ENHANCE trial?
24      A.  Not with the scientists. To

Page 89

1   my knowledge, I had no idea who the
2   scientists were who were involved with
3   the ENHANCE trial.
4       Q.  Do you have any knowledge,
5   personal knowledge, whether Merck or
6   Schering-Plough, the individuals
7   responsible for the ENHANCE clinical
8   trial, were acting ethically?
9       A.  Please repeat the question.
10      MR. ALMEIDA: Sure. Can you
11  read it back, please?
12          - - -
13      (Whereupon, the court
14  reporter read the following part
15  of the record:
16      "Question: Do you have any
17  knowledge, personal knowledge,
18  whether Merck or Schering-Plough,
19  the individuals responsible for
20  the ENHANCE clinical trial, were
21  acting ethically?")
22          - - -
23      THE WITNESS: That they were
24  acting ethically? I would say,

23 (Pages 86 to 89)