# Exhibit B

Barry Scarbrough

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

| | |
|---|---|
| IN RE: SCHERING-PLOUGH CORPORATION/ENHANCE SECURITIES LITIGATION | :<br>:CIVIL ACTION NO.<br>:08-397(DMC)(JAD) |
| IN RE: MERCK & CO., INC. VYTORIN/ZETIA SECURITIES LITIGATION | :<br>:CIVIL ACTION NO.<br>:08-2177(DMC)(JAD) |
| IN RE: SCHERING-PLOUGH CORP. ENHANCE ERISA LITIGATION | :<br>:CIVIL ACTION NO.<br>:08-1432(DMC)(JAD) |

- - -

MONDAY, JUNE 13, 2011

- - -

Videotaped deposition of BARRY SCARBROUGH, taken pursuant to subpoena, was held at the law offices of Davis Graham & Stubbs, LLP, 1550 17th Street, Suite 500, Denver, Colorado 80202, commencing at 1 p.m., on the above date, before Lisa A. Knight, Registered Merit Reporter and Certified Realtime Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

```
 1   APPEARANCES:
 2
     FOR THE SECURITIES PLAINTIFFS:
 3      SALVATORE J. GRAZIANO, ESQUIRE
        BERNSTEIN LITOWITZ BERGER &
 4         GROSSMANN LLP
        1285 Avenue of the Americas
 5      New York, New York 10019
        (212) 554-1538
 6      sgraziano@blbglaw.com
 7
     FOR THE DEFENDANT MERCK/SCHERING-PLOUGH:
 8      ALEX YOUNG K. OH, ESQUIRE
        PAUL, WEISS, RIFKIND, WHARTON &
 9         GARRISON, LLP
        1285 Avenue of the Americas
10      New York, New York 10019
        (212) 373-3697
11      aoh@paulweiss.com
12
           - and -
13
        (APPEARING TELEPHONICALLY):
14      DANIEL J. JUCEAM, ESQUIRE
        YAEL FUCHS, ESQUIRE
15      PAUL, WEISS, RIFKIND, WHARTON &
           GARRISON, LLP
16      1285 Avenue of the Americas
        New York, New York 10019
17      (212) 373-3697
        djuceam@paulweiss.com
18      yfuchs@paulweiss.com
19
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES (continued)
 2
     FOR THE DEFENDANT MERCK/SCHERING-PLOUGH:
 3      (APPEARING TELEPHONICALLY:)
        KERSTIN M. SUNSTROM, ESQUIRE
 4      LOWENSTEIN SANDLER, PC
        65 Livingston Avenue
 5      Roseland, New Jersey 07068
        (973) 597-2500
 6      ksundstrom@lowenstein.com
 7
 8   FOR THE UNDERWRITER DEFENDANTS:
        JACYLN A. BARNAO, ESQUIRE
 9      SHEARMAN & STERLING, LLP
        599 Lexington Avenue
10      New York, New York 10022
        (212) 848-4000
11      jacyln.barnao@shearman.com
12
13
     ALSO PRESENT:
14
        ALAN MODLINGER
15      Office of the General Counsel
        Merck & Co., Inc.
16
        RANDALL SMITH
17      Paul, Weiss, Rifkind, Wharton &
           Garrison, LLP
18
19
20   VIDEOGRAPHER:
21      BARBARA HORN
        Golkow Technologies, Inc.
22
23         ---
24
```

Page 4

```
 1              INDEX
             BARRY SCARBROUGH
 2            JUNE 13, 2011
 3   APPEARANCES                    2
 4   DEPOSITION SUPPORT INDEX        6
 5
     EXAMINATION OF BARRY SCARBROUGH:
 6
        BY MS. OH                  10
 7      BY MR. GRAZIANO            63
        BY MS. OH                  71
 8
 9   CERTIFICATE                    76
10   ACKNOWLEDGMENT OF DEPONENT    77
11   ERRATA                        78
12   LAWYER'S NOTES                79
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1        DEPOSITION EXHIBITS
            BARRY SCARBROUGH
 2            JUNE 13, 2011
 3   NUMBER      DESCRIPTION         MARKED
 4   Defendant 251  Subpoena for Documents   19
                   and Testimony in a Civil
 5                 Action
 6   Plaintiff 562  E-mail string, Bates     63
                   MSP-CIVOR1087362 to
 7                 -7364
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Barry Scarbrough

Page 34

1  Q.  Okay. Did you have any
2  discussions with Mr. Hassan about ENHANCE?
3  A.  No.
4  Q.  Did you have any discussions
5  with Ms. Cox about ENHANCE?
6  A.  No.
7  Q.  And other than the conference
8  calls you've talked about already where the
9  concerns were raised and the suppositions,
10 did you have any discussions with Mr. Ziakas
11 about ENHANCE that you recall?
12 A.  No.
13 Q.  Same question with Mr. Nichols.
14 Did you have any discussions about ENHANCE
15 with him other than what you've testified to
16 that you recall?
17 A.  The only thing that I recall is
18 when he had his conference with the regional
19 directors, he shared a very similar directive
20 as to why the data was delayed.
21 Q.  Which is what you referred to
22 as "data collection issues"?
23 A.  Correct.
24 Q.  Did you have an understanding,

Page 35

1  sir, of what that meant?
2  A.  In dealing with Baycol in the
3  past and other statins, I knew that they were
4  extremely large trials typically that
5  sometimes -- you know, for example, like a
6  Framingham or something more significant
7  could span years.
8      So it wouldn't be unusual to
9  have data collection issues when we might be
10 talking about -- I didn't even know the "in,"
11 but I could suppose the patient in could be
12 upwards of 3- to 5- to 6,000 patients.
13     So it wasn't surprising that it
14 would take some time to aggregate the data.
15 Q.  Other than what you've
16 testified to, what is your understanding of
17 the design of ENHANCE, if you had one?
18 A.  Just don't have one. Sorry.
19 Q.  Okay. Fair enough.
20 A.  Yeah.
21 Q.  Understood.
22 A.  Yeah.
23 Q.  Okay. And did anyone tell you
24 any other reasons for the delay in ENHANCE?

Page 36

1  A.  No. I think the final meeting
2  that I had attended where the marketing team
3  was present, Mike McCann discussed or briefly
4  mentioned a similar problem.
5      So we were attending the
6  Vytorin-Zetia breakout for the regional
7  directors, and he mentioned data collection.
8  Tough time getting it together. Could not
9  present the data at this time.
10 Q.  And other than taking them at
11 their words, did you have any other insight
12 into what the delay was being caused by?
13 A.  No. Like I say, you know, the
14 only concern that pops into mind, being in
15 the business for ten years, is that a delay
16 might be negative.
17 Q.  Sure.
18 A.  So, you know --
19 Q.  Right. That's guesswork?
20 A.  That's guesswork.
21 Q.  Yeah.
22 A.  Yeah.
23 Q.  Okay. All right.
24     So let me now turn to your

Page 37

1  conversation, either one or two of them, with
2  the plaintiffs' attorneys.
3  A.  Yes.
4  Q.  You believe it was a lady.
5  A.  (Nodded head up and down.)
6  Q.  In the first conversation which
7  I believe you said took maybe 20 minutes,
8  could you tell us to the best of your
9  recollection what she said to you and what
10 you said to her.
11 A.  Yes.
12     She discussed the reason for
13 the call, so that there was a case ongoing
14 between plaintiff and Schering-Plough related
15 to ENHANCE trial. And she asked very similar
16 questions to today: What was my
17 understanding.
18     I shared with her that having
19 left in January 2008, it wasn't until I
20 understood perhaps a week or a week later
21 that something was wrong. An old friend of
22 mine mentioned that the -- some of the
23 information presented at CHEST was going to
24 create quite an issue for -- related to the

10 (Pages 34 to 37)

Barry Scarbrough

Page 38

1  ENHANCE trial, itself.
2          But what I shared with her was
3  that was all after my release from the
4  organization. And the only communication I
5  received related to ENHANCE was that phone
6  mail from Todd Nichols related to data
7  collection and that we were to share that
8  with customers if they had concerns.
9      Q.   Okay.
10     A.   She asked if I knew of anything
11 else related to concerns about the trial.
12 And I said I had been on Cafepharma, which
13 was the first time that I had been on the
14 site.
15         And one of the reasons I went
16 on Cafepharma, quite frankly, was also to
17 network for additional positions. So clearly
18 I would visit occasionally the Schering-
19 Plough feedback.
20         And what I shared with her was
21 that I had seen probably two or three posts
22 from anonymous sales professionals that
23 related great concerns about the results at
24 CHEST and that the posts were individuals

Page 39

1  getting very concerned about their career
2  future related to the demise or the
3  difficulty of the top -- the top medication
4  for Schering-Plough.
5      Q.   Okay. Great.
6          First of all, when you say
7  "CHEST," what are you referring to?
8      A.   The annual meeting for, you
9  know, cardiothoracic surgeons and
10 cardiologists.
11     Q.   Would that be the American
12 College of Cardiologists?
13     A.   Correct. Correct.
14     Q.   Okay.
15     A.   And obviously the -- well, I've
16 been out of the business for so long, but
17 it's obviously, you know, the top meeting for
18 cardiologists, the most influential. So if
19 there's negative publicity or, heaven forbid,
20 negative trial results at CHEST, it can
21 impact your market share almost immediately.
22     Q.   And is that congress typically
23 held in March of each year?
24     A.   I believe, correct.

Page 40

1      Q.   And -- now let me first ask
2  about the discussion about Cafepharma.
3      A.   Correct.
4      Q.   You said you had visited
5  Cafepharma right around that time when this
6  lady called because you were networking --
7      A.   Correct.
8      Q.   -- for other sales positions?
9      A.   That's right.
10     Q.   Because you had just left
11 Schering-Plough.
12     A.   Correct.
13     Q.   Got it.
14     A.   See, you can get some very
15 honest feedback from folks on other
16 organizations. So if you're looking at other
17 organizations, they can give you, you know,
18 pretty clear pros and cons.
19     Q.   Would you -- and prior to that
20 occasion, you had not visited Cafepharma?
21     A.   Never.
22     Q.   Had you heard of it prior to
23 that occasion?
24     A.   Oh, yes.

Page 41

1      Q.   You had?
2      A.   Yeah.
3      Q.   And what did you hear about it
4  before you visited it?
5      A.   That it was very rumor-based.
6  And one of the reasons I hadn't visited it is
7  I just don't like rumors --
8      Q.   Okay.
9      A.   -- I didn't -- if there were
10 rumors on me or another individual or other
11 organizations, I just -- I really choose not
12 to get involved. So I got involved for the
13 career search and found it somewhat useful
14 but not as impactful as other tools.
15     Q.   And when you say you found it
16 "somewhat useful," do you mean that it was
17 useful in terms of trying to figure out what
18 organization you might want to work for --
19     A.   Correct.
20     Q.   -- or what organizations might
21 have openings available?
22     A.   Correct, and/or the culture --
23     Q.   Okay.
24     A.   -- at the organization. So --

11 (Pages 38 to 41)

Barry Scarbrough

Page 42

1  you know, because it will -- it will draw out
2  both sides of an organization.
3      So if people have concerns,
4  they'll post it because they feel -- you
5  know, it's anonymous. They're comfortable.
6      If people are really pleased,
7  they'll do that as well, and they'll counter
8  a negative post or they'll give you thoughts
9  and feedback on the culture compensation,
10 their feelings on the future for a certain
11 medication.
12     Q.   And approximately how many
13 times did you visit Cafepharma after leaving
14 Schering-Plough?
15     A.   In total or just through that
16 time period?
17     Q.   In total.
18     A.   I would say 15 times maybe,
19 16 times.
20     Q.   And it was in those 15 or 16
21 times after you left Schering-Plough that you
22 saw the postings concerning ENHANCE?
23     A.   Correct.
24     Q.   And were they all anonymous

Page 43

1  postings?
2      A.   Yes. Yeah, just about every
3  posting is anonymous, so ...
4      Q.   Did you, yourself, post
5  anything on Cafepharma?
6      A.   No, I've never posted. I did
7  counter a negative post. So I sent them two
8  e-mails to remove postings.
9      Q.   Have you, yourself, seen any
10 posts about yourself?
11     A.   Oh, yes.
12     Q.   And is that how you know that
13 the site is rumor-based?
14         MR. GRAZIANO: Objection.
15     A.   I wasn't comfortable with the
16 truth of the posts, yeah. So it's -- since
17 it's anonymous and wide open, you know, it
18 almost becomes the Twitter of pharma. So you
19 have to be -- you have to take it with a
20 grain of salt.
21 BY MS. OH:
22     Q.   Okay.
23         In my questions about the
24 initial conversation with the plaintiffs'

Page 44

1  attorney that you had, you also mentioned a
2  voicemail from Todd Nichols.
3      A.   Yes.
4      Q.   Okay. Could you tell me what
5  you recall about that voicemail.
6      A.   I don't recall a date, but I
7  recall it coming in the afternoon or evening,
8  picking it up, say, 7 or 8 o'clock mountain
9  time. And maybe -- Todd was pretty concise,
10 I want to say about three or four minutes,
11 discussing that he had heard our feedback as
12 well as feedback from district managers in
13 the division that there were concerns.
14         He knew that the customer, top
15 physicians and cardiologists, were being
16 concerned. And he said that our position
17 that we should take and our communication we
18 should make to customers was data collection
19 issues were delaying trial results.
20     Q.   Okay. And do you recall
21 approximately when this voicemail happened in
22 relation to your leaving Schering-Plough?
23     A.   Wow. It's really hard to
24 remember if it was before or after the

Page 45

1  holidays.
2      Q.   And by "holidays," do you
3  mean --
4      A.   The Christmas holiday,
5  Christmas and New Year's.
6      Q.   Okay.
7      A.   I want to say it came before
8  the holidays.
9      Q.   Okay. So it was late 2007?
10     A.   Correct.
11     Q.   Okay. Would it be fair to say
12 it's all within the same time period where
13 those conference calls took place?
14     A.   Correct.
15     Q.   Okay.
16     A.   Because I would then, in turn,
17 have to forward that message on to my team,
18 which I did.
19     Q.   So do you recall anything else
20 about your conversation with the plaintiffs'
21 attorney?
22     A.   That's the only thing I recall,
23 yeah.
24     Q.   Did the attorney explain to you

12 (Pages 42 to 45)

Page 46

1  that she was an attorney, and she would be
2  using your words as a confidential informant
3  for the plaintiffs?
4      A.   She said you'd be using -- she
5  said she'd be using my information.  I don't
6  recall the phrase "confidential informant."
7      Q.   Did she explain to you that
8  your words would be quoted in a court file
9  document?
10     A.   Yes, she did.
11     Q.   Did she come back to you and
12 review with you what statements she would
13 like to use?
14     A.   No.
15     Q.   To this day, have you seen any
16 court file document that purports to refer to
17 information that the plaintiffs obtained from
18 you?
19     A.   No documentation.
20     Q.   Orally have you been told what
21 information has been used that you provided?
22     A.   Yes.
23     Q.   What were you told?
24     A.   Yeah.  I did receive a call --

Page 47

1  this was after I received the subpoena.
2      Q.   Oh, okay.  From the defendants'
3  lawyers?
4      A.   Correct.
5      Q.   From Mr. Juceam?
6      A.   Correct.
7      Q.   Okay.  My question was:  Did
8  the plaintiffs' attorney who spoke to you
9  first ever come back to you to inform you how
10 they used the information that they
11 reportedly obtained from you?
12     A.   No.  No.
13     Q.   Okay.  Did you and the
14 plaintiffs' attorney, in that initial
15 conversation, discuss what Cafepharma was?
16     A.   I believe she asked a similar
17 question, how often I visited, I believe.
18 And I think I told her at that time I had
19 just started after, you know, years of
20 hearing about it.  I don't recall anything
21 other than how many times I had visited.
22     Q.   Did you ever inform the
23 plaintiffs' attorney, in words or substance,
24 that all of your mentors had used Cafepharma

Page 48

1  or visited Cafepharma?
2      A.   I don't recall that, but I do
3  -- yeah.  There were a few mentors that had
4  been on Cafepharma.
5      Q.   Okay.
6      A.   I don't recall that, but that
7  wouldn't -- that wouldn't surprise me if I
8  said that.
9      Q.   Were they mentors from
10 Schering-Plough or Bayer or other entities?
11     A.   Both.
12     Q.   Both?
13     A.   Yeah.
14     Q.   Can you identify any specific
15 individuals at Schering-Plough?
16     A.   At Schering-Plough?  No, I
17 can't.  I can at Bayer, but I can't at
18 Schering-Plough.  Yeah.
19     Q.   Did you also use any words or
20 substance to the effect that about 90 percent
21 of those in the pharmaceutical industry visit
22 Cafepharma?
23     A.   Yeah, that wouldn't surprise me
24 because it's -- at the time and I would

Page 49

1  imagine still is a very popular site.
2      Q.   And was that 90-percent number
3  something that you had seen in a document or
4  is that --
5      A.   No.
6      Q.   -- something you're guessing?
7      A.   That would be a guess from
8  conversations and feedback from managers,
9  reps, friends, others in the business that
10 regularly quoted it, you know, almost to the
11 point of driving me crazy because I never
12 went on, so . . .
13     Q.   And you weren't referring to
14 90 percent of Schering-Plough sales reps?
15     A.   I was not.
16     Q.   And did you tell the
17 plaintiffs' attorney, in words or substance,
18 that management referred to Cafepharma in
19 conversations?
20     A.   That wouldn't surprise me at
21 all, yeah.
22     Q.   But do you recall --
23     A.   I don't recall it.
24     Q.   You don't recall it?