# Exhibit C

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF NEW JERSEY

3                    - - -

4  IN RE: SCHERING-PLOUGH            :
   CORPORATION/ENHANCE               :CIVIL ACTION NO.
5  SECURITIES LITIGATION             :08-397(DMC)(JAD)

6  _____

   IN RE: MERCK & CO., INC.          :
7  VYTORIN/ZETIA SECURITIES          :CIVIL ACTION NO.
   LITIGATION                        :08-2177(DMC)(JAD)
8  _____

9  IN RE: SCHERING-PLOUGH            :
   CORPORATION ENHANCE               :CIVIL ACTION NO.
10 ERISA LITIGATION                  :08-1432(DMC)(JAD)

11 _____

12                    - - -

13              JUNE 20, 2011

14                    - - -

15

16            Videotape deposition of
   RAYMOND J. SKELLY, taken pursuant to notice,
17 was held at the law offices of Morgan, Lewis
   & Bockius LLP, 1701 Market Street, 18th Floor,
18 Philadelphia, Pennsylvania 19103, beginning
   at 10:00 a.m., on the above date, before
19 Amanda Dee Maslynsky-Miller, a Certified
   Realtime Reporter and Notary Public in and
20 for the State of Pennsylvania.

21

22                    - - -

23         GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com

Raymond J. Skelly

### Page 2

```
 1  APPEARANCES:
 2
    FOR THE SECURITIES PLAINTIFFS:
 3
        JEFF A. ALMEIDA, ESQUIRE
 4      GRANT & EISENHOFER, P.A.
        1201 North Market Street
 5      Wilmington, Delaware 19801
        (302) 622-7000
 6      Jalmeida@gelaw.com
 7
 8
 9  FOR THE DEFENDANT MERCK/SCHERING-PLOUGH:
10
        DANIEL J. JUCEAM, ESQUIRE
11      PAUL, WEISS, RIFKIND, WHARTON
        & GARRISON, LLP
12      1285 Avenue of the Americas
        New York, New York 10019
13      (212) 373-3697
        djuceam@paulweiss.com
14
          - and -
15
16  VIA TELEPHONE:
        SUZANNE K. SKINNER, ESQUIRE
17      PAUL, WEISS, RIFKIND, WHARTON
        & GARRISON, LLP
18      1285 Avenue of the Americas
        New York, New York 10019
19      (212) 373-3697
        sskinner@paulweiss.com
20
21
22
23
24
```

### Page 3

```
 1  APPEARANCES (continued)
 2
 3
    VIA TELEPHONE:
 4      KRISTIN A. MUIR, ESQUIRE
        LOWENSTEIN SANDLER, P.C.
 5      65 Livingston Avenue
        Roseland, New Jersey 07068
 6      (973) 597-2500
        Kmuir@lowenstein.com
 7      Representing the Defendant,
        Merck/Schering-Plough
 8
 9
10  VIA TELEPHONE:
        VINCENT R. LODATO, ESQUIRE
11      SILLS, CUMMIS & GROSS, P.C.
        The Legal Center
12      One Riverfront Plaza
        Newark, New Jersey 07102
13      (973) 643-7000
        vlodato@sillscummis.com
14      Representing the Defendant
        Underwriters
15
16
17  VIA TELEPHONE:
        LAWRENCE S. BADER, ESQUIRE
18      MORVILLO, ABRAMOWITZ, GRAND,
        IASON, ANELLO & BOHRER, P.C.
19      565 Fifth Avenue
        New York, New York 10017
20      (212) 880-9440
        Lbader@maglaw.com
21      Representing Defendants in the
        Schering-Plough Derivative Action
22
23  ALSO PRESENT: Scot Dantzer, Videographer
24
```

### Page 4

```
 1              - - -
 2            I N D E X
 3              - - -
 4
    Testimony of: RAYMOND J. SKELLY
 5
 6  By Mr. Juceam                    8, 96
    By Mr. Almeida                      83
 7
 8
              - - -
 9
           E X H I B I T S
10
              - - -
11
12  NO.       DESCRIPTION            PAGE
13  Exhibit-270  Ray Skelly LinkedIn
                 Profile                24
14
    Exhibit-271  Notice of Deposition
15               of Ray Skelly          48
16  Exhibit-272  5/23/11 Letter from
                 R. Skelly to J. Sonenfeld  50
17
    Exhibit-273  8/10/11 Letter from
18               K. McGee to R. Skelly  53
19  Exhibit-274  Draft Unsigned Declaration
                 of Ray Skelly         70
20
    Exhibit-275  Proposed Amended
21               Complaint             80
22
23
24
```

### Page 5

```
 1              - - -
 2        DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  Page Line    Page Line    Page Line
 7  None
 8
 9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17   7    3
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24
```

Raymond J. Skelly

Page 26

1  this litigation?
2      A.   I'm not sure of the
3  terminology.  As a witness, yeah, okay.
4  I don't fully understand the term
5  confidential witness.  But, yeah, I
6  understand I've been identified as a
7  witness, that's why I'm here.
8      Q.   Do you understand you've
9  been identified as a witness by the
10 plaintiffs in the case?
11     A.   Yes.  Yes.
12     Q.   And do you know why the
13 plaintiffs have identified you as a
14 witness?
15     A.   I'm not entirely certain.
16     Q.   Do you have any clue?
17     A.   They probably want me to
18 support their -- their case.
19     Q.   And do you know -- have any
20 reason to know why they would want you to
21 support their case?
22     A.   Perhaps to -- to make some
23 statements indicting the corporation I
24 work for in some way.

Page 27

1      Q.   Do you understand who the
2  plaintiffs are in the litigation?
3      A.   Generally.  You know, I
4  mean, you know, I'm not really familiar
5  with the law firm or, you know -- but I
6  understand it's a class action suit and
7  this law firm is acting on behalf of the
8  class and -- and suing Merck.  You know,
9  that's my understanding of it.
10     Q.   Okay.
11     A.   About what, I'm not so sure,
12 but, you know --
13     Q.   That was going to be my next
14 question.
15          Do you know anything about
16 the content of the litigation?
17     A.   I mean, I did, you know, do
18 some searching and read a little bit
19 about the ENHANCE study, you know, to
20 kind of try to figure out what's going
21 on.  You know, I have my -- you know, I
22 have, like, some inkling as to what's
23 going on but I'm not -- it's nothing
24 definitive.  You know, I don't know what

Page 28

1  the case really stands on.
2      Q.   Okay.  Did you have any
3  conversations with the plaintiffs' side
4  of the case about the allegations that
5  are made?
6      A.   I had a telephone
7  conversation with someone who told me
8  that they were doing an -- an
9  investigation, a long time ago.  I mean,
10 I can't even remember how long ago it
11 was.  And, you know, I guess I wasn't
12 really, you know, aware of what their --
13 their aim was.  I kind of viewed them as,
14 you know, an information gathering,
15 perhaps a marketer, perhaps someone who
16 could, you know, be -- you know, part of
17 my network of contacts.  I believe at the
18 time I was -- I was looking for
19 employment.  I don't know if I was still
20 with Camstar or not.
21          But, yeah, I remember a
22 conversation with someone, probably
23 from -- from the plaintiffs' law firm,
24 the law firm representing the plaintiffs.

Page 29

1      Q.   How many conversations with
2  the plaintiffs' firm did you have?
3      A.   Well, I remember that
4  initial conversation.  And then a year
5  later, or a long time later, I remember
6  getting a call from the law firm, it may
7  even be the individual sitting here at
8  the table, Jeff, after I had received the
9  letter from the law firm -- okay, no, I
10 had to get another call.
11          So I got another -- hang on.
12 So there's an initial call from the
13 investigator.  Then there was another
14 contact from the investigator, as I
15 received a letter that that person asked
16 me to sign, okay.  I looked at the
17 information in the letter and I did not
18 consider that information to be factual,
19 and I indicated I would not sign it.
20          I got another call from a
21 representative of a law firm, that --
22 which may be this person Jeff here today,
23 and that person suggested that if I
24 didn't sign it, I would be subpoenaed and

Page 30

1  I said, so be it. I'm not going to sign
2  false information, you know. And here I
3  am today.
4      Q.   Okay. So we've talked about
5  three phone calls, correct?
6          MR. ALMEIDA: Objection.
7          THE WITNESS: So far as I
8      can recall, yes.
9  BY MR. JUCEAM:
10     Q.   There was the initial call
11 with the investigator, right?
12     A.   Right.
13     Q.   There was a call one year
14 later from a law firm in connection with
15 a letter that you received?
16     A.   Yes.
17     Q.   And then there was a third
18 call in which you were told that if you
19 didn't sign you would be subpoenaed?
20         MR. ALMEIDA: Objection.
21         THE WITNESS: Okay.
22 BY MR. JUCEAM:
23     Q.   Is that correct or not?
24     A.   You know, that's what I --

Page 31

1  that's my understanding of it. I mean, I
2  looked at the letter that I received, I
3  submitted the letter --
4      Q.   Right.
5      A.   -- as, you know, as a
6  document to you folks.
7          And, you know, I just looked
8  at the information in that letter and I
9  just -- I'm sorry, I couldn't agree with
10 it. I couldn't sign -- I couldn't sign
11 it.
12         And that's what I told
13 whomever, and then they indicated that I
14 would be subpoenaed and, you know,
15 unfortunately, we're going through this
16 now. But that was my understanding of
17 it, correct, yeah.
18     Q.   So let's now dial back on
19 each of those -- on each of those
20 communications and dig a little deeper.
21     A.   Okay.
22     Q.   Let's go back to the first
23 contact.
24         Do you have any idea what

Page 32

1  year that was?
2      A.   I would think 2008. I would
3  guess 2008.
4      Q.   And did you ever get the
5  name of the lawyer investigator or
6  investigator who called you?
7      A.   Yeah, I think it's in the
8  documents, you know, that I have. But
9  I'd have to look it up in the documents.
10     Q.   We'll -- we'll look at all
11 the documents.
12         At this point I just want to
13 see if I can -- see what you remember --
14     A.   Right.
15     Q.   -- independently.
16         The person that called you,
17 was it a man or a woman?
18     A.   It was a man.
19     Q.   And how long was the first
20 phone call? I assume -- was it on the
21 phone?
22     A.   Yeah. Yeah.
23     Q.   Okay.
24     A.   The first phone call was, I

Page 33

1  don't know, it was -- it was a while, I
2  guess we talked for 10, 15 minutes. You
3  know, I didn't understand, you know, who
4  I was talking to, perhaps, very well.
5  But I was just, you know, trying to be
6  social.
7      Q.   How did this individual
8  identify himself to you?
9      A.   As an investigator.
10     Q.   And what did he say he was
11 investigating?
12     A.   You know, he may have been
13 very accurate in indicating that he was
14 representing a law firm who was
15 representing the plaintiffs, but, you
16 know, I -- I just recognized him as an
17 investigator. I kind of, you know,
18 believed it to be some sort of survey for
19 information.
20         I mean, marketing, you deal
21 a lot with -- well, information
22 gatherers, that was my business. And we
23 share information all the time, and the
24 way you do it, to a large degree, is

Raymond J. Skelly

Page 34

1  through telephone conversations.
2      Q.   Did they say anything to the
3  effect that they were conducting a market
4  survey?
5      A.   No.
6          MR. ALMEIDA: Objection.
7          THE WITNESS: I don't
8      remember. Sorry.
9  BY MR. JUCEAM:
10     Q.   Did they tell you how they
11 got your name?
12         MR. ALMEIDA: Objection.
13         THE WITNESS: I -- I don't
14     know.
15 BY MR. JUCEAM:
16     Q.   Did they tell you that they
17 might use the statements you were making
18 in a public court filing?
19     A.   At -- at some point, you
20 know, I think it got down to that. And I
21 said, no, I don't give permission for
22 that, you know. So it's, like, you know,
23 I didn't want -- I didn't want what we
24 were talking about to, you know, to

Page 35

1  appear in any, you know, formal
2  statements of any sort.
3          You know, we were just -- I
4  was trying to be social and just make
5  conversation with the person.
6      Q.   So you told the investigator
7  that you did not want your statements to
8  appear in a public court filing?
9      A.   Correct.
10     Q.   What did they say in
11 response to that?
12     A.   I don't recall exactly, but
13 it sounded like, you know, -- I don't
14 recall exactly.
15     Q.   If they had told you from
16 the outset that they were going to use
17 your words in a public court filing,
18 would you have spoken to the person at
19 all?
20     A.   Probably not.
21     Q.   What did -- what else can
22 you recall about what was said to you in
23 the first conversation with the
24 investigator?

Page 36

1          MR. ALMEIDA: Objection.
2          THE WITNESS: What does that
3      mean?
4          MR. JUCEAM: He's objecting,
5      it's for --
6          MR. ALMEIDA: You can answer
7      the question.
8          MR. JUCEAM: You can answer
9      the question.
10         THE WITNESS: So what did we
11     talk about?
12 BY MR. JUCEAM:
13     Q.   Yes.
14     A.   You know, the ENHANCE study.
15 You know, he started, like, asking me
16 about the ENHANCE study. You know, did
17 you ever hear of the ENHANCE study? I
18 wasn't sure. I mean, it was a catchy
19 name and, you know, I may have. But if I
20 did, it would be through public
21 information. I get the annual report,
22 for example, it may have been reported in
23 the annual report for Merck & Co, Inc.
24         And we started talking about

Page 37

1  it. And I think he said something
2  about -- he seemed to know who the
3  study's sponsor was, so I was, like,
4  interested, okay, who was the study
5  sponsor. And, you know, he shared some
6  information about that.
7          And then he made some
8  statement about, you know, the study did
9  not have a review board or something, how
10 do you feel -- would you feel about that,
11 to learn there was no review board for
12 the study? Oh, I would be shocked, you
13 know, to learn Merck did a study without
14 a review board. You know, and I would.
15 But I just don't -- I don't believe that.
16     Q.   You said that you had only
17 heard about ENHANCE through public
18 information; is that correct?
19     A.   That I recall, yes.
20     Q.   Whatever you knew about
21 ENHANCE was by public information, not by
22 virtue of having worked at Merck?
23     A.   Absolutely. It would have
24 had to have been.

10 (Pages 34 to 37)