NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
| --- | --- |
| : | **Hon. Dennis M. Cavanaugh** |
| : |  |
| IN RE MERCK & CO., INC., : <br> VYTORIN/ZETIA SECURITIES: <br> LITIGATION : | **OPINION** |
| : | Civil Action No. 08-2177 (DMC)(JAD) |
| : |  |

**DENNIS M. CAVANAUGH, U.S.D.J.**

This matter comes before the Court on Lead Plaintiffs' Amended Motion for Class

Certification. ECF No. 179. Pursuant to FED. R. CIV. P. 78, nor oral argument was heard. Based

on the submissions of the parties, and for the reasons expressed herein, it is the decision of this Court

that Lead Plaintiffs' Motion is **granted**, and the Court certifies a class as defined below.

I.      **BACKGROUND**

This putative class action concerns alleged misrepresentations and omissions relating to a

clinical trial of prescription drug products. Lead Plaintiffs are Stichting Pensioenfonds ABP

("ABP"), International Fund Management, S.A. (Luxemburg) ("IFM"), the Jacksonville Police and

Fire Retirement System ("Jacksonville"), and the General Retirement System of the City of Detroit

("Detroit") (collectively, "Plaintiffs" or "Lead Plaintiffs"). Defendants are Merck & Co., Inc.

("Merck"), Merck/Schering-Plough Pharmaceuticals, MSP Distribution Services (C) LLC, MSP

Singapore Company LLC (collectively, "M/S-P"), Merck Chairman, President, and CEO Richard

T. Clark, President of Merck Research Laboratories Peter S. Kim, M.D., and Senior Vice President

of Merck and General Manager of M/S-P Deepak Khanna (collectively, "Defendants").

Plaintiffs' allegations concern the ENHANCE clinical trial of prescription drug products that Merck co-marketed with the Schering-Plough Corporation ("Schering") through the joint venture M/S-P. The ENHANCE study compared patients who were prescribed Vytorin, a fixed-dose combination pill containing the anti-cholesterol agent Zetia and the drug Zocor (the active ingredient of which is simvastatin), with patients who were prescribed a pill only containing Zocor. The study intended to compare the relative effectiveness of Vytorin and Zocor on reducing arterial plaque, as measured by changes in carotid artery intima-media thickness ("CA IMT"). Defendants expected the study to demonstrate that Vytorin's combination of Zetia and Zocor would stop or reduce the growth of fatty arterial plaque more than Zocor alone.

Plaintiffs allege that Defendants knew or recklessly disregarded, but did not disclose, the results of the ENHANCE study, which showed that Vytorin was in fact no more effective at reducing CA IMT than simvastatin alone. Plaintiffs allege that Defendants knew the results of the ENHANCE test well before the results were "un-blinded," but withheld that information in order to forestall any negative implications the results would have on Defendants' common stock price. According to Plaintiffs, Defendants used the pretext of data issues to delay the release of the ENHANCE results, and simultaneously made public statements actually touting the ENHANCE study and the purportedly greater medical benefits of Vytorin over simvastatin alone.

On January 14, 2008, apparently in response to growing criticism over the delay in releasing the ENHANCE results, Merck and Schering released what Plaintiffs call "selected top-line results" of the ENHANCE study, which showed that Vytorin failed to reduce the buildup of arterial plaque more than simvastatin alone. Around that same time, reports were published about Congressional and regulatory investigations into improper marketing and advertising of Vytorin in connection with

-2-

the ENHANCE study.  In response to this news, Merck's common stock price dropped from $60.55 per share on Friday January 11, 2008, to close at $58.35 on January 16, 2008, and dropped again to $54.87 per share on January 17, 2008.

Plaintiffs contend that Defendants' improper actions continued beyond these dates. According to Plaintiffs, the response of investors, analysts, and the medical community was tempered by Merck's appeal to wait for the release of the full ENHANCE results.  This release occurred on March 30, 2008, which again showed that Vytorin provided no benefit over generic simvastatin alone in reducing plaque buildup in the arteries.  This release also showed that the Vytorin portion of the study actually experienced an increase in arterial plaque.  A panel of experts then released a statement calling for cardiologists to rein in the use of Zetia and Vytorin.  Following the release of this news, Merck's stock dropped from $44.51 per share on Friday, March 28, to $38.75 per share on Monday, March 31.

A group of plaintiffs filed the original Complaint in this action on May 5, 2008.  ECF No. 1. In an Order dated July 2, 2008, the Court appointed ABP, IFM, Jacksonville and Detroit as Lead Plaintiffs, and appointed Grant & Eisenhofer P.A. ("G&E") and Bernstein Litowitz Berger & Grossmann LLP ("BLBG") as Co-Lead Counsel.  ECF No. 18.  Lead Plaintiffs then filed an Amended Complaint on October 6, 2008.  ECF No. 24.  Plaintiffs filed the currently operative Second Amended Complaint ("SAC") on February 9, 2012.  ECF No. 208.  The SAC alleges that Defendants knew or recklessly disregarded the outcome of the ENHANCE trial months before its public disclosure, but intentionally withheld those results.  The SAC also alleges that Defendants' failure to disclose those results and their public statements concerning the ENHANCE trial were materially false and misleading, causing damage to investors who purchased Merck securities during

the Class Period.

Plaintiffs filed the present Amended Motion to Certify Class on September 16, 2011, seeking

to certify a Class defined as:

> All persons and entities that purchased or acquired Merck common stock, or call options, and/or sold Merck put options, during the period between December 6, 2006 through and including March 28, 2008, and who were damaged thereby.

> Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the subsidiaries and affiliates of Defendants, as these terms are defined by the federal securities laws, including the 401(k) plans of Merck and Schering; (d) any person or entity who was a partner, executive officer, director, or controlling person of Merck, M/S-P or Schering (including any of their subsidiaries or affiliates), or any other Defendants; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

Defendants filed Opposition to Plaintiffs' Motion on December 6, 2011, contending that the

proposed Class Period is too long, that the proposed Class cannot include "in and out" traders, that

the proposed Class cannot include options traders, and that none of the Lead Plaintiffs are "typical"

or "adequate." ECF No. 195.  Plaintiffs filed a Reply on January 31, 2012.  ECF No. 203.  The

matter is now before this Court.

## II.    LEGAL STANDARDS

Class certification under FED. R. CIV. P. 23 has two primary requirements.  First, pursuant

to Rule 23(a), the party seeking class certification must demonstrate the existence of numerosity of

the class, commonality of the questions of law or fact, typicality of the named parties' claims or

defenses, and adequacy of representation.  Second, the party must demonstrate that the class fits

within one of the three categories of class actions set forth in FED. R. CIV. P. 23(b).  Rule 23(b)(1)

allows certification of a class if prosecuting separate actions would result in prejudice either to Plaintiffs or Defendants. In re Ikon Office Solutions, Inc. Sec. Litig., 191 F.R.D. 457, 466 (E.D.Pa. 200). Rule 23(b)(2) allows certification of a class where the party opposing the class has acted or refused to act in a manner generally applicable to the class, so that final injunctive or declaratory relief would be appropriate with respect to the class as a whole. Certification under Rule 23(b)(3) is permitted when the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310 (3d Cir. 2008) (quoting FED. R. CIV. P. 23(b)(3)). "The twin requirements of Rule 23(b)(3) are known as predominance and superiority." Id.

III.   **DISCUSSION**

A.   **FED. R. CIV. P. 23(a)**

1. Numerosity

The numerosity element is met where the class is so numerous that joinder of all class members is impracticable. The Third Circuit has advised that the numerosity requirement is satisfied where the proposed class consists of "more than 90 geographically dispersed plaintiffs." Eisenberg v. Gagnon, 766 F.2d 770, 785-86, cert. denied, 424 U.S. 946 (1985). Further, this Court has previously recognized that numerosity is "obviously" present where the securities issuer is "a large and prominent publicly held company, and its SEC filings confirm that its shareholders number in the thousands." In re Honeywell Int'l, 211 F.R.D. 255, 260 (D.N.J. 2002). In this instance, Plaintiffs clearly have satisfied this element. Merck is a large, publicly held company traded on the New York

Stock Exchange ("NYSE"), and there were approximately 2.147 billion shares of Merck outstanding shortly after the Class Period.  Accordingly, the numerosity element is met.

2. Commonality

Rule 23(a)(2) states that commonality exists if "there are questions of law or fact common to the class."  All claims or facts do not have to be common to all class members, and "the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).  "[F]actual differences among the putative claims of the class members will not defeat certification." Id. at 56.  Further, the United States Court of Appeals for the Third Circuit "has recognized that courts have set a low threshold for satisfying this requirement." Georgine v. Amchem Prods. Inc., 83 F.3d 610, 627 (3d Cir. 1996).

Here, Plaintiffs have easily surpassed this low bar.  Where "[a]ll plaintiffs, both individual representatives and member of the class, seek to establish the defendants' fraudulent conduct under the federal securities laws, commonality is found to exist." In re Loewen Group Sec. Litig., 233 F.R.D. 154, 162 (D.Pa. 2005).  Further, in a securities fraud class action, "questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact . . . ," and therefore, "the commonality requirement has been permissively applied in the context of securities fraud class actions." In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 296 (D. Del. 2003).  This securities fraud class action involves questions such as whether Defendants' alleged statements and omissions were misleading, whether these statements and omissions were material, and whether Defendants acted with scienter.  Accordingly, the commonality element is met.

3. Typicality

To satisfy the typicality requirement, "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims." Gen. Tel. Co. of the Northwest, Inc. v. EEOC, 446 U.S. 318, 330 (1980). The typicality inquiry is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Weisfeld v. Sun Chem. Corp., 210 F.R.D. 136, 140 (D.N.J. 2002) (citing Baby Neal, 43 F.3d at 57). The requirement is satisfied as long as the Lead Plaintiffs, the other representatives, and the Class "point to the same broad course of alleged fraudulent conduct to support a claim for relief." In re Lucent Techs., Inc. Sec. Litig., 307 F. Supp. 2d 633, 640 (D.N.J. 2004). As with the commonality requirement, "factual differences between the claims of the putative class members do not defeat certification." Baby Neal, 43 F.3d at 56. Further, "[i]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong presumption that the claims of the representative parties will be typical of the absent class members." Sun Chem., 210 F.R.D. at 140 (quoting In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)).

Typicality is only destroyed "where the defenses against named plaintiffs are likely to consume a significant portion of the litigant's time and energy and where there is a danger that preoccupation with defenses unique to the representatives will cause absent class members to suffer." In re Sys. Software Assocs., Sec. Litig., No. 97-177, 2000 U.S. Dist. LEXIS 18285, *6 (D. Ill. Dec. 6, 2000). The Third Circuit has held that in order to defeat class certification, a defendant must show

the "likelihood a unique defense will play a significant role at trial." Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006). It is worth noting that "a unique defense is merely a factor that informs the court's decision on class certification and need not destroy typicality." Sys. Software Assocs., 2000 U.S. Dist LEXIS 18285, at *6.

There is no question that Plaintiffs "point to the same broad course of alleged fraudulent conduct" with respect to each Lead Plaintiff and the class. In this instance, Defendants challenge the typicality requirement by arguing that each Lead Plaintiff did not actually rely on the ENHANCE results, and that each Lead Plaintiff is subject to other unique Defenses. The Court will address each argument in turn.

Plaintiffs seek to establish the reliance element of their Section 10(b) claim with the "fraud-on-the-market" theory. Pls.' Mot. Br. 25, ECF No. 179-1. Under this theory, Plaintiffs may be entitled to a rebuttable presumption of reliance "when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 175 (3d Cir. 2001). The first question on this issue is therefore whether the Merck stock was traded on an efficient market. To make such a determination, the Court looks to several factors, including (1) the existence of a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). Defendants have not challenged that the stock was traded on an efficient market; rather, Defendants only argue that the presumption established by each Lead Plaintiff has been rebutted. The Court will therefore

only briefly discuss the above stated <u>Cammer</u> factors, before turning to Defendants' rebuttle arguments.

As an initial matter, the Court notes that securities traded on the NYSE are routinely recognized as trading in an efficient market. <u>In re DVI Inc. Sec. Litig.</u>, 249 F.R.D. 196, 208 (E.D.Pa. 2008) (citing <u>Oran v. Stafford</u>, 226 F.3d 275, 282 (3d Cir. 2000)). The fact that Merck's common stock is traded on the NYSE is of course not a per se indicator of market efficiency, but the <u>Cammer</u> factor analysis in this case once again shows that a stock traded on the NYSE is trading in an efficient market. Under the first factor, an "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." <u>Id.</u> at 209 (citing <u>Cammer</u>, 711 F.Supp. at 1286)). Plaintiffs demonstrate that Merck stock traded at a volume closer to 2.8 percent, well over the threshold justifying a "strong presumption," and this factor accordingly weighs in favor of an efficient market. The analysts coverage also weighs in favor of an efficient market, given that analysts from a number of well known firms such as A.G. Edwards, Bear Stearns, Citibank, JP Morgan, and Merrill Lynch published reports on Merck's securities during the Class Period, and that over 10,000 stories about Merck appeared in leading financial publications during the Class Period. Merck was also clearly eligible to file a Form S-3, since the value of its common stock far exceeded the $75 million dollar threshold, and as demonstrated by the fact that Merck filed a Form S-3 on September 27, 2007. Finally, Plaintiffs have sufficiently demonstrated the existence of a causal relationship between the announcement of unexpected news and an immediate response in the price of Merck common stock. This is evidenced by the drops in Merck stock in response to the events at issue, as discussed above, and is borne out by the report of Plaintiffs' expert Professor Gregg A.

Jarrell comparing the "day-to-day percentage change in the market price of [Merck's] security . . . to the return predicted by a 'market model'" and finding that new information causing an excess in stock returns "was impounded in Merck's stock price within one day." Accordingly, the Court has no doubt that Merck stock traded on an efficient market, and that Plaintiffs are entitled to a presumption of reliance.[1]

Defendants argue that this presumption has been rebutted with respect to each individual Lead Plaintiff. Defendants argue that Lead Plaintiff ABP actually admitted that it did not follow or discuss the ENHANCE clinical trial, Vytorin, or Merck during the class period, and instead only bought Merck stock because Merck was a member of the S&P 100, Merck was a member of the MSCI index, Merck had a favorable social responsibility rating, Merck fit into a "thematic" investment strategy, and Merck was considered less sensitive to the financial crisis. Defs.' Opp'n Br. 33-34. Defendants also point to testimony from ABP's investment managers indicating that they did not rely on the ENHANCE results, but instead pursued other strategies, such as the employment of straight index-based portfolios. Defs.' Opp'n Br. 34. Similarly, Defendants challenge Lead Plaintiff IFM's status, arguing that IFM also admitted that it did not follow the ENHANCE trial and that none of its trades were made in actual reliance on anything about the ENHANCE study. Instead, Defendants note that IFM engaged in "basket trades." Under this system, when new money flowed into IFM's funds, IFM would buy the complete portfolio of 150 securities it identified to own, regardless of the company's particular views of any of the individual stocks. Defs.' Opp'n Br. 35-36.

---

[1] The Court need not consider the market maker factor. "Because market makers are used only for securities traded on the NASDAQ or in the over-the-counter market, this factor is not relevant for our purposes." In re DVI Inc. Sec. Litig., 249 F.R.D. at 210.

Defendants make similar arguments with regards to Jacksonville and Detroit, pointing to testimony from each that the neither Lead Plaintiff relied on the ENHANCE results, and that investment managers for Jacksonville and Detroit testified that they did not follow the ENHANCE trial in their investment strategies.  Defs.' Opp'n Br. 37-39.

In each instance, Defendants' arguments essentially boil down to the contention that the Lead Plaintiffs' mechanical index purchasing and basket trades did not rely on Defendants' alleged misstatements or omissions.  The Court disagrees with the fundamental premise of this contention, however, and finds that the law fully supports the notion that index purchases and the like are in fact a perfect example of reliance on the market.  As the Central District of California noted, "because index purchases seek only to match the index and exclude other considerations (such as, for example, reliance on nonpublic information or other idiosyncratic motivations), index purchases rely exclusively upon the market to impound any representations (including misrepresentations) into securities' prices."  In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 602 (C.D.Cal. 2009).  Defendants' argument that none of the Lead Plaintiffs can establish reliance therefore fails to destroy the typicality of Lead Plaintiffs.

As previously stated, Defendants' challenge to the typicality element is not limited to the reliance arguments.  Defendants also argue that each Lead Plaintiff is subject to other unique defenses.  According to Defendants, ABP is not a typical or adequate representative because its agents have taken positions that put them in conflict with the class.  Defs.' Opp'n Br. 35.  As an example, Defendants note that one of ABP's investment managers testified that it was not aware of any false or misleading misstatements or omissions by Merck during the class period, and that it expected ENHANCE to have negative results before those results were announced.  Defs.' Opp'n

Br. 35. For IFM, Defendants argue that testimony from IFM indicates that Merck's stock dropped immediately on the day of the ENHANCE reveal, which is at odds with the class' contention that it took four trading days for Merck's price to react to the results. Defs.' Opp'n Br. 36. Jacksonville is also subject to unique defenses, according to Defendants, because Jacksonville has taken the position that the ENHANCE trial should not have had significant commercial applications, while a later trial called IMPROVE-IT was expected to have "real meaning" for clinical outcomes. Defs.' Opp'n Br. 38. Finally, Defendants challenge Detroit's status as a typical representative because one of its investment managers testified that he was not aware of any inaccurate statements by Defendants, while another testified that the market did not expect ENHANCE to meet its endpoint. Defs.' Opp'n Br. 40.

Defendants' contentions fail for the simple reason that the Court is not convinced that discussion of these defenses will play a significant role at trial. Defendants' Opposition only brings to light a handful of representatives from the various Lead Plaintiffs whose previous testimony may or may not prove damaging at trial, and the Court finds this insufficient to establish a likelihood that these defenses will prove a "major distraction," as Defendants suggest. Finally, to the extent that such defenses could play any role at trial, the Court again recognizes that this is merely a factor that informs the Court's decision, and need not destroy typicality. The Court therefore finds that the typicality requirement is satisfied.

### 4. Adequacy

Finally, the adequacy requirement is met where the class representatives' interests are not adverse to those of other members of the class, and the class representative is represented by

attorneys who are qualified, experienced, and generally able to conduct the litigation.  The Court

has no doubt that the Class Counsel in this matter is qualified, experienced, and generally able to

conduct the litigation, and Defendants do not challenge this issue.  The other prong of the adequacy

inquiry "serves to uncover conflicts of interest between named parties and the class they seek to

represent and does not mandate that the interests of all class members be identical." La. Mun. Police

Employees Ret. Sys. v. Dunphy, No. 3-4372, 2008 WL 700181, at *6 (D.N.J. March 13, 2008)

(citing Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 625 (1997)) (internal quotation marks

omitted).  "A class cannot be certified when its members have opposing interests or when it consists

of members who benefit from the same acts alleged to be harmful to other members of the class"

Id. (citing Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)).  "Further, when

Lead Plaintiffs have a strong interest in establishing liability under federal securities law, and seek

similar damages for similar injuries, the adequacy requirement can be met." Id. (citations omitted).

In this matter, Lead Plaintiffs' claims are identical to those of the Class: they claim that they

purchased Merck securities during the Class Period and have been injured by the allegedly wrongful

course of conduct at issue.  The Court is therefore satisfied that the adequacy requirement is met.


**B.    FED. R. CIV. P. 23(b)**

Lead Plaintiffs seek certification under Rule 23(b)(3), which is permissible when "the court

finds that the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." FED.R.CIV.P. 23(b)(3).

The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." Hydrogen Peroxide, 552 F.3d at

311 (quoting Windsor, 521 U.S. at 623). "It requires more than a common claim . . . rather, issues

common to the class must predominate over individual issues." Neale v. Volvo Cars of N. Am.,

LLC, No.10-4407, 2011 U.S. Dist. LEXIS 39154, at *5 (D.N.J. April 11, 2011) (citations omitted).

"Because the nature of the evidence that will suffice to resolve the question determines whether the

question is common or individual, a district court must formulate some prediction as to how specific

issues will play out in order to determine whether common or individual issues predominate in a

given case." Id. (citations omitted). "If proof of the essential elements of the cause of action

requires individual treatment, then class certification is unsuitable." Id. at *5-6 (citations omitted).

       As discussed at length above, the reliance inquiry in this matter is the primary issue, and

given Plaintiffs' use of the fraud-on-the-market theory, common questions of Defendants' alleged

misrepresentations and how those statements and omissions affected Merck stock during the class

period will be the critical and predominant issues at trial.

       The superiority inquiry requires a balancing, based on fairness and efficiency, of the merits

of a class action against those of alternative methods of adjudication. Georgine, 83 F.3d at 632.

"One consideration is the economic burden class members would bear in bringing suits on a

case-by-case basis." In re Ins. Brokerage Antitrust Litig., No. 4-5184, 2012 WL 1071240, at *12

(D.N.J. March 30, 2012). Another such consideration is judicial economy; for example, "[i]n a

situation where individual cases would each require weeks or months to litigate, would result in

needless duplication of effort by all parties and the Court, and would raise the very real possibility

of conflicting outcomes, the balance may weigh heavily in favor of the class action." Id. (citations

and internal quotation marks omitted).

This is a classic example of a case that warrants class action. Plaintiffs seek to represent a large Class of securities purchasers who are geographically dispersed and whose individual damages may well be small enough to render individual litigation prohibitively expensive. Further, given the amount of Class members, individually litigating these matters could certainly raise the possibility of conflicting outcomes. Accordingly, the Court finds that this action satisfies the requirements of Rule 23(b)(3), and the Court will certify this matter as a class action.

### C.   Defendants' Remaining Contentions

1. Length of the Class Period

Having determined that this matter should be certified as a class action, the Court must now define that Class. The primary issue raised by Defendants in this regard is their argument that "Plaintiffs seek a class period that is at least two and one-half months too long." Defs.' Opp'n Br. 11. Stating that the issue is "whether the disclosure is sufficiently robust such that 'facts which underlie the gravamen of the plaintiff's complaint [no longer] continue to represent a reasonable basis on which an individual purchaser or the market would rely,'" Defendants argue that the January 14, 2008 disclosure marks the appropriate end date for the Class. Defs.' Opp'n Br. 12 (citing In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 143-44 (D.N.J. 1984)). According to Defendants, the fraud alleged by Plaintiffs is Defendants' purported failure to disclose the results of the ENHANCE trial and that Vytorin was no more effective than Zocor alone in reducing plaque build up in the carotid arteries. Defs.' Opp'n Br. 12. Defendants state that this is exactly what was disclosed on January 14, 2008, that this disclosure and ENHANCE's failure was widely known and reported, and that no reasonable investor would purchase Merck stock after that date under the mistaken view that

the ENHANCE trial was a success.  Defs.' Opp'n Br. 12-16.  Accordingly, Defendants argue that the class period must close on January 14, 2008.

Defendants take issue with Plaintiffs' conclusion that the January 14, 2008 disclosure was only "partial," and further argue that Plaintiffs' proposed end date of March 28, 2008 should be rejected for a number of reasons.  Defendants' first argument on this point cites to Alaska Elec. Pension Fund v. Pharmacia Corp. for the proposition that "as a matter of law, the class period terminates upon a curative disclosure when 'investors should have known that there was a possibility that defendants' claims were false.'" Defs.' Opp'n Br. 16 (citing Pharmacia, 554 F.3d 342, 351 n.11 (3d Cir. 2009)).  Defendants note that in Pharmacia, the Third Circuit held that an earlier disclosure of alleged fraud discussed in a major national newspaper closed the class period, finding that following that publication it was no longer "reasonable for plaintiffs to rely upon defendants' statements," and that any subsequent disclosures were "different in only degree, and not in kind." Defs.' Opp'n Br. 21 (citing Pharmacia, 554 F.3d at 346, 351 & n.11).  Defendants therefore argue that following the January 14, 2008 disclosure, investors "should have known there was a possibility" of fraud, and that any subsequent disclosures were different only in degree.  Defs.' Opp'n Br. 21-22.

Defendants' second disagreement with Plaintiffs' proposed end date is that the more detailed statistical information Plaintiffs point to was in fact not new information, and was not information Defendants allegedly knew, but failed to disclose.  Defs.' Opp'n Br. 22.  According to Defendants, the only "new" information Plaintiffs cite to, that Vytorin actually increases plaque buildup, was already disclosed on January 14, 2008.  Defs.' Opp'n Br. 22-23.  Further, Defendants argue that the "more detailed statistical information" is actually irrelevant anyways, because Plaintiffs mistake a

partial disclosure of the ENHANCE clinical results with a partial disclosure of the alleged fraud. Defs.' Opp'n Br. 23.

Finally, with respect to Plaintiffs' proposed end date, Defendants take issue with Plaintiffs' assertion that the January 2008 release was "tempered by Merck's (and Schering's) appeal to wait for the release of the full ENHANCE results." Defs.' Opp'n Br. 24 (quoting Pl.'s Mot. Br. 9-10). Defendants argue that Plaintiffs do not point to a single statement in which Defendants assert that the trial results disclosed on January 14 were wrong, or that any of Defendants' statements concerning those results were untrue. Defs.' Opp'n Br. 25.

Each of Defendants' contentions on this point argues, as a central premise, that the January 14, 2008 disclosure "cured" any prior misrepresentations. The problem with these contentions, however, is that they are simply premature. Whether a disclosure actually cured any previous misrepresentations is a fact sensitive inquiry, and is more appropriately resolved after sufficient fact finding. See, e.g., In re LDK Solar Sec. Litig., 255 F.R.D. 519, 529 (N.D.Cal. 2009) ("whether or not a particular release or disclosure 'actually cured a prior misrepresentation' is a sensitive issue to rule on at this early stage of the proceedings because it comes so close to assessing the ultimate merits in the case, and courts therefore decline to find reliance thereafter 'unreasonable, as a matter of law,' unless there is 'no substantial doubt as to the curative effect of the announcement.'") (citing In re Federal Nat. Mortg. Ass'n Sec., Derivative and " ERISA" Litig., 247 F.R.D. 32, 38 (D.D.C.2008)). Accordingly, the Court will not limit the Class Period to Defendants' suggested time period. Rather, the Court agrees with Plaintiffs that the Class Period should extend from December 6, 2006 through and including March 28, 2008.

2. "In and Out" Traders

Defendants also seek to exclude so called "in and out" traders from the Class definition. Defendants note that it is "well established that shareholders cannot seek recovery unless they were damaged by the alleged fraud." Defs.' Mot. Br. 28 (quoting In re FleetBoston Fin. Corp. Sec. Litig., No. 02-5461, 2007 WL 4225832, at *11 (D.N.J. Nov. 28, 2007)).   Accordingly, Defendants assert that shareholders who sold their shares while the company stock was allegedly inflated, and before any disclosure corrected that inflation, cannot be included in the class because they have not been damaged.   Plaintiffs have already conceded this point, however, and the Court need not delve deeply into the issue.   See Pl.'s Reply Br. 1 n.1 ("Plaintiffs have already conceded that persons who sold Merck stock before January 14, 2008 were not damaged and are appropriately excluded from the class as defined.").   Accordingly, the Court's definition of the Class will exclude "in and out" traders.

3. Options Traders

Finally, Defendants ask this Court to exclude options traders from the Class, arguing that none of the Lead Plaintiffs has standing to represent options traders.   Defendants note that three of the four Lead Plaintiffs did not purchase or sell any Merck options, and the fourth Lead Plaintiff concedes that it profited from its options trades. Defs.' Opp'n Br. 29.   Defendants rely on In re Bank of America Corp. Sec., Derivative, and Employee Retirement Income Security Act (ERISA) Litig., No. 9-2058, 2011 WL 3211472, (S.D.N.Y. July 29, 2011), for its holding that plaintiffs did not have standing to bring claims on behalf of a class that invested in options that plaintiffs themselves did not trade during the class period.   In this instance, however, the Court finds that Lead Plaintiffs do

-18-

have standing to represent options traders.  The Eastern District of Pennsylvania addressed nearly this exact same issue, confronting the argument by defendants that "common stock holders have interests that diverge from proposed members who held options."   In re Tel-Save Sec. Litig., No. 98-3145, 2000 U.S. Dist. LEXIS 10134, at *18 (E.D. Pa July 19, 2000).  The court disagreed with this argument, finding that "option traders have standing under Rule 10(b) to seek damages for the affirmative misrepresentations that Defendants allegedly made, just as holders of common stock do. Both option and stock holders have an interest in proving that stock prices were artificially inflated by defendants' material misrepresentations and omissions." Id. at *18-19.[2]  Similarly, this District has previously approached the issue as well, holding that a lead plaintiff "may represent purchasers of securities other than common stock because the claims of those purchasers arise from the same alleged fraud as the claims of the common stock purchasers." In re Cendant Corp. Litig., 60 F. Supp. 2d 354, 376 (D.N.J. 1999).  That opinion went on to note that "[w]here the claims of absentee class members arise out of the same basic allegations of fraud as those of the lead plaintiff, the lead plaintiff may adequately represent the interests of those absentee class members." Id. (citing In re Prudential, 148 F.3d 283, 313 (3d Cir. 1998)).

Lead Plaintiffs allege a cause of action for fraud under Rule 10(b) with respect to their purchases of common stock, and with respect to purchases of options by absent class members.  The gravamen of this allegation is the same whether Lead Plaintiffs purchased stock or options; that is, Lead Plaintiffs need to prove, inter alia, that Defendants made material misstatements and/or

---

[2] That opinion went on to note that lead plaintiffs in that instance did purchase both common stock and options.  However, the logic of that opinion, that "[b]oth option and stock holders have an interest in proving that stock prices were artificially inflated" by the defendants' fraud, still properly guides this Court's analysis.

omissions regarding the ENHANCE trial.  Accordingly, the Court finds that Lead Plaintiffs may represent options traders, and the Court will not exclude options traders from the class.

**D.     The Class**

For the reasons stated herein, the Court certifies this matter as a class action, and approves the definition of a Class as follows:

All persons and entities that purchased or acquired Merck common stock, or call options, and/or sold Merck put options, during the period between December 6, 2006 through and including March 28, 2008, and who did not sell their stock and/or options on or before January 14, 2008, and who were damaged thereby.

Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the subsidiaries and affiliates of Defendants, as these terms are defined by the federal securities laws, including the 401(k) plans of Merck and Schering; (d) any person or entity who was a partner, executive officer, director, or controlling person of Merck, M/S-P or Schering (including any of their subsidiaries or affiliates), or any other Defendants; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion is **granted**.  An appropriate Order accompanies this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:
Orig.:          Clerk
cc:             All Counsel of Record
                Hon. Joseph A. Dickson, U.S.M.J.
                File

-21-