CLERK, U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2013 FEB 28 PM 12 40

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| IN RE SCHERING-PLOUGH CORP.<br>ENHANCE SECURITIES LITIGATION | Civil Action No. 08-397 (DMC) (JAD) |
| --- | --- |

| IN RE MERCK & CO., INC.<br>VYTORIN/ZETIA<br>SECURITIES LITIGATION | Civil Action No. 08-2177 (DMC) (JAD) |
| --- | --- |

## REPORT AND RECOMMENDATIONS OF THE SPECIAL MASTERS RELATING TO THE AWARD OF ATTORNEYS' FEES AND EXPENSES

**IN RE SCHERING-PLOUGH CORP. ENHANCE SECURITIES LITIGATION**
**APPEARANCES:**

James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI, OLSTEIN,**
**BRODY & AGNELLO**
5 Becker Farm Road
Roseland, NJ 07068-1739
(973) 994-1700

*Liaison Counsel for the Class*

Max W. Berger
Salvatore J. Graziano
Adam H. Wierzbowski
Laura H. Gundersheim
**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Co-Lead Counsel for the Class*

Jonathan M. Plasse
Christopher J. McDonald
**LABATON SUCHAROW, LLP**
140 Broadway
New York, NY 10005
(212) 907-0700

*Co-Lead Counsel for the Class*

**IN RE MERCK & CO., INC. VYTORIN/ZETIA SECURITIES LITIGATION**
**APPEARANCES:**

James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI, OLSTEIN,**
  **BRODY & AGNELLO**
5 Becker Farm Road
Roseland, NJ 07068-1739
(973) 994-1700

*Liaison Counsel for the Class*

Max W. Berger
Salvatore J. Graziano
Adam H. Wierzbowski
Laura H. Gundersheim
**BERNSTEIN LITOWITZ BERGER &**
  **GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Co-Lead Counsel for the Class*

Jay W. Eisenhofer
Daniel L. Berger
John C. Kairis
Jeff A. Almeida
Kyle J. McGee
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

*Co-Lead Counsel for the Class*

# **Table of Contents**

I. INTRODUCTION .................................................................................................................................1

II. BACKGROUND................................................................................................................................7

    A.    Vytorin and the ENHANCE Trial...........................................................................................7

    B.    The January 14, 2008 Disclosure of the ENHANCE Results...................................8

    C.    The Impact of the January 14 Disclosure ..................................................................8

    D.    The Impact of Subsequent Disclosures....................................................................10

III. THE PROSECUTION OF THE SCHERING AND MERCK ACTIONS ..............................11

    A.    The Securities Litigation is Commenced................................................................11

            1.    The Schering Action ....................................................................................11

            2.    Lead Plaintiff and Co-Lead Counsel Are Appointed in the Schering Action ...........................................................................................11

            3.    The Merck Action ........................................................................................12

            4.    The Merck Lead Plaintiffs and Co-Lead Counsel Are Appointed ............12

            5.    Consolidated Amended Complaints Are Filed in Both Actions................12

            6.    Defendants' Motion to Dismiss the Consolidated Class Action Complaint....................................................................................................14

            7.    Defendants Fight Class Certification ..........................................................14

            8.    Both Actions Involved Massive Fact Discovery ........................................16

            9.    Depositions .................................................................................................19

            10.    Extensive Reliance on Experts....................................................................20

            11.    Summary Judgment Motions .......................................................................22

            12.    Settlement Negotiations...............................................................................23

            13.    Preparation for Trial....................................................................................24

            14.    Settlement Agreements Are Reached on the Eve of Trial ..........................24

| | 15. | The Preliminary Approval Orders ................................................................26 |
| | 16. | The Fee Applications ...................................................................................27 |

IV. DISCUSSION OF APPLICABLE LEGAL STANDARDS ....................................................29

A. The Legal Standard Applicable to Common Fund Cases. ......................................29

B. A Robust Assessment of the Fee Requests is Mandated ........................................31

C. The Applicable Reasonableness Factors.................................................................31

D. The Weight, if Any, to be Accorded Views Expressed by the Lead
Plaintiffs...................................................................................................................32

V. ANALYSIS OF THE SCHERING AND MERCK APPLICATIONS......................................35

A. The Schering Fee Application ................................................................................35

1. The First Factor: The Size of the Fund Created and the Number of
Persons.........................................................................................................35

2. The Second Factor: The Presence or Absence of Substantial
Objections by Members of the Class ...........................................................37

3. The Third Factor: The Skill and Efficiency of the Attorneys
Involved .......................................................................................................37

4. The Fourth Factor: The Complexity and Duration of the Litigation .........40

5. The Fifth Factor: The Risk of Non-Payment .............................................43

6. The Sixth Factor: The Amount of Time Devoted to the Case....................45

7. The Seventh Factor: The Requested Attorneys' Fees are
Reasonable In Comparison to Awards in Similar Cases .............................46

8. The Eighth Factor: Did the Benefits Accrue from the Efforts of
Class-Counsel or Others?.............................................................................49

9. The Ninth Factor: The Amount That Could Be Negotiated in a
Private Contingency Fee Agreement ...........................................................49

10. The Tenth Factor: Any Innovative Terms in Settlement ..........................50

11. An Additional Factor: The Views of Lead Plaintiff Group
Members .......................................................................................................50

12. The Lodestar Cross-Check...........................................................................51

|     | 13. | The Orloff Objection................................................................................54 |

| B. | Co-Lead Counsel's Request for Reimbursement for Litigation Expenses............56 |

| C. | Request for Reimbursement of Costs and Expenses Incurred by Members of Lead Plaintiff Group............................................................................................58 |

| D. | The Schering Recommendations ............................................................................60 |

| E. | The Merck Fee Application .....................................................................................62 |

|     | 1. | The First Factor: Size of the Fund Created and the Number of Persons Benefitted .......................................................................................63 |

|     | 2. | The Second Factor: Number Of Objections By Class Members ...............65 |

|     | 3. | The Third Factor: The Skill and Efficiency of Co-Lead Counsel .............66 |

|     | 4. | The Fourth Factor: Complexity and Duration ...........................................67 |

|     | 5. | The Fifth Factor: The Risk of Non-Payment ............................................68 |

|     | 6. | The Sixth Factor: Amount of Time Devoted By Plaintiffs' Counsel ........72 |

|     | 7. | The Seventh Factor: Awards in Similar Cases .........................................72 |

|     | 8. | The Eighth Factor: Were the Benefits Acquired from the Efforts of the Class-Counsel or Others........................................................................76 |

|     | 9. | The Ninth Factor: The Amount That Could Be Negotiated in a Private Contingency Fee Agreement ........................................................77 |

|     | 10. | The Tenth Factor: Innovative Factors in the Settlement............................77 |

|     | 11. | An Additional Factor: The Views of Lead Plaintiff Group Members .....................................................................................................77 |

| F. | Merck Co-Lead Counsel's Request for Reimbursement for Litigation Expenses ...................................................................................................................90 |

| G. | Members of Merck Lead Plaintiff Group Request for Reimbursement of Costs and Expenses.................................................................................................94 |

| H. | The Merck Recommendations .................................................................................95 |

# STEPHEN M. GREENBERG AND JONATHAN J. LERNER, SPECIAL MASTERS

## I. INTRODUCTION

In this Report and Recommendation, we address two separate motions for an award of attorneys' fees and expenses arising out of the settlement of two different but parallel securities class actions brought on behalf of shareholders of Schering-Plough Corporation (the "Schering Action") and Merck & Co., Inc. (the "Merck Action"), respectively.[1]

Although the claims differ in certain respects, both the Schering Action and the Merck Action contain securities claims under the Securities Exchange Act of 1934 (the "1934 Act") based on allegedly false and misleading statements made in connection with the commercial prospects of Vytorin, a drug being developed and marketed by a Joint Venture formed by Merck and Schering.[2] The allegations in both cases focused on the claimed failure to disclose material information and allegedly false statements pertaining to the results of a clinical trial known as ENHANCE that tested whether Vytorin, a cholesterol lowering drug consisting of a combination of a Merck drug (Zocor) and a Schering drug (Zetia), was more effective than Zocor alone in reducing the intima-media thickness of the carotid arteries ("cIMT").

In both the Schering Action and the Merck Action, the core allegations are that more than a year before the ENHANCE results were made public, the corporate and individual

---

[1]  The Motion by Schering Co-Lead Counsel for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Schering Application") is supported by the Joint Declaration of Salvatore J. Graziano, Esq., a member of Co-Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Christopher J. McDonald, Esq., a member of Co-Lead Counsel Labaton Sucharow, LLP ("Labaton ") (the "Schering Declaration"). The Motion by Merck Co-Lead Counsel for Attorneys' Fees and Reimbursement of Litigation Expenses (THE "Merck Application") is supported by the Joint Declaration of Daniel L. Berger, Esq., a Director of Co-Lead Counsel Grant & Eisenhofer PA ("G&E") and Salvatore J. Graziano, Esq., a member of Co-Lead Counsel BLB&G (the "Merck Declaration").

[2]  Unlike the Schering Action, allegations in the Merck Action does not contain any claims under the Securities Act of 1933. (Merck Decl.. at ¶15.)

defendants conducted improper statistical analyses of ENHANCE trial results and thereby determined that there was no statistically significant difference in cIMT change between subjects receiving Zocor alone and subjects receiving Vytorin. Lead Plaintiffs in the Schering and Merck Actions allege that the defendants failed to disclose their knowledge of these negative trial results while making materially false and misleading positive statements concerning the ENHANCE trial and the commercial prospects of Vytorin and Zetia which allegedly inflated the prices of both Schering and Merck shares. (Merck Decl. ¶ 17; Schering Decl. ¶ 17)

Following the statutory procedure dictated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court appointed a Lead Plaintiff in the Schering and Merck Actions. In each case, the Court appointed a "group" Lead Plaintiff consisting of four large institutions to supervise the prosecution of the cases and in each action approved the Co-Lead Counsel selected by Lead Plaintiff.[3] As is customary in class actions, the Co-Lead Counsel in the Schering and Merck Actions undertook the prosecution of each of these cases purely on a contingency basis. (Schering Decl. ¶ 160-162; Merck Decl. ¶ 144, 145.)

Unlike many large securities class actions, where restated financial statements already have been issued by solvent corporations,[4] or indictments of senior corporate officers

---

[3] *In re Cendant Securities Litigation, 264 F.3d 201, 223 n.3 (3d Cir. 2001),* then Chief Judge Becker observed that where, as here, the Lead Plaintiff appointed under the PSLRA consists of a "group", the members of the group still constitute a *single* plaintiff: "Only one 'entity' is entitled to speak for the class: *the Lead Plaintiff.* In cases where a group serves as Lead Plaintiff, it is for the group's members to decide how the group will make decisions, but it is the group – not its constituent members – that speaks for the class. *A fortiori,* we use the term 'Lead Plaintiff' throughout this opinion." In this Report and Recommendation we follow the Court's instruction referring to the Schering and Merck Lead Plaintiff Groups, and to their constituents as "members" of these groups.

[4] *See, e.g., In re Cendant, supra*; *In re Worldcom, Inc, Sec. Litig., 388 F. Supp. 2d 319, 329 (S.D.N.Y. 2005); Aronson v. McKesson, HBOC, Inc., 2005 WL 93433 (N.D. CA 2005).*

2

already have been announced or are likely to be forthcoming,[5] and critical elements of liability may be viewed from the inception of the case as a foregone conclusion, none of those aids were present here. (Schering Decl. ¶ 155; Merck Decl. ¶ 139.)

In both these cases, Co-Lead Counsel, whose compensation was entirely contingent on achieving success, were on their own.[6] Their success, if any, depended solely on their own discovery efforts to prove liability, their investment of time and expenses would be substantial and the potential that the Class -- and Co-Lead Counsel -- would not prevail and could come away empty-handed was significant.

In both the Schering and Merck Actions, the Co-Lead Counsel, who are among the most sophisticated and qualified law firms in the securities class action Bar, were well aware that these were challenging cases and by no means "lay-ups". (Schering Decl. ¶ 162; Merck Decl. ¶ 146.) At the time the Co-Lead Counsel undertook the significant responsibility to zealously prosecute the Schering and Merck Actions, respectively, they knew they were committing substantial resources to cases that promised to be difficult, complex, lengthy, and in all likelihood, extremely expensive with uncertain outcomes. *(Id.)* After all, the main corporate defendants, Schering and Merck, were large pharmaceutical companies who adamantly denied

---

[5] *Id.*

[6] Apart from the absence of any restatement or potential indictment, no companion SEC proceeding was commenced and no deep-pocket shareholder had initiated separate litigation on which the class action could "piggy back." *See In re DaimlerChrysler AG Securities Litigation, Civ. Action No. 00-993/00-984/01-004 (JJF), Report of Special Master Seitz, January 28, 2004 at 5-6 (*"The revelations in the Financial Times caused Tracinda Corporation to file a fraud and securities action in this case. . . . The filing of Tracinda's complaint triggered an avalanche of class action complaints filed in this district.*") Tracinda v. DaimlerChrysler AG, 502 F.3d 212 (3d Cir. 2007).* At most, a group of state attorney generals investigated allegations that Schering and Merck delayed releasing the results of the ENHANCE trial which settled on July 15, 2009 – almost four years before the settlements in this case – without any admission of misconduct or liability by Schering or Merck and involved a payment of only $5.4 million to cover the cost of the investigation. *(See* Schering Decl. ¶ 120; Merck Decl. ¶ 109.)

3

the allegations. They were no strangers to litigation and had more than ample resources to vigorously defend their innocence. Not surprisingly, Schering and Merck retained eminent and experienced defense counsel and for five years fought both cases tooth and nail. (Schering Decl. ¶ 142; Merck Decl. ¶ 158.)

Reflecting the profoundly divergent views of the merits of the two cases held by both sides, initial efforts to resolve each of the cases through mediation failed dismally. (Schering Decl. ¶ 122; Merck Decl. ¶ 111.) Only after defendants were unsuccessful in obtaining interlocutory review by the Court of Appeals of this Court's orders granting class certification, and after extensive contentious negotiations presided over by the Special Masters (who had served as Mediators pursuant to an Order dated April 9, 2012), were the parties to the Schering and Merck Actions finally able to reach agreements to settle each case – efforts that did not bear fruit in either case until the eve of trial.[7]  (Schering Decl. ¶ 125; Merck Decl. ¶ 114.)

The Schering settlement provides for a cash Settlement Fund of $473 million. (Schering Decl. ¶ 6.) It would be among the twenty-five largest securities class action settlements since passage of the PSLRA. Even more significantly, it would rank among the ten largest post-PSLRA securities class action settlements not involving a financial restatement. (Schering Decl. ¶ 8.)

On July 2, 2013, the Schering Co-Lead Counsel moved for approval of the settlement and for an award of attorneys' fees amounting to 16.92% of the Settlement Fund (including interest thereon), for reimbursement of litigation expenses in the amount of

---

[7]     The settlements finally came only after the Mediators made *final* proposals and imposed a deadline to accept or reject them.   (Schering Decl. ¶ 125; Merck Decl. ¶ 114.)

4

$3,620,049.63, and for reimbursement of expenses incurred by members of the Lead Plaintiff Group. (Schering Decl. ¶ 6.)

The Merck settlement provides for a cash Settlement Fund of $215 million. (Merck Decl. ¶ 8.) It would be among the fifty largest securities class action settlements ever obtained, would rank among the thirty largest securities class action settlements not involving a financial restatement, and is the third largest settlement ever obtained from a pharmaceutical company. (Merck Decl. ¶ 8; *see* Ex. A.) The amount of the Merck Settlement Fund, although not as large as the Schering Settlement Fund, is extremely impressive given the particular challenges presented by the Merck Action in proving causation, materiality, *scienter* and damages emanating from, among other difficulties, the failure of Merck shares to decline in the wake of the initial public disclosure that Vytorin had failed the ENHANCE trial. Unlike Schering's stock, which plummeted approximately 8% losing approximately $3.5 billion in value, Merck's stock price did not decline by any significant amount. (Merck Decl. ¶ 104.)

On July 2, 2013, the Merck Co-Lead Counsel moved for approval of the settlement and for an award of attorneys' fees, for reimbursement of expenses amounting to $4,367,376.95 and for reimbursement of expenses incurred by the members of the Lead Plaintiff Group. (Merck Decl. ¶ 6.) In the Merck Declaration, Co-Lead Counsel abjure applying for a specific amount of attorneys' fees: "[I]in light of the fact that the amount of attorneys' fees to be awarded will be initially recommended to the Court by the Court-appointed Special Masters, Co-Lead Counsel has not applied for a specific fee amount." (Merck Decl. ¶ 130.) Nevertheless, throughout the Merck Declaration and accompanying Memorandum of Law, the Merck Co-Lead Counsel argue that an award of 28% of the settlement would be "reasonable", and they offer support from three members of the Lead Plaintiff Group, "who support an award of fees

5

amounting to 28% of the settlement fund." (*Id.; see also* Merck Lead Plaintiffs' Memorandum of Law in Support at 2: "it is abundantly clear an award of 28% is reasonable".)

By Order dated April 19, 2013, the Court appointed the Special Masters.[8] (S.ECF 418; M.ECF 327.)[9] Among other tasks, the Order directed the Special Masters "to prepare and file with the Court a Report and Recommendation determining any and all issues relating to the amount of attorneys' fees and expenses that should be awarded to the various law firms representing the Class Plaintiffs."[10] (*Id. at 2-3.*) In discharging this responsibility, we are cognizant that the Third Circuit has admonished district courts "to engage in robust assessments of the fee award reasonableness factors when evaluating a fee request." *In Re Rite Aid Corporation Securities Litigation, 396 F.3d 294, 301 (3d Cir. 2005) (Scirica, C.J.); see In Re Prudential Ins. Co., 148 F.3d 283, 340 (3d Cir. 1998)* (remanding for clarification of basis for fee award.) As the Third Circuit subsequently stated in an *en banc* decision in *Sullivan v. D.B. Investments, Inc.*: "[O]ur case law makes clear that a robust and 'thorough judicial review of fee applications is required in all class action settlements." *667 F.3d 273, 329 (3d Cir. 2011)(citation and quotation omitted).*

While we address in detail below the legal standards applicable to assessing legal fee applications, we apply these standards mindful that the overarching objective of our review is

---

[8] References to docket entries in the Schering Action are designated "S.ECF" followed by the entry number and references to docket entries in the Merck Action are designated as M.ECF followed by entry number.

[9] On March 18, 2013, the Court filed a Notice of Intent to Appoint Special Masters pursuant to Federal Rules of Civil Procedure 23(h)(4) and 54(d)(2)(D) and sought consent, objections or any other views no later than March 23, 2013. (S.ECF 394; M.ECF 314.) On March 22, 2013, counsel for the Defendants advised the Court that the Defendants had no objection to the appointment of the Special Masters (S.ECF 395; M.ECF 315) and by letter dated March 25, 2013, Lead Counsel consented to the appointment. (S.ECF 396; M.ECF 316.)

[10] On August 21, 2013, the Court issued an Amended Order directing that we also address the request in the Schering and Merck Applications for reimbursement of expenses by members of the Lead Plaintiff Groups. *(See S.ECF 434; M.ECF 341.)*

6

to "evaluate what class counsel actually did and how it benefitted the class." *In re AT&T Corp.,*
*455 F.3d 160, 165-66 (3d Cir. 2006).* Accordingly, in this Report and Recommendation, we
describe (i) the background of the Schering and Merck Actions; (ii) the prosecution of the
Actions by Co-Lead Counsel from the inception of the actions through the settlement
agreements; (iii) the applicable legal standards to be applied; and then (iv) we evaluate
separately the Fee Applications submitted in the Schering and Merck Actions under the criteria
mandated by Third Circuit law and provide our recommendations.

## II.  BACKGROUND

### A.    Vytorin and the ENHANCE Trial

In 2000, Merck and Schering formed a Joint Venture to develop and market a
cholesterol-lowering drug called Vytorin. (S.ECF 52 ¶ 24; M.ECF 208 ¶ 31.) Vytorin
combines two cholesterol-lowering drugs: (i) Zocor (a brand name for simvastatin, the popular
generic statin drug) and (ii) Zetia (the brand name for ezetimibe). ( S.ECF  52 ¶¶ 44, 80¶; M.ECF
208 ¶¶  47, 52.) Cholesterol has long been linked to plaque buildup that narrows the arteries,
known as "atherosclerosis." (S.ECF 52 ¶¶ 4, 80; M.ECF 208 ¶ 45.) In 2004, the U.S. Food and
Drug Administration approved the use of Vytorin based on clinical evidence that Vytorin is
highly effective in reducing low-density lipoprotein ("LDL" or "bad") cholesterol.  (S.ECF 52 ¶
80; M.ECF 208 ¶ 52.)

The ENHANCE trial was designed to test whether Vytorin was more effective
than statins alone in reducing plaque buildup, as measured by the intima-media thickness
( "IMT") of the carotid arteries.  S.ECF 52 ¶ 90; M.ECF 208 ¶¶ 64, 68.)  Half of the study
participants were treated with Vytorin, and the other half were treated with Zocor. (S.ECF 52 ¶
91; M.ECF 208 ¶ 71.) The "primary endpoint," or main research question being analyzed, was
the amount of change in patients' carotid IMT after two years of treatment. (S.ECF 52 ¶¶ 7, 90-

7

92; M.ECF 208 ¶ 69.) The Defendants expected the ENHANCE trial to demonstrate that Vytorin's combination of Zetia and Zocor would stop or reduce the growth of fatty arterial plaque more than Zocor alone. (Schering Class Action Decision at 2-3, S.ECF 314.)

## B.    The January 14, 2008 Disclosure of the ENHANCE Results

On January 14, 2008, at 8:05 a.m., defendants issued a news release entitled "Merck/Schering Plough Pharmaceuticals Provides Results of the ENHANCE Trial," which announced that there was no statistically significant difference between the carotid IMT of the Vytorin and Zocor patients. (S.ECF 52 ¶ 172; M.ECF 208 ¶¶ 218-220; News Release dated Jan. 14, 2008.) The news release unequivocally stated that the ENHANCE trial had found "no statistically significant difference between treatment groups on the primary endpoint." (S.ECF No. 52 ¶ 172; M.ECF No. 208 ¶ 220.) In fact, it disclosed that there was also no statistically significant difference between treatment groups for each of the components of the primary endpoint, or any of the key secondary imaging endpoints.

The January 14, 2008 news release produced substantial media coverage. The major wire service ran stories that same day, with headlines such as: "Merck, Schering's Vytorin No Better Than Generic" (*Bloomberg News*); "Merck, Schering: Enhance Study Misses Significance" (*Reuters News*); "Merck, Schering-Plough's Cholesterol Drug Combination Fails to Benefit Patients in Study" (*Associated Press Newswires*); and "Study Shows Zetia Increases Level of Plaque in Blood" (NBC Nightly News). (*See, e.g.,* Expert Report of Gregg A. Jarrell (M.ECF 180 ¶ 84.)

## C.    The Impact of the January 14 Disclosure

The following day, national television networks and major newspapers throughout the country ran stories with headlines such as: "Cholesterol Drug Shocker Tests Show No Benefit from Zetia & Vytorin" (ABC News) (Good Morning America); "Cholesterol-Lowering

8

Drug Vytorin Comes Up Short vs. Statin in Study" (USA Today); "Generic Found as Good as Vytorin" (Los Angeles Times); "Study Deals Setback to Vytorin Cholesterol Drug" (Wall Street Journal); and "Study Reveals Doubt on Drug for Cholesterol" (New York Times). (M.ECF 180 ¶ 86.) In one of the articles that day concerning the news release, Dr. Steven Nissen, chief of cardiology at the Cleveland Clinic, stated: "This drug doesn't work. Period. It just doesn't work." (M.ECF 208 ¶ 227; S.ECF 52 ¶ 176.)

The Lead Plaintiffs themselves allege that the January 14, 2008 release "shocked the market" because it "showed that Vytorin failed to reduce the buildup of arterial plaque any more than less expensive generic simvastatin alone." (S.ECF ¶ 172; M.ECF ¶ 218.) Only four days after the news release, on January 18, 2008, Schering shareholders filed a securities class action complaint alleging that the disclosure of the ENHANCE results had been delayed and that the purported "fraud" was disclosed on January 14, 2008. Specifically, the complaint alleged:

On January 14, 2008, investors were shocked and alarmed after it was revealed, for the first time . . . that defendants had purposefully delayed the publication of a study that they possessed throughout the Class Period that demonstrated that VYTORIN was neither safe nor effective.

(S.ECF 1 ¶ 60.)

After the news was announced, Schering's stock price fell approximately 8%, resulting in a loss of approximately $3.5 billion of its market capitalization. (Schering Class Action Decision S.ECF 314.) In contrast, the shares of Merck's stock did not decline by any statistically significant amount on January 14, 2008. (Merck Decl. ¶ 104.) Given the importance of proving loss causation emanating from the Third Circuit's decision in *Semerenko v. Cendant Corp., 223 F. 3d 165 (3d Cir. 2000)*,[11] and the United States Supreme Court's subsequent

---

[11]    In Semerenko, the Third Circuit stated "where the value of the security does not actually decline as a result of our alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that

*(cont'd)*

decision in *Dura Pharmaceuticals, Inc. v. Michael Broudo, et al., 544 U.S. 336 (2005)*, the vastly different stock market reaction of Merck's shares remained an overarching and potentially fatal problem for the Merck Lead Plaintiffs – placing the potential success of the Merck Action on a far more risky footing than the Schering Action.

## D. The Impact of Subsequent Disclosures

In the wake of the January 14 disclosures, the Merck Defendants publicly appealed to investors, analysts and the medical community to await release of the full ENHANCE results and this may have tempered the stock market reaction to the January 14 news. (Schering Class Action Decision at 3; S.ECF 314.)

The release of full information about the ENHANCE trial occurred on Sunday, March 30, 2008 when the results were vetted at a meeting of the American College of Cardiology and discussed in an online article in the *New England Journal of Medicine*. (S.ECF 52 ¶¶ 194, 198; M.ECF 208 ¶¶ 249-255.) In keeping with the previous January 14 release, the full ENHANCE results showed that Vytorin provided no benefit over general simvastatin alone in reducing plaque buildup in the arteries. (Schering Class Action Decision at 3; S.ECF 314.) It also showed that the Vytorin portion of the study actually experienced an increase in arterial plaque. Thereupon, a panel of experts released a statement calling for cardiologists to limit the use of Zetia and Vytorin. *(Id.)*

Following the release of this news, on Monday, March 31, 2008, Schering's shares again plummeted, losing approximately $8.2 billion of its market capitalization. *(Id. at 3.)*

*(cont'd from previous page)*

misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price." Id., 233 F. 3d at 185. *See, Alaska Elec Pension Fund v. Pharmacla Corp., 554 F.3d 342 (3d Cir. 2009).*

10

This time, Merck's shares also declined by more than $14 billion in value. (M.ECF 208 ¶ 261.) Lead Plaintiffs in the Schering and Merck Actions vehemently contended these sharp declines demonstrated that the statements by Merck officials following the January 14 revelation of top line results urging investors to withhold judgment until disclosure of the full results of the ENHANCE trial were both misleading and highly effective. (Schering Class Action Dec. at 3; S.ECF ¶ 314.) Prevailing on this claim was by no means an easy task. After all, given the basic disclosures that already had made on January 14, 2008, revealing Vytorin had failed the ENHANCE trial and the widespread publicity it had received, "it is hard to see what benefits accrue from a short respite from an inevitable day of reckoning. There is no claim here the false statements were made in an effort to sell off shares by management, or to delay a criminal prosecution." *Shields v. Cititrust Bankcorp, 25 F.3d 1124, 1130 (2d Cir. 1994)*.

For the Schering Class, success on this difficult claim could have extended the class period beyond January 14, 2008 and significantly increased the amount of recoverable damages beyond the already large damage claims based on the $3.5 billion investor losses from the original January 14, 2008 disclosures. But, for the Merck Class (and Co-Lead Counsel) winning this argument was imperative. Failure to prevail and extend the case beyond January 14, 2008 would be fatal to the entire Merck Action.

## III. THE PROSECUTION OF THE SCHERING AND MERCK ACTIONSThe Securities Litigation is CommencedThe Schering Action

The ink was barely dry on the January 14 news release when the first Schering Action was filed. On January 18, 2008, the first of several securities class action complaints was filed by Schering shareholders alleging that disclosure of the ENHANCE results had been purposely delayed by Schering. (S.ECF No. 1).

### 2. Lead Plaintiff and Co-Lead Counsel Are Appointed in the Schering Action

11

On April 18, 2008, the Court entered an Order appointing the Lead Plaintiff in the Schering Action pursuant to the PSLRA. The Court appointed as Lead Plaintiff a "group" consisting of the following four institutions: Arkansas Teacher Retirement System ("ATRS"), the Mississippi Public Employees' Retirement System ("MPERS"), Louisiana Municipal Police Employees' Retirement System ("LMPERS"), and Massachusetts Pension Reserves Investment Management Board ("Mass PRIMB") (collectively "Schering Lead Plaintiff Group"). (S.ECF 30) (Schering Decl. ¶ 24)

The Court also approved the Group's selection of BLB&G and Labaton as Co-Lead Counsel for the Class and approved the law firm of Carella, Byrne, Cecchi, Olstein Brody and Agnello ("CBCOBA") as Liaison Counsel for the Class. (Schering Decl. ¶ 139, n. 11.)

### 3. The Merck Action

On May 5, 2008, a securities class action complaint was filed in the United States District Court for the District of New Jersey on behalf of Merck shareholders against Merck and its then Chief Executive Officer Richard T. Clark ("Clark"). (Merck Decl. ¶ 23.)

### 4. The Merck Lead Plaintiffs and Co-Lead Counsel Are Appointed

By Order dated July 2, 2008, the Court appointed as Lead Plaintiff in the Merck Action a group consisting of the following four institutions: Stichting Pensioenfonds ADP ("ADP"), International Fund Management, S.A. (Luxemburg) ("IFM"), the Jacksonville Police and Fire Retirement System ("Jacksonville"), and the General Retirement System of the City of Detroit ("Detroit") (collectively, the "Merck Lead Plaintiff Group"). (Merck Decl. ¶ 24.)

The Court also approved retention by Lead Plaintiff of the law firms of G&E and BLB&G as Co-Lead Counsel (Merck Decl. ¶ 3) and the law firms of CBCOBA and Seeger Weiss, LLP ("Seeger") as Liaison Counsel to the Class (Merck Decl. ¶ 135, n. 7).

### 5. Consolidated Amended Complaints Are Filed in Both Actions

12

Once the PSLRA appointment process was completed, Co-Lead Counsel in both the Schering and Merck Actions began preparing detailed and comprehensive Amended and Consolidated Complaints.

On September 15, 2008, the Schering Lead Plaintiffs filed a 230-page Consolidated Amended Complaint against 37 defendants, including, Schering-Plough Corporation ("Schering"), Merck/Schering-Plough Pharmaceuticals ("M/S-P"), Fred Hassan ("Hassan"), Carrie S. Cox ("Cox"), Robert J. Bertolini ("Bertolini'), Steven H. Koehler ("Koehler"), Susan Ellen Wolf ("Wolf'), certain members of the Schering Board of Directors (the "Director Defendants") (collectively, the "Schering-Related Defendants"), and the underwriters of two offerings of Schering common and preferred stock (the "Underwriter Defendants") (referred to collectively along with the Schering-Related Defendants as the "Schering Defendants"). (*See* Schering Decl. ¶ 26.)

In the Amended Complaint, members of the Schering Lead Plaintiff Group alleged claims under section 10(b), 20(a) and 20 A of the 1934 Act and Sections 11, 15 and 12(a)(2) of the 1933 Act. In essence, they alleged that Schering knew or recklessly disregarded, but did not disclose, the results of the ENHANCE study, which showed that Vytorin was in fact no more effective at reducing cIMT than simvastatin alone. Lead Plaintiff alleged that Schering knew the results of the ENHANCE test well before the results were "un-blinded," but withheld that information in order to forestall any negative impact the results would have on sales of Vytorin and Schering's common stock price. According to Lead Plaintiff, Schering used the pretext of data issues to delay the release of the results, and simultaneously made public statements actually touting the ENHANCE study and the purportedly greater medical benefits of Vytorin over simvastatin alone. (Schering Class Action Decision at 2-3; S.ECF 314.)

13

On October 6, 2008, the Merck Lead Plaintiff Group filed a 216-page

Consolidated and Amended Complaint against Merck, Clark and other officers. (Merck Decl. ¶ 25; M.ECF 24.)

On February 9, 2012, members of the Merck Lead Plaintiff Group filed a Second Amended Consolidated Complaint for violations of the Federal Securities Laws (the "Complaint") which again asserted claims under Sections 10(b) and 20(a) of the 1934 Act and Rule 10b-5. (Merck Decl. ¶ 33.) The Complaint added additional allegations concerning the alleged false statements and dropped all claims against two of Merck's officers who had been named as defendants in the Consolidated Complaint. Defendants denied all violations of the securities laws and asserted affirmative defenses to Lead Plaintiffs' allegations. (Merck Decl. Ex. A to Ex. F at p. 4.)

### 6. Defendants' Motion to Dismiss the Consolidated Class Action Complaint

By December 12, 2008, the Defendants in both cases had moved to dismiss the Schering and Merck Consolidated Class Action Complaints on a variety of legal grounds. In Orders dated September 2, 2009, the Court denied all dismissal motions. (S.ECF No. 123; M.ECF 64 and 65.)

### 7. Defendants Fight Class Certification

On February 7, 2011, members of the Lead Plaintiff Group in both the Schering and Merck Actions filed motions for class certification and, on September 16 and September 22, 2011, respectively, filed amended motions for class certification. (Schering Decl. ¶¶ 46, 47; Merck Decl. ¶¶ 46, 47.)

Securities class actions like the Schering and Merck Actions, routinely are certified as class actions, especially since the advent of the PSLRA in which the Court has been

14

actively involved in the selection of lead plaintiffs and approval of lead counsel. Even though several significant institutions were selected as the Lead Plaintiffs in the Schering and Merck Actions, defendants, leaving no stone unturned, conducted extensive discovery into the propriety of certification and actively contested virtually every possible aspect of class certification. (*See* Schering Decl. ¶ 35; Merck Decl. ¶ 35.) Defendants not only resisted certification, but also utilized the certification process as a vehicle to attempt to sharply limit the Schering class period to end on January 14, 2008 – and to try to eliminate the Merck class entirely. (Merck Decl. ¶ 48.) The pitched battle waged over certification was ferocious.

Indeed, on April 12, 2010, even before Lead Plaintiff Group's motions for class certification were filed, the Schering and Merck Defendants commenced extensive discovery by serving members of the Lead Plaintiff Groups with document requests that were extremely broad, including forty-eight (48) separate requests for documents and nine interrogatories. In response to Defendants' discovery requests, Lead plaintiffs produced more than 15,000 pages of documents, including account statements, investment guidelines and investment manager reports. Defendants then deposed five Rule 30(b)(6) representatives of the various members of the Schering Lead Plaintiff Group and six Rule 30(b)(6) representatives of the various members of the Merck Lead Plaintiff Group. (Schering Decl. ¶¶ 35, 36; Merck Decl. ¶¶ 35-37.)

Defendants also sought discovery from the external investment advisers that purchased Schering and Merck securities on behalf of members of the Lead Plaintiff Groups during the class period. It is common for public pension funds to diversify their investment strategy by apportioning capital among a number of investment managers, who usually specialize in different asset classes – *e.g.*, equity, fixed income, emerging markets, etc. (Schering Decl. ¶ 42; Merck Decl. ¶ 42.)

15

Between December 2010 and March 2011, Defendants served subpoenas *duces tecum* on fifteen external advisors to the members of the Schering Lead Plaintiff Group and twenty-one external advisors to the members of the Merck Lead Plaintiff Group. (Schering Decl. ¶ 43; Merck Decl. ¶ 43.) These subpoenas required review by Co-Lead Counsel of approximately 100,000 pages of documents. (*Id.*) At depositions held throughout the country, Defendants deposed five representatives of the advisors to the members Schering Lead Plaintiff Group and fourteen advisors to the members of the Merck Lead Plaintiff Group. The unusually intense battle over certification even involved submissions of expert reports and expert depositions by all parties. (Schering Decl. ¶ 44; Merck Decl. ¶ 44.)

Following class certification discovery, and after receiving voluminous briefing, on September 25, 2012, the Court issued Opinions and entered Orders granting Lead Plaintiffs' motions in both the Schering and Merck Actions certifying Classes (*See* S.ECF 314; M.ECF 250.)

## 8. Both Actions Involved Massive Fact Discovery

After the motions to dismiss were denied, formal fact discovery began in both the Schering and Merck Actions.[12] (Schering Decl. ¶ 58; Merck Decl. ¶ 55.)

At bottom, both the Schering and Merck Actions required proof of what Defendants knew about the ENHANCE trial – and when they knew it. Of course, this evidence was almost entirely in the exclusive possession of Defendants. Accordingly, a massive discovery effort was required and the highly complex scientific and statistical nature of the

---

[12] Even before the automatic PSLRA stay expired upon the denial of the dismissal motions and resort to formal discovery became available, Co-Lead Plaintiffs had conducted an extensive factual investigation. (*See* Schering Decl. ¶¶ 21-33 ; Merck Decl. ¶¶ 20-22.) The members of the Schering Lead Plaintiff Group also unsuccessfully sought to partially vacate the automatic stay granted by the PSLRA to obtain documents produced in related investigations. (Schering Decl. ¶ 57.)

16

evidence added to the difficulty. Throughout the course of both actions, Co-Lead Counsel embarked on an extensive and hotly-contested discovery effort to attempt to develop evidentiary support for the claims asserted in the Complaints. These efforts were critical to the result achieved for the Classes in both the Schering and Merck Actions.

Lead Plaintiffs in both cases served lengthy document requests, as well as interrogatories, on the various Defendants. Further, Lead Plaintiffs in the two cases gathered additional evidence through subpoenas *duces tecum* served on numerous non-parties, including clinical imaging firms, informatics and technology firms, industry intelligence firms and crisis management firms engaged by Defendants in connection with the ENHANCE trial or the marketing of Vytorin. (Schering Decl. ¶ 59; Merck Decl. ¶ 56.)

In response to these discovery efforts by Co-Lead Counsel, Defendants and non-parties produced more than 12 million pages of documents. (Schering Decl. ¶ 51; Merck Decl. ¶ 58.) In order to efficiently review and analyze this massive response, Co-Lead Counsel dedicated extensive resources and utilized advanced technology to organize, review and analyze the vast amount of information produced by Parties and non-parties. Given the significant efficiencies both in terms of time and money that could be achieved by joining their efforts in the two parallel actions, Co-Lead Counsel in the Schering and Merck Actions coordinated their discovery efforts. (Schering Decl. ¶ 62; Merck Decl. ¶ 59.)

Co-Lead Counsel in the two actions developed a joint discovery program for the review of documents and the taking of depositions, and areas of responsibility both as to document review and depositions were allocated among attorneys in both actions. This approach, among other things, allowed for a larger overall team of attorneys to review the documents and for the teams to effectively share information with each other and with more

17

senior lawyers in each case. This increased the efficiency of the document review in both cases by reducing redundancy and duplicated efforts and facilitated the review of documents and the efficient preparation for depositions. (Schering Decl. ¶ 53; Merck Decl. ¶ 60.)

Additionally, the Co-Lead Counsel in the respective actions also sought to realize significant cost savings by placing all the documents in a shared electronic document depository hosted by a leading litigation technology support company that was hired jointly by Co-Lead Counsel in the Schering and Merck Actions. This avoided significant copying costs necessary to create numerous hard copy sets of the 12 million pages produced at a cost of more than $1 million (at $0.10/page) per set, an order of magnitude more than the $325,602.86 cost Co-Lead Counsel incurred in connection with the document depository. (Schering Decl. ¶ 64; *see* Merck Decl. ¶ 63.)

The electronic document depository also enabled all Lead Plaintiffs' Counsel working on both cases to search the documents through "Boolean" type word searches (*i.e.,* the type of searches used in the Westlaw and Lexis-Nexis databases), as well as by multiple categories, such as by author and/or recipients, type of document (*e.g.*, emails, memoranda, SEC filings), date, bates number, etc. The electronic database was accessible through the Internet, allowing attorneys in both the Schering and Merck Actions, under the direction and supervision of their respective co-lead counsel, to review documents and coordinate discovery remotely. For example, when attorneys in one location identified "hot" documents, that designation was saved so attorneys in other locations would be aware of which documents carried that designation and could immediately review them. Co-Lead Counsel achieved substantial savings by working primarily electronically (saving significant copying costs), and by sharing the costs of electronic data storage. (Schering Decl. ¶ 65; Merck Decl. ¶ 62.)

18

To review the enormous document production, teams of attorneys from Plaintiffs' Counsel in both the Schering and Merck Actions were assembled and thorough document review guidelines and protocols were prepared to aid them. With guidance from more senior attorneys, they worked full-time on this project to complete the document review and analysis as quickly and efficiently as possible. The review was structured to limit overall cost, with the bulk of the initial review being conducted by more junior attorneys. (Schering Decl. ¶ 67; Merck Decl. ¶ 69.)

All aspects of the review by attorneys were supervised by Co-Lead Counsel to attempt to eliminate inefficiencies and to try to insure a high-quality work-product. This supervision included multiple in-person training sessions, the drafting of a detailed "document review manual," presentations regarding the key legal and factual issues in the case and in-person instruction from senior attorneys and experts. The training sessions were supplemented by weekly conferences with senior attorneys at each Co-Lead Counsel firm as well as conferences with Co-Lead Counsel in the companion case to discuss important documents and case strategy. (Schering Decl. ¶ 68; Merck Decl. ¶ 65.)

So-called "hot" documents that were identified were all subject to further analysis and assessment by senior attorneys (with the assistance of Lead Plaintiffs' experts) on an on-going basis. In addition, samplings of documents coded as "relevant" and "non-relevant" were reviewed by those same senior attorneys to provide quality control, i.e., to make certain that the more junior attorneys' assessments were accurate. (Schering Decl. ¶ 69; Merck Decl. ¶ 66.)

### 9. Depositions

In addition to reviewing more than 12 million pages of documents and taking and defending depositions related to class discovery as described above, Lead Plaintiffs in the

19

Schering and Merck Actions conducted more than 45 depositions of fact witnesses and 30(b)(6) witnesses, some of which were two-day depositions. (Schering Decl. ¶ 71; Merck Decl. ¶ 67.)

In preparing for these depositions (and for possible trial), Co-Lead Counsel in both cases needed to analyze complex medical, scientific and statistical issues that were integral to the claims, including to prove loss causation and damages. As a result, Co-Lead Counsel and their experts needed to devote considerable time and effort to learning and analyzing: (i) the principles of conducting clinical trials and the protocol for the ENHANCE study; (ii) the interim and final clinical trial results of the ENHANCE study; (iii) information relating to collection, transmittal, storage and analysis of data gathered during the course of the ENHANCE study, including the use of the "SAS" platform in connection with statistical analyses; (iv) internal Schering and Merck documents and scientific literature concerning the various elements of Vytorin, Zetia, Zocor, other cholesterol drugs in the "statin" class and other cholesterol-lowering medications; (v) internal Schering and Merck documents and scientific literature relating to complex statistical concepts and methods; and (vi) information relating to the marketing practices of Schering, Merck and M/S-P relating to their cholesterol franchise. [13] (Schering Decl. ¶ 73; Merck Decl. ¶ 69.)

### 10. Extensive Reliance on Experts

Given the complex scientific nature of the Schering and Merck Actions, it is hardly surprising that both sides needed to make extensive use of expert testimony. This required the preparation of lengthy expert reports, expert depositions and, of course, *in limine* motions. (Schering Decl. ¶¶ 75-83; Merck Decl. ¶¶ 71-78.) In the Schering Action, the parties

---

[13] Co-lead Counsel in the Schering Action also needed to analyze internal correspondence and memoranda produced by the Underwriter Defendants to determine whether adequate due diligence was conducted in advance of the Offerings. (Schering Decl. ¶ 73.)

exchanged a total of 22 opening and rebuttal reports from 11 experts. (Schering Decl. ¶ 75.) In

the Merck Action, the parties exchanged a total of 18 opening and rebuttal expert reports from a

total of 9 experts. (Merck Decl. ¶ 71.)

On September 15, 2011, the Schering and Merck Lead Plaintiff Groups served

expert reports on Defendants from the following 5 experts:

| Expert | Subject Area |
|---|---|
| Chad Coffman, CPA (Schering expert only) | Damages, Market Efficiency, Causation, Valuation Analyses |
| Gregg A. Jarrell, Ph.D. (Merck expert only) | Damages, Market Efficiency, Loss Causation, Valuation Analyses |
| Curt D. Furberg, M.D., Ph.D. (both actions) | Clinical Trial Standards, Clinical Trial Design, Clinical Trial Data Analyses, Publication of Clinical Trial Results |
| David B. Madigan, Ph.D. (both actions) | Biostatistics, Clinical Trial Standards Relating to Blinded Data, Clinical Trial Data Quality and Reliability |
| Allan J. Taylor, M.D., F.A.C.C., F.A.H.A. (both actions) | Cardiology, Clinical Trial Standards, Imaging Trials, cIMT Methodology, Surrogate Clinical Markers |

(Schering Decl. ¶ 76; Merck Decl. ¶ 72.) Also, on September 15, 2011, Defendants served

expert reports on Lead Plaintiffs in both the Schering and Merck Actions from the following

individuals:

| Expert | Subject Area |
|---|---|
| Arnold Barnett, Ph.D. | Statistics, Clinical Trial Data Quality and Reliability |
| Marc Cohen, M.D., F.A.C.C. | Cardiology, Surrogate Clinical Markers, Publication of Clinical Trial Results |

| Expert | Subject Area |
|---|---|
| Eva Lonn M.D., M.Sc., F.R.C.P.C., F.A.C.C. | Cardiology, Surrogate Clinical Markers, Imaging Trials, cIMT Methodology, Publication of Clinical Trial Results |
| Denise Neumann Martin, Ph.D. | Damages, Market Efficiency, Loss Causation, Valuation, Analyses |
| Robert Starbuck, Ph.D. | Biostatistics, Clinical Trial Data Quality and Reliability, Clinical Trial Data Cleaning |

(Schering Decl. ¶ 78; Merck Decl. ¶ 73.) An additional expert report from Gary Lawrence, Esq. was served by Defendants in the Schering Action on the subjects of investment banking, public equity offerings and underwriter due diligence. (Schering Decl. ¶ 78.) Each of these experts was deposed. (Schering Decl. ¶¶ 81-82; Merck Decl. ¶¶ 76-77.)

## 11. Summary Judgment Motions

On March 1, 2012, the Defendants moved for partial summary judgment and summary judgment in the Schering and Merck Actions, respectively. (Schering Decl. ¶ 84; Merck Decl. ¶ 79.) They contended that Lead Plaintiffs could not prove loss causation as to any corrective disclosure after January 14, 2008. (Schering Decl. ¶ 85; Merck Decl. ¶ 80.) After extensive briefing, on September 25, 2012, the Court denied the motions. (Schering Decl. ¶ 89; Merck Decl. ¶ 84.) In most cases, this would have cleared away the last major obstacle to trial.

Undaunted, on October 9, 2012, Defendants filed separate petitions in both the Schering and Merck Actions pursuant to Rule 23(f) in the Court of Appeals seeking interlocutory review of the Court's orders granting certification in both the Schering and Merck Actions. (Schering Decl. ¶ 53; Merck Decl. ¶ 51.) In these petitions, Defendants specifically challenged the district court's determination that it would be premature to determine to end the class period

22

on January 14, 2013. (Schering Decl. ¶ 53; Merck Decl. ¶ 51.) If Defendants had succeeded, this would have significantly reduced the potential damages in the Schering Action (Schering Decl. ¶ 114) and would have entirely eliminated the Merck Action (Merck Decl. ¶ 104). As Co-Lead Counsel in the Merck Action note, if the class period were ended on January 14, 2008, it would "result[ ] in no recoverable damages for the Class." (Merck Decl. ¶ 104.) On January 7, 2013, the Third Circuit denied the Defendants Rule 23(f) the petitions. (Schering Decl. ¶ 54; Merck Decl. ¶ 52.)

## 12. Settlement Negotiations

By any definition, the settlement negotiations in both the Schering and Merck Actions were protracted and extremely contentious. Before the Court appointed Pilgrim Mediation Group LLC ("Pilgrim") to attempt to mediate a resolution, efforts led by party-appointed mediator Layne Phillips, Esq. had been unsuccessful and an enormous gulf existed between the parties in both cases. (Schering Decl. ¶ 121-22 ("those efforts still left the Parties with unbridgeable differences."). At the inception of Pilgrim's involvement, the discussions with counsel for all parties were dominated by recriminations over who was responsible for the previous miscommunications and lack of progress. As a result, it was difficult to make significant headway as Lead Plaintiffs continued to make stratospheric demands while Defendants refused to move beyond bargain basement proposals. While a modicum of progress did ensue, our efforts to translate it into a resolution fared no better than previous attempts. An "all-hands" mediation session, convened at the courthouse on September 7, 2012, failed to achieve a resolution and quickly demonstrated neither the time nor the dynamics were yet ripe for a settlement. In response, we determined to suspend our efforts and await further litigation developments to see whether they might create a more receptive environment. (*See generally,* Schering Decl. ¶¶ 120-124; Merck Decl. ¶¶ 110-113.)

23

### 13. Preparation for Trial

Once it became evident that neither action could be resolved in the short term, the
Parties turned their full attention to final preparations for what promised to be a lengthy, complex
jury trial scheduled to commence on March 4, 2013. Among other tasks, Co-lead Counsel in
both the Schering and Merck Actions:

- In January, 2013, as part of the pretrial order process, submitted lengthy
  statements of stipulated facts, exhibit lists, deposition designations, *voir dire*
  questions, jury instructions and verdict forms.

- In January and February 2013, filed motions to bifurcate and were served with
  Defendants' competing motions to bifurcate different aspects of the case.

- On January 14, 2013, filed a Dauber motion in the Schering Action
  challenging the testimony of an expert defense witness.

- On February 1, 2013 filed 23 *in limine* motions accompanied by an omnibus
  96-page brief and were served with seven *in limine* motions by the corporate
  defendants, and 2 additional *in limine* motions by the Underwriter Defendants
  in the Schering Action.

- On February 1, 2013 filed responses to Defendants' Dauber motions
  challenging the opinions and qualifications of their expert witnesses.

- In February 2013, filed a trial brief outlining their case in brief and the
  important legal and factual issues to be discussed.

(Schering Decl. ¶¶ 91, 98-100; Merck Decl. ¶¶ 86, 87, 89, 91-96.)

### 14. Settlement Agreements Are Reached on the Eve of Trial

24

In January 2013, once the summary judgment motions had been denied, class action status had been granted, the Third Circuit had rejected any interlocutory review and trial appeared to be both certain and imminent in both the Schering and Merck Actions, we restarted settlement discussions.

Given the radically divergent positions espoused by all of the Parties on the merits and damages and their correspondingly antagonistic settlement postures, either or both of the cases could well have gone to trial. Indeed, both sides appeared ready, willing and able to go that route, especially as the push toward final trial preparation gained momentum. Initially, Lead Plaintiffs and Co-Lead Counsel in both the Schering and Merck Actions continued demanding enormous amounts to settle a difficult circumstantial case they insisted had merit, while defendants and their counsel maintained the cases lacked merit and implacably resisted paying significant amounts until the very end.

Though negotiations still remained complex and difficult, on February 11, 2013, agreements in principle in both cases were reached only after final "take it or leave it" Mediators' proposals containing the financial terms of the settlements ultimately embodied in both the Schering and Merck settlements were accepted. On February 27, 2013, the Court was notified by Counsel for the Defendants that the parties had entered into an agreement in principle to settle the Schering and the Merck Actions. (*See generally*, Schering Decl. ¶¶ 125-126; Merck Decl. ¶¶ 114-115.)

We think the sophistication and quality of counsel for both sides who persuaded their clients that there was considerable risk that the jury, Judge or the Third Circuit might not share their bullish views about the cases were instrumental in producing the Settlement Fund. Given our own perspective, having participated in the intense negotiations, we think the

25

settlements were true compromises by both sides – and the prudence of the Lead Plaintiffs and Co-Lead Counsel in both the Schering and Merck Actions recognizing the considerable risk faced at all levels was significant and constructive. To paraphrase lyrics from a Kenny Rodgers country music song, Co-Lead Counsel in both the Schering and Merck Actions "knew when to hold'em, when to fold'em [and] knew when to walk away" ("The Gambler", lyrics by Don Schlitz.) We believe Co-Lead Counsel in both the Schering and Merck Actions played their cards deftly and their efforts to persuade Lead Plaintiffs to resolve the case at an optimal time for the Class warrants mention, if not some added support for their fee applications.

## 15. The Preliminary Approval Orders

On June 7, 2013, the Court entered Orders preliminarily approving both the proposed Schering and Merck settlements and providing for notice (the "Preliminary Approval Orders"). (Schering Decl. ¶ 133; Merck Decl. ¶ 122.) In the Preliminary Approval Orders, the Court specifically approved the form and content of the notice of the proposed settlements provided to members of the Class (the "Settlement Notice").

The Schering Settlement Notice specifically provided notice that:

Plaintiffs' Counsel, which collectively is Co-Lead Counsel, Liaison Counsel, and all other counsel who, at the direction and under the control of Co-Lead Counsel, performed services on behalf of or for the benefit of the Class, have prosecuted this Action on a wholly contingent basis since its inception in 2008. Co-Lead Counsel (defined below), on behalf of Plaintiffs' Counsel, will apply to the Court for a collective award of attorneys' fees to Plaintiffs' Counsel in an amount not to exceed 17% of the settlement fund (which includes accrued interest). In addition, Co-Lead Counsel will apply for reimbursement of Litigation Expenses paid or incurred in connection with the prosecution and resolution of the Action in an amount not to exceed $5,250,000, plus accrued interest (which will include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class in an amount not to exceed $150,000). Any fees and expenses awarded by the Court will be paid from the settlement fund.

(Schering Decl., Ex. A to Ex. 6 at 2.)

26

The Merck Settlement Notice provided notice that :

Plaintiffs' Counsel, which collectively is Co-Lead Counsel, Liaison Counsel, and all other legal counsel who, at the direction and under the supervision of Co-Lead Counsel, performed services on behalf of or for the benefit of the Class, have prosecuted this Action on a wholly contingent basis since its inception in 2008. Co-Lead Counsel (defined below), on behalf of Plaintiffs' Counsel, will apply to the Court for a collective award of attorneys' fees to Plaintiffs' Counsel in an amount not to exceed 28% of the settlement fund (which includes accrued interest). In addition, Co-Lead Counsel will apply for reimbursement of Litigation Expenses paid or incurred in connection with the prosecution and resolution of the Action in an amount not to exceed $5,000,000, plus accrued interest, and will also apply for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class in an amount not to exceed $175,000. Any fees and expenses awarded by the Court will be paid from the Settlement Fund.

(Merck Decl. Ex. A to Ex. F at 2.)

Pursuant to the Preliminary Approval Orders in both Actions, hearings have been scheduled for October 1, 2013 to determine, inter alia, whether the Proposed Settlements and the motions by Co-Lead Counsel for an award of attorneys' fees and reimbursement of litigation expenses should be approved by the Court. (S.ECF 421, Order at 4; M.ECF 330, Order at 4.) The Preliminary Approval Orders provide that written objections to the Proposed Settlements must be made in writing no later than August 5, 2013.[14]

## 16.  The Fee Applications

---

[14]   The Preliminary Approval Orders provide that any objections must be filed no later than forty-five (45) calendar days after the "Notice Date" (S.ECF 421; Order at 11) which is defined to be ten (10) business days after entry of the Preliminary Approval Order (id. at 4-5) which occurred on June 7, 2013. Accordingly, the Notice Date is June 21, 2013 and 45 days thereafter would fall on Sunday, August 4, 2013, allowing any objections to be filed on or before August 5, 2013, the following business day. (See Schering Decl. ¶ 134; Merck Decl. ¶ 123.)

On July 2, 2013, Co-Lead Counsel in both the Schering[15] and Merck Actions filed their separate applications for attorneys' fees and expenses. Co-Lead Counsel in the Schering Action seek 16.92% of the Settlement Fund which would constitute a total amount of \$80,031,600, plus interest; reimbursement for total litigation expenses incurred in prosecuting the action in the amount of \$3,620,049.63; and reimbursement for expenses incurred by members of the Schering Lead Plaintiff Group totaling \$109,865.31. (Schering Decl. ¶ 6.)

In the Merck Fee Application, Co-Lead Counsel have taken a slightly different approach.[16] As they state, "in light of the fact that the amount of attorneys' fees to be awarded will be initially recommended to the Court by the Court-appointed, independent Special Masters, Co-lead Counsel has not applied for a specific fee amount." (Merck Decl. ¶ 130.) Having demurred from explicitly requesting a specific amount, Co-Lead Counsel hasten to note, "three of the four Lead Plaintiffs expressly support an award of fees amounting to 28% of the Settlement Fund, and the fourth Lead Plaintiff takes no position on the amount of the fee, *and*

---

[15] To be precise, the fee application is by Schering's Co-Lead Counsel on behalf of all the law firms involved on the plaintiffs' side of the Schering Action: "Co-Lead Counsel is making a collective application on behalf of Plaintiffs' Counsel for a fee award of 16.92% of the settlement fund (which includes accrued interest)." (Schering Decl. ¶ 139.) Plaintiffs' Counsel include Co-Lead Counsel and the law firm of CBCOB&A, Court-appointed liaison counsel to the Class; the law firm of Cohen, Milstein, Sellers & Toll, PLLC, and the law firm of Corlew Munford & Smith, PLLC, which served as additional counsel for Lead Plaintiff the Public Employees' Retirement System of Mississippi." (Schering Decl. ¶ 139.)

[16] Although not as explicit as the Schering Fee Application, we interpret the Merck Fee Application by Co-Lead Counsel also to be made collectively on behalf of all Plaintiffs' Counsel who are referred to and included in the lodestar calculation, and who have submitted declarations in support of Merck Co-lead Counsel's Fee Application. (*See* Exhibit A to Exhibit F of Merck Decl.; Notice of Proposed Settlement at 2 ("Co-Lead Counsel on behalf of Plaintiffs' Counsel, will apply to the court for a collective award of attorneys' fees. . . . ").) Throughout the Lead Plaintiffs' Memorandum of Law, they use Co-Lead Counsel and Plaintiffs' Counsel interchangeably. (*See, e.g.,* "[T]he Court should grant Plaintiffs' Counsel a fee equal to a percentage of the \$215 million settlement" (Mem. Of Law at p. 19.)) As stated in paragraph 135 of the Merck Declaration, Plaintiffs' Counsel in the lodestar calculation "include Co-Lead Counsel, the law firms of CBCOB&A and Seeger, Court-appointed liaison counsel to the class; Labaton and Klausner Kaufman PA, additional counsel to Jacksonville". (Merck Decl. ¶ 135.)

*instead defers to the discretion of the Special Masters and the Court.*"[17] (*Id., emphasis supplied.*) In this same vein, the balance of the Merck Declaration states "an award of fees up to 28% would be fair and reasonable" (Merck Decl., subheading A ¶ 132) and that "under the lodestar approach, a fee award of 28% of the settlement fund yields a multiplier of 1.34 on the lodestar . . . which is within the range of multipliers awarded in actions where similar settlements have been achieved." (Merck Decl. ¶ 136.) (*See also* ¶ 150: "[F]or the reasons set forth therein [referring to the Co-Lead Counsel's Memorandum of Law], a fee award *of 28%* is well within the range of fee awards that have been approved in other similarly sized litigation" (emphasis supplied).) Suffice it to say, we interpret the Merck fee application as strongly suggesting, if not requesting, an award of 28%. Merck Co-Lead Counsel also have applied for reimbursement of expenses amounting to $4,367,376.50 and for reimbursement of expenses of the four members of the Merck Lead Plaintiff Group in the aggregate amount of $109,865.31.

## IV. DISCUSSION OF APPLICABLE LEGAL STANDARDS

### A. The Legal Standard Applicable to Common Fund Cases.

In the Third Circuit, the percentage-of-recovery method ("POR") should be applied in common fund cases like the Schering and Merck Actions. *Sullivan v. DB Investments, Inc., 667 F.3d 273, 330 (3d Cir. 2011) (En Banc)("Sullivan").* As the Court of Appeals has held: "[T]he POR method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *(Id. at 3; citations and quotations omitted.) In re AT&T Corp., 455 F.3d 160, 164 (3d Cir. 2006*

---

[17] This characterization is a more definitive reading of the Declaration of ABP, the abstaining a member of the Merck Lead Plaintiff Group, than we give it. The Declaration actually states "ABP will not now take a position on the specific amount of attorneys' fees that should be awarded; rather ABP will await the report and recommendation of the Special Masters and *evaluate that recommendation when it is made, but expects it will defer to the Special Masters.*" (Exhibit B to Merck Declaration at ¶ 13, emphasis supplied.)

*("AT&T")*; *In re Rite Aid Corp. Sec. Litig.*, 396 *F.3d 294, 300 (3d Cir. 2005) ("Rite Aid")
quoting In re Prudential Ins. Co.*, *148 F.3d 283, 333 (3d Cir. 1998)*.

Indeed, Court of Appeals has "several times reaffirmed that the application of a
percentage-of-recovery method is appropriate in common-fund cases." *In re Cendant Corp.
PRIDES Litig., 243 F.3d 722, 734 (3d Cir. 2001) ("Cendant PRIDES") (citing Gunter v.
Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) ("Gunter")).* To be sure, while
the Third Circuit has repeatedly "recommended" that POR award be "cross-checked" against the
lodestar method to ensure its reasonableness,[18] *In re Cendant Corp. Litigation, 264 F.3d 201,
286 (3d Cir. 2001)("Cendant I"),* "[t]he lodestar cross-check, while useful, should not displace a
district court's primary reliance on the percentage-of-recovery method." *AT&T at 164.*

In keeping with prior case law, the PSLRA, which governs the Schering and
Merck Actions, incorporated the POR method by providing that "[t]otal attorneys' fees and
expenses awarded by the court to counsel for plaintiffs shall not exceed a reasonable percentage
of the amount of any damages and prejudgment interest actually paid to the class." PSLRA, 15
U.S.C. §78u-4(a)(6). The Third Circuit has interpreted this language to reflect the intention of
Congress to adopt the percentage-of-recovery method, rather than the lodestar method, in

---

[18] Although consistently phrased as a "recommended" or "suggested" cross-check, the Third Circuit in *Rite Aid*
agreed with the objector that in "cross-checking" the lodestar, "the district court improperly applied the billing
rates of only the most senior partners of plaintiffs' co-lead counsel, resulting in an artificially low multiplier. . . .
The district court should apply blended billing rates that approximate the fee structure of all attorneys who
worked on the matter. That did not occur here. . . . Failure to apply a blended rate, we believe is inconsistent
with the exercise of sound discretion *and requires vacatur and remanding* for further consideration." *396 F.3d
at 306 (emphasis supplied)..* If an incorrect calculation of the lodestar by the court while cross-checking is an
abuse of discretion, *a fortiori*, failure to perform a lodestar cross-check at all must be reversible error. In
reality, the lodestar cross-check, therefore, must be considered to be a requirement. As then Chief Judge Becker
previously had observed in *Cendant I*, "Arguably Cendant PRIDES, which, as noted above . . . was not decided
as a Reform Act case, may have, by implication, elevated the lodestar cross-check from being a
'recommendation' to a requirement." *264 F.3d at 285, n.57.* In light of *Rite-Aid's* subsequent remand, there can
no longer be any real doubt that the lodestar "cross-check" is more than a recommendation – it is mandated.

determining attorneys' fees in securities class actions. *See In re Cendant Corp. Sec. Litig.*, *404 F.3d 173, 188 n.7 (3d Cir. 2005) ("Cendant II"); Rite Aid, 396 F.3d at 300.*

## B.  A Robust Assessment of the Fee Requests is Mandated

As the Court of Appeals has made abundantly clear: "[A] 'robust and thorough

judicial review of fee applications is required in all class action settlements.'" *Sullivan,* 667 F.3d

at 329 *quoting In re DietDrugs*, 582 F.3d 524, 537-38 (3d Cir. 2009). *Accord, Rite Aid*, *396 F.3d*

*at 302* ("[W]e remind the trial courts to engage in robust assessments of the fee award

reasonableness factors when evaluating a fee request").

## C.  The Applicable Reasonableness Factors

In applying the POR method to a requested fee award, among the factors the

district court should consider are the seven factors derived from *Gunter:*

> (1) the size of the fund created and the number of persons benefitted; (2) the
> presence or absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

*223 F.3d at 195, n.1; accord,  AT&T, 445 F.3d at 165;  Rite Aid, 396 F.3d at 301.*

These factors were, however, not "intended to be exhaustive". *AT&T, 455 F.3d at*

*165*. As Chief Judge Scirica observed:

> In *Prudential*, we noted three other factors that may be relevant and important to
> consider: (i) the value of benefits accruing to class members attributable to the
> efforts of class counsel as opposed to the efforts of other groups, such as
> government agencies conducting investigations (ii) the percentage fee that would
> have been negotiated had the case been subject to a private contingency fee
> agreement at the time counsel was retained; and (iii) any "innovative" terms of
> settlement.

*AT&T, 455 F.3d 165 (citations omitted)*.  Thus, there are at least ten factors that must be

evaluated in assessing the reasonableness of an award of legal fees. *Sullivan, 366 F.3d at 330*

(referring to "each of the ten factors that we identified in *Gunter v. Ridgewood Energy* and

*Prudential"*).

In applying these factors in *AT&T*, the Third Circuit has emphasized the

touchstone of the reasonableness analysis:

> [W]henever a district court awards attorneys' fees in class action cases, "[w]hat is
> important is that the district court evaluate what class counsel actually did and
> how it benefitted the class."

*In re AT&T, 455 F.3d at 166, quoting Prudential, 148 F.3d at 342.*

## D.  The Weight, if Any, to be Accorded Views Expressed by the Lead Plaintiffs

Each member of the Schering Lead Plaintiff Group and three out of four members

of the Merck Lead Plaintiff Group have expressed views on the fee applications. We must,

therefore, determine what, if any, weight should be accorded to these views.

As established in *Cendant I,* "[u]nder the PSLRA, courts should accord a

presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that

was entered into between a properly-selected lead plaintiff and a properly selected lead counsel."

*264 F.3d at 282.* As the Court explained, "[t]his presumption will ensure that the lead plaintiff,

not the court, functions as the class's primary agent vis-à-vis its lawyers," and also would help

align the interests of the class and its lawyers: "Further, by rendering *ex parte* fee agreements

more reliable, it will assist those agreements in aligning the interests of the class and its lawyers

during the pendency of the litigation." ( *Id.)*

Even when an *ex ante* fee agreement is entered into by a lead plaintiff and lead

counsel, subsequent Third Circuit jurisprudence appears to have diluted the weight to be

accorded the *Cendant* presumption. As the Court of Appeals emphasize in *AT&T*:

> We now emphasize that the presumption of reasonableness set forth in
> *Cendant* does not diminish a court's responsibility to closely scrutinize all fee
> arrangements to ensure fees do not exceed a reasonable amount. *We caution*

*against affording the presumption too much weight at the expense of the court's duty to act as a fiduciary guarding the rights of absent class members.*

*455 F.3d at 168 (emphasis supplied).*

Where, as here, the fee application is not predicated on an *ex ante* fee agreement, the Court of Appeals has held, "We would then review the fee request using the traditional standards." *AT&T, 455 F.3d at 172* (holding "traditional standards" apply if *Cendant* presumption were abrogated.) The question remains, however, what, if any, weight should be accorded the *ex post* views provided by members of the Schering Lead Plaintiff Group and the majority of the members of the Merck Lead Plaintiff Group.[19]

Unlike *ex ante* fee agreements which help "align[] the interests of the class and its lawyers during the pendency of the litigation," the *ex post* views provided here by Lead Plaintiffs do not assist this alignment. *A fortiori*, the *ex post* views expressed by Lead Plaintiffs do not rise to the level of an *ex ante* agreement and are not sufficient to trigger even the mild *Cendant* presumption. *Compare, Lucent Technologies, Inc. Securities Litigation, 327 F. Supp. 2d 426, 434 (D.N.J. 2004) (Pisano, J.)* (applying *Cendant* reasonableness presumption where Lead Plaintiffs negotiated a revised fee agreement with common shareholders' lead counsel when the case concluded to reflect the evolution of the case and to harmonize the terms of the two original retainer agreements.) We are reinforced in our conclusion by both the Schering and Merck Fee Applications which do not suggest any presumption of reasonableness applies.

---

[19] Although APB has reserved its position on the amount of legal fees that should be awarded in the Merck Action, it provides some affirmative support for the fee application. At the very least, APB appears to have authorized the fee application to be submitted (*see* Merck Lead Plaintiff Mem. Of Law at p. 18 ("Co-Lead Plaintiffs requested Plaintiffs' Counsel not to seek a fee greater than 28% of the Settlement Fund, and Lead Counsel agreed")), attests to the reasonableness of the *Lodestar* of *G&E*, acknowledges the fee agreement with G&E was executed before "joining with co-lead plaintiffs and co-lead counsel," and indicates it "expects" to defer to the Special Masters' Recommendation. (*See* Merck Decl. Ex. B ¶ 13.) We interpret this as more than a mere "failure to object". (*Compare Cendant*, 264 F.3d at 281 ("acquiescence" (which is the most a failure to object shows) is not the same thing as "prior approval".)

33

On the other hand, the Lead Plaintiff and Co-Lead Counsel in both the Schering and Merck Actions were properly selected pursuant to the PSLRA and "there is good reason to think under the PSLRA that a lead plaintiff that has been properly selected" would possess "the incentive and ability to monitor lead counsel's performance". *Cendant*, 264 F.3d at 282.   Each member of the Lead Plaintiff Groups (except for ABP in the Merck Action which has deferred) has submitted an affidavit attesting to their involvement in this case and their active roles in monitoring Lead Counsel.   Our own previous observation of the active roles played by Lead Plaintiffs during the Mediation confirm that they actively participated in supervising Lead Counsel.

As the Third Circuit has stated, "[i]n reviewing an attorneys' fees award in a class action settlement, a district court should consider the *Gunter* factors, the *Prudential* factors, and any other factors that are useful and relevant to the particular facts of the case." *AT&T*, 455 F.3d at 166 (emphasis supplied).   Given their active roles, we believe the views of the members of the Lead Plaintiffs Groups in both the Schering and Merck Actions are "useful and relevant," that according weight to them is consistent with their role under the PSLRA as "the class' primary agent[s] *vis-a-vis* its lawyers" *(Cendant I , 264 F.3d at 282)* and their views should be considered as an additional factor bearing on the reasonableness of the amount of the award. *(See Lucent Technologies, 377 F Supp. 2d at 440.)*

## V. ANALYSIS OF THE SCHERING AND MERCK APPLICATIONS

### A. The Schering Fee Application

We now apply the reasonableness factors to the Schering Fee Applications.

#### 1. The First Factor: The Size of the Fund Created and the Number of Persons

The first *Gunter* factor requires assessment of the size of the fund created and the number of persons benefitted. The size of the common fund is a primary benchmark of the success obtained and is, therefore, one of the critical factors in evaluating an attorneys' fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("the most critical factor is the degree of success obtained").

Under any criteria, the size of the fund created by the Schering settlement is an outstanding result. The Schering settlement created a $473 million Settlement Fund which would be among the twenty-five largest securities class action settlements since passage of the PSLRA. Even more significantly, it would rank among the ten largest post-PSLRA securities class action settlements ever achieved without the assistance of a financial restatement. In absolute dollars alone, the size of the Schering Settlement Fund is extremely impressive. A comparison of the Settlement Fund created here to the results in other cases involving comparably sized investor losses, confirms the great success achieved by Schering's Co-Lead Counsel. Although the Schering Fee Application did not provide an expert report or offer comparative analyses to other settlements – perhaps content to let the absolute amount speak for itself -- the NERA Consulting Group's respected "Recent Trends in Securities Class Action Litigation: 2012 Full Year Review," which contains an analysis of the median securities class action settlement value as a percentage of investor losses from January 1996 through December 2012, confirms that the size of the Settlement Fund is a significant achievement for the Class.

35

According to NERA's analysis, the median settlement value as a percentage of investor losses in cases where investor losses were between \$1 billion and \$4.999 billion was only 1.1%. Where investor losses were between \$5 billion and \$9.999 billion, the median settlement was only 1.0%, and where investor losses exceeded \$10 billion, the median settlement was a mere .7%. *(NERA, Recent Trends in Securities Class Action Litigation: 2012 Full Year Review at p. 32.)*

Measured against January 14, 2008 investor losses of \$3.5 billion, the \$473 million Settlement Fund constitutes more than 13% of the investor losses. The achievement is all the more impressive given the absence of any critical admissions from criminal pleas or financial restatements or assistance by companion SEC or DOJ proceedings, or even a motivated deep-pocket individual shareholder leading the charge.[20]

Even if we were to include in the equation the far more speculative additional Schering investor losses on March 31, 2008, after the full results of the ENHANCE trial were disclosed -- recovery of which are much more problematic given the January 14 disclosures -- which could add another \$8.2 billion of investor losses, the Settlement Fund still would constitutes a full 4% of the \$11.7 billion of investor losses compared to the median settlement for losses of that size of only .7% -- a very small fraction of the Schering settlement here.

As of August 12, 2013, a total of 406,733 Settlement Notice Packets had been mailed to potential class members and nominees. (Suppl. Decl. of Stephanie A. Thurin ¶¶ 4,5.) Accordingly, there can be little doubt that a great number of Schering investors will benefit from the settlement.

---

[20] Indeed, the only other outside effort appears to have come from a group of state attorneys general who resolved their investigations years before the settlement of the Schering Action for \$5.4 million to cover their costs. *(See* Schering Mem. Of Law at p. 27; Schering Decl. ¶ 120.)

In the final analysis, we think the $473 million Settlement Fund is an outstanding accomplishment that strongly supports the requested 16.92% attorneys' fees requested.

## 2. The Second Factor: The Presence or Absence of Substantial Objections by Members of the Class

As of July 1, 2013, more than 346,000 Settlement Notice Packets had been mailed to potential Class Members pursuant to the Court's Preliminary Approval Order advising them that Co-Lead Counsel would seek an award of attorneys' fees not to exceed 17% of the Settlement Fund. Despite the large number of Class Members, only a single objection to the fee application had been received by the August 5, 2013 deadline.

Under these circumstances, there can be no doubt that this overwhelmingly positive reaction to the Schering Fee Application strongly supports approval of the requested fee. In *Rite Aid*, the Court of Appeals for the Third Circuit held in language equally applicable here: "The class' reaction to the fee request supports approval of the requested fees. Notice of the fee request and the terms of the settlement were mailed to 300,000 class members, *and only two objected. We agree with the district court such a low level of objection is a 'rare phenomenon.'*" *Rite Aid, 396 F.3d at 30 (emphasis supplied). See AT&T, 455 F.3d at 166, 170* (where "more than one million class members were notified of the proposed settlement. . . and only four opposed the attorneys' fee award. No objections were filed by institutional investors with the greatest financial stake in the settlement. The district court characterized this low level of objection as rare. . . . ") Plainly, the single objection here, which we conclude below lacks merit, is an equally "rare phenomenon" and strongly supports the Schering fee application.

## 3. The Third Factor: The Skill and Efficiency of the Attorneys Involved

In this case, we have no doubt that the outstanding result achieved for the class is the direct product of outstanding skill and perseverance by Co-Lead Counsel. The skill and

37

efficiency of counsel is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Hall v. AT&T Mobility LLC*, No. *07-5325 (JLL), 2010 WL 4053547, at \*19 (D.N.J. Oct. 13, 2010) (citation omitted).* Indeed, courts in this district have found that "the single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." *In re Aremisoft Corp. Sec. Litig.*, *210 F.R.D. 109, 132 (D.N.J. 2002).* Here, the $473 million Settlement Fund was obtained through Co-Lead Counsel's hard work, persistence and skill, overcoming numerous difficult and novel legal and factual challenges, which were litigated to the hilt by highly-experience and first-rate defense counsel to the eve of trial.

Indeed, the case was fraught with unusual class certification issues and the absence of high-level direct admissions requiring Co-Lead Counsel to grapple with complex issues of circumstantial proof, loss causation and damages, many of which lacked clear precedent. In particular, they faced substantial difficulties in establishing falsity and *scienter,* given Defendants' claimed data quality reasons for delaying the ENHANCE results and loss causation and damages under Section 10(b), given that the top-line results of the ENHANCE study were publicly disclosed two months before the end of the Class Period. *Scienter* would have been especially hard to prove in a highly complex, scientifically based case where Co-Lead Counsel were forced to rely only on circumstantial evidence presented through adverse witnesses and highly technical expert testimony. (Schering Decl. ¶¶ 106-14, 159-60.)

Although cases of this magnitude, especially founded on complex scientific circumstantial evidence, by nature do not lend themselves to efficiency, no doubt mindful that a

recovery was by no means certain and that a very real risk existed that the enormous amount of time and expenses Co-Lead Counsel committed to the Schering Action might never be recoverable, Lead Counsel had every incentive to be as efficient as possible. From their pre-filing investigation, through fact and expert discovery, and into final pretrial preparations, Co-Lead Counsel developed and followed a plan to coordinate the marshaling of evidence and prosecution of the Action. (Schering Decl. ¶ 21.) To achieve synergies, among other things, Co-Lead Counsel conducted the review of Defendants' twelve million page document production in close coordination with Co-Lead Counsel in the parallel Merck Action. The cooperative effort among Plaintiffs' Counsel in the two cases allowed for a larger overall team of attorneys to review the documents and for the teams to more effectively share information with each other and with more senior lawyers in each case, allowing for a more efficient document review, reducing redundancy and duplicated efforts. (Schering Decl. ¶¶ 62-69.)

         With respect to "the experience and expertise" of counsel, Plaintiffs' Counsel are the cream of the crop of the securities class action Bar. Co-Lead Counsel are among the most experienced and skilled firms in the securities class action litigation field, and each firm has a long and successful track record in securities cases throughout the country. (Schering Decl. ¶ 157.) *In re Schering-Plough Corp. Enhance ERISA Litig.*, *No. 08-1432, 2012 WL 1964451, at *6 (D.N.J. May 31, 2012) (Cavanaugh, J.)* (noting that the skill and efficiency of attorneys with substantial experience in class action litigation, as demonstrated by their supporting documents, favored an award of attorneys' fees); *In re Genta Sec. Litig.*, *No. 04-2123, 2008 WL 2229843, at *10 (D.N.J. May 28, 2008)* ("the attorneys' expertise in securities litigation favors approving the requested award for attorneys' fees").

In a securities class action of this potential magnitude, and given the caliber of the opposition, a top-tier team like this was needed. "'The quality of opposing counsel is also important in evaluating the quality of counsel's work.'" *Hall*, 2010 WL 4053547, at \*19 (citation omitted); *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-CV-525 (GEB), 2007 WL 4225828, at \*7 (D.N.J. Nov. 28, 2007). *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 358 (S.D.N.Y. 2005) (stating defense counsel, including Paul, Weiss, the lead defense firm here, were "formidable opposing counsel" and among "some of the best defense firms in the country").

Defense counsel zealously represented the interests of their respective clients and were fully prepared to try and appeal this case to the very end. Faced with this experienced, formidable, and well-financed opposition who aggressively litigated the Schering Action, Co-Lead Counsel stood toe-to-toe and achieved an outstanding result for the Class. The fact that Co-Lead Counsel achieved this Settlement for the Class "in the face of formidable legal opposition further evidences the quality of their work." *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 496 (E.D. Pa. 2003).

The quality of the representation provided by Co-Lead Counsel and the team they assembled, which we believe is directly responsible for the outstanding result that was achieved, strongly supports the reasonableness of the fee request.

**4. The Fourth Factor: The Complexity and Duration of the Litigation**

As the Third Circuit has observed, a case is complex when it involves "complex, and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." (*PRIDES, 243 F.3d at 722.*) Under this definition, or any other test, the Schering Action epitomizes the kind of complex case embodying all the factors described by the Third Circuit. It was vigorously litigated to the hilt for five years and

40

required extensive discovery into extremely difficult circumstantial evidence involving complex scientific and statistical data.

The Schering Action included claims under both the 1934 Act and the Securities Act against more than two dozen defendants. (Schering Decl. ¶¶ 15-19.) At every turn, the case presented difficult and challenging legal and factual issues that required creativity and sophisticated analysis. It was hotly contested at every stage -- from motions to dismiss and class certification through the partial summary judgment motion -- and included exhaustive discovery and trial preparation. Even the settlement negotiations, which initially succeeded only inflaming both sides, spanned two years and were incredibly contentious and complicated. *(Id. at ¶¶ 11, 121-25.)*

The basic theory of the case – that Schering cheated on the ENHANCE trial by secretly "unblinding" it -- presented extremely difficult challenges given the highly technical nature of the alleged fraud. Given the absence of admissions of liability or a "smoking gun" to prove their case, Lead Plaintiff needed to show that Schering biostatisticians conducted improper statistical analyses on unblinded data from the ENHANCE study, and from their knowledge of statistical methods, were able to deduce that Vytorin had failed the ENHANCE study. These complicated claims of cheating in the conduct of clinical trials were especially difficult to present to a jury and were vigorously disputed by Defendants, who offered a plausible alternative explanation, supported by experts and numerous exhibits, that Defendants were attempting to improve data quality and not improperly learning the ENHANCE results. In this context, a very real risk existed that a jury would conclude Defendants did not "cheat" at all by prematurely unblinding the ENHANCE test or that they did not act with the requisite *scienter* required by the 1934 Act claims. Indeed, it bears emphasis that the statistical analyses at the heart of the

41

Schering Action were conducted by employees of Schering who were several steps down the corporate ladder from the senior officers of the Company requiring Co-Lead Counsel to rely entirely on circumstantial evidence to attempt to show that the senior officers were aware that the ENHANCE study had failed. (Schering Decl. ¶¶ 109-11); *AT&T, 455 F. 3d at 170* ("the difficulty of proving actual knowledge under §10(b) of the Securities Exchange Act . . . weighed in favor of approval of the fee request.").

The Securities Act claims were also challenging. Sections 11 and 12 require a plaintiff to "come forward with facts to suggest that reasonable jurors might be able to find that the information allegedly omitted or misrepresented *was known* . . . prior to the time the prospectus was prepared and disseminated. . . . : *Krim v. Banktexas Group, Inc. 989 F.2d* 1435, *1446 (5th Cir. 1993). Compare, Castlerock Management, Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 323 (D.N.J. 2000) (Hochberg, J.)* ("Section 11 or Section 12 require 'that allegedly omitted facts both existed *and were known or knowable at the time* of the offering'") *with Truk Int'l Fund LP v. Wehlmann, 737 F. Supp. 2d 611, 621 aff'd 389 Fed. Appx. 354 (5th Cir. 2010).* Accordingly, the Schering Lead Plaintiffs to prevail on the Securities Act claims still needed to prove the underlying misconduct with the ENHANCE trial was known by senior officers of Schering at the time of the Offering Materials.

Lead Counsel also needed to rely heavily on expert witnesses for critical scientific expert testimony. Defendants sought to block the experts by the filing of Daubert motions challenging all five of Lead Plaintiff's designated testifying experts. Had Defendants prevailed in excluding any of this testimony, the presentation of many aspects of the case would have been more difficult and the exclusion of all this testimony could have crippled the case. (See Schering Decl. ¶¶ 116-17.)

42

We conclude the Schering Action was extremely complex and lengthy and that this factor strongly supports the requested attorneys' fees.

### 5. The Fifth Factor: The Risk of Non-Payment

Some cases addressing the risk of non-payment have focused on the credit risk presented to defendants when trying to "collect" a judgment once it is obtained. (*See, e.g., In re Lucent Technology, 327 F. Supp. At 439; see also, In re AT&T Corp.*, *455 F.3d at 171* ("chances of AT&T going bankrupt are quite small. . . . ") In *Rite-Aid*, the Third Circuit made clear the risk of non-payment also includes the "risk of establishing liability". *396 F.3d at 304* (holding " the District Court made several significant findings in assessing the 'risks of establishing liability' under the *Girsh* analysis that affect the risk of non-recovery" and "there were significant risks of non-payment or non-recovery, which weighs in favor of approving the fee request.") *See Rowe v. DuPont DeNemours & Co., 2011 WL 383710 (D.N.J. 2011).*

Here, Plaintiffs' Counsel undertook this Action on a purely contingent fee basis, assuming an enormous risk that the litigation would yield potentially little, or no, recovery and leave them uncompensated for their significant investment of time and very substantial expenses. This Court and others have consistently recognized that this risk is an important factor favoring an award of attorneys' fees. *See, e.g., Schering-Plough ENHANCE ERISA Litig., 2012 WL 1964451, at \*6 (Cavanaugh, J.)* ("Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval").

From the outset of this Action, Co-Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Co-Lead Counsel obligated themselves to ensure adequate resources were dedicated to the prosecution of the Schering Action, and that millions of dollars

in funding were available to compensate staff and to cover the expenses a case like the Schering Action required. Even if the case were to be successful – which, as we have explained, was by no means a foregone conclusion – an expected lag time of several years exists for cases of this type to conclude. Accordingly, both the risk and financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. As it turned out, Plaintiffs' Counsel still have not yet received any compensation whatsoever during the nearly five years the Schering Action has been pending for the massive commitment of attorney time devoted to the case – 126,177.49 hours (*see* Schering Decl. ¶ 152) or reimbursement for the $3,620,049.63 incurred in external expenses in prosecuting this Action for the benefit of the Class. (Schering Decl. ¶ 162.)

The significant risk of no financial recovery in a complex case like this one is heightened when plaintiffs' counsel aggressively press to maximize the result for the Class, as Co-Lead Counsel did here, rather than "satisficing" – accepting a more modest recovery that may pass muster and may be less risky to counsel and far easier to achieve. By pushing the case to the brink of trial and convincing Defendants that Co-Lead Counsel were ready, willing and able to try the case (and thereby threatening to "go all in") raising the stakes for Defendants by exposing them to a potentially ruinous jury verdict", Plaintiffs' Counsel were able to achieve a better result for the Class. By doing so, however, Plaintiffs' Counsel raised the stakes for themselves as well -- by increasing the potential that Defendants would accept the challenge and win the case, leaving Plaintiffs' Counsel to walk away empty-handed. Even if Lead Plaintiffs had prevailed at trial on both liability and damages, which was by no means assured, the judgment would not have been secure until after the rulings on the inevitable post-judgment motions and appeals became final – a process that could have taken years. Co-Lead Counsel

44

were acutely aware that their success in a contingent litigation, like the Schering Action, is never assured, and there are many examples of class actions in which plaintiffs' counsel expended tens of thousands of hours and received nothing for their efforts.[21] (Schering Decl. ¶¶ 161-163.)

We conclude that a significant risk of non-payment existed in the Schering Action from the beginning of the case and until the Settlement. (*See* Schering Decl. ¶¶ 108-119, 161, 163.) Given the very substantial investment of time and expenditure of money by Plaintiffs' Counsel that was required by their fiduciary duty to effectively prosecute the Schering Action on behalf of the Class, the risk was very significant in this case. (Schering Decl. ¶ 162.) We conclude the risk of non-payment in this case weighs strongly in favor of the requested attorneys' fees.

### 6. The Sixth Factor: The Amount of Time Devoted to the Case

It follows from our prior discussion of other factors, especially *Gunter* Factor 4 (complexity and duration) and *Gunter* Factor 5 (risk of non-payment) that an enormous amount of time was devoted to this case. Plaintiffs' Counsel devoted more than 126,00 total hours to the Schering Action which had a value of almost $60 million – with no guaranty whatsoever it would be recovered. In keeping with their fiduciary duties, Plaintiffs' Counsel had to devote this enormous amount of time to this case because the large amount at stake, the hotly-contested nature of the case, the complexity and the five-year duration mandated it. This was the antithesis of cases like *Cendant PRIDES*, where liability under Section 11 of the 1933 Act was

---

[21] Indeed, even judgments that are bonded and initially affirmed on appeal by an appellate panel are not an absolute assurance of an ultimate recovery. *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after 11 years of litigation, and following a jury verdict for plaintiffs and an affirmance by a First Circuit panel, plaintiffs' claims were dismissed by an en banc decision and plaintiffs recovered nothing). Similarly, even the most promising cases can be eviscerated by a sudden change in the law after years of litigation. *See, e.g., In re Alstom S.A. Sec. Litig., 741 F. Supp. 2d. 469 (S.D.N.Y. 2010)* (after completion of extensive foreign discovery, 95% of plaintiffs' damages were eliminated by the Supreme Court's reversal of 40 years of unbroken circuit court precedents in *Morrison v. Nat'l Bank of Austl., 130 S. Ct. 2869 (2010)*).

45

"virtually certain" due to a financial restatement that was issued almost immediately after the securities offering was marketed to investors by a corporation that could withstand an enormous judgment, and a large settlement -- which was inevitable -- was quickly procured in a Securities Act case without any significant motion practice or discovery. This factor too weighs heavily in favor of the requested fee award.

### 7. The Seventh Factor: The Requested Attorneys' Fees are Reasonable In Comparison to Awards in Similar Cases

The seventh Gunter factor is the size of awards in similar cases. In this case, the

requested fee is 16.92% of the Settlement Fund which consists of $473 million.

In *Rite-Aid*, the Third Circuit considered an award of 25% of the $126.6 million

settlement noting the district court's analysis of this factor with apparent approval:

> In comparing this fee request to awards in similar cases, the District Court found persuasive three studies referenced by Professor Coffee: one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period that found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million that found recoveries in the 25-30% range were "fairly standard." Id. at 610. We see no abuse of discretion in the District Court's reliance on these studies.

*Rite Aid,, 396 F.3d at, 303..*

District courts within the Third Circuit regularly have approved fee awards larger than the POR sought in the Schering Fee Application in other securities class actions and other complex common fund cases involving settlements of similar size to the Schering Settlement Fund. *See, e.g., Lucent Technologies, 327 F. Supp. 2d at 442-43* (awarding 17% of $517 million settlement and stating that the fee was "considerably less than the percentages awarded in nearly every comparable case"); *In re Rite Aid Corp. Sec. Litig., 362 F. Supp. 2d 587 (E.D. Pa. 2005) and 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001)* (awarding 25% of combined $320 million

46

settlement); *In re DaimlerChrysler AG Sec. Litig., No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004)*

(awarding 22.5% of $300 million settlement).[22]

In *Sullivan* where the Third Circuit affirmed an award of 25% of a $295 million

settlement in a non-securities class action, Judge Rendell, writing for the Court *en banc,* stated:

> [I]n Cendant PRIDES, we discussed fee awards in class actions in which
> the settlement fund exceeded $100 million and which relied upon the POR
> method, finding that "the attorneys' fee awards ranged from 2.8% to 36% of the
> total settlement fund." 243 F.3d at 737. Similarly, in Rite Aid, we found no abuse
> of discretion in a district court's reliance on three studies that demonstrated an
> average percentage fee recovery in large class action settlements of 31%, 27–
> 30%, and 25–30%. 396 F.3d at 303. Here, the District Court determined that the
> 25% fee requested by counsel fell within this range.

*Sullivan, 667 F.3d 273, 332.*

Comparing the POR awarded in other cases of similar size is necessary to the

analysis of the seventh *Gunter* factor, but not sufficient. To be meaningful, the analysis must

also take account of several variables that bear on the "similarity" of the cases. As *Sullivan*

holds:

> We are cognizant that a comparison of this award to fees ordered in other
> cases is a complex analytical task, in light of variations in the efforts exerted by
> attorneys and the presence of complex legal and factual issues. That said, we have
> emphasized "that a district court may not rely on a formulaic application of the
> appropriate range in awarding fees but must consider the relevant circumstances
> of the particular case."

---

[22] Although less persuasive because the jurisprudential basis upon which fee awards are granted often varies by circuit, Co-Lead Counsel also have cited fee decisions in securities class actions and other complex common fund cases with comparable settlements in *other* federal circuits also have approved fee awards significantly higher than the awards sought in the Schering fee application. *See, e.g., In re Cardinal Health, Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007) (awarding 18% of $600 million settlement); *In re BankAmerica Corp. Sec. Litig.* 228 F. Supp. 2d 1061, 1066 (E.D. Mo. 2002) (awarding 18% of $490 million settlement); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LLM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 Fed. Appx. (2d Cir. 2008) (awarding 21.4% of $455 million settlement); *In re Checking Account Overdraft Litig.*, No. 09-MD-0236-JLK, 2011 WL 5873389, at *22 (S.D. Fla. Nov. 22, 2011) (awarding 30% of $410 million settlement); *Ohio Pub. Employees Ret. Sys. v. Freddie Mac.*, No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380, at *4 (S.D.N.Y. Oct. 26, 2006) (awarding 20% of $410 million settlement).

47

*Sullivan,* 667 F.3d 273, 332.

These additional variables that can influence the amount of a fee award may include the stage at which the case settles, the amount of discovery conducted, including the number of documents and depositions, the complexity of the issues and the amount of hours the case required. An extreme illustration would be a comparison of the fee awards in two of the largest settlements ever reached, *Tyco* and *Cendant*, both of which involved settlement amounts of approximately $3.2 billion but produced vastly different fee awards of $464 million (*Tyco)* and $55 million (*Cendant).* The amount of discovery conducted in *Tyco* was vast, including 83 million pages of documents reviewed and 220 depositions conducted. In sharp contrast, *Cendant* involved one million pages of documents reviewed and no depositions.[23] (*See In re Enron Securities, Derivative & ERISA Litigation Conclusions of Law, Findings of Fact and Order re: Award of Attorneys' Fees, Fed. Sec. L. Rep. [2008 TRANSFER BINDER] ¶ 94,836 at 95,447-48 (S.D. TX 2008).* As our analysis of the other *Gunter* factors previously discussed makes abundantly clear, the Schering Action was settled on the courthouse steps only after a lengthy five-year pitched battle over a potentially meritorious but highly uncertain case – unaided by restatements, criminal convictions or parallel government actions -- that required massive discovery and complex circumstantial proof.

In light of other awards in similar cases, we believe the 16.92% sought by Co-Lead Counsel is extremely reasonable – if not modest – and strongly supports the Schering Fee Application. *See Rite Aid*, 396 F.3d at 303-04 (distinguishing *Cendant PRIDES).*

---

[23] Of course, these variables are also likely to be reflected in the lodestars as they were in *Tyco* ($172 million) and *Cendant* ($8 million). *(Id.)*

48

### 8. The Eighth Factor: Did the Benefits Accrue from the Efforts of Class-Counsel or Others?

The record in this case compels the conclusion that all the benefits accruing to the class derive exclusively from the efforts of Plaintiffs' Counsel. As we have already observed, there was no one else on the scene that could have produced the result here – no government agency or corporate litigant to lead the charge and the Settlement Fund is the product solely of the efforts of Plaintiffs' Counsel.

### 9. The Ninth Factor: The Amount That Could Be Negotiated in a Private Contingency Fee Agreement

In several cases, courts within the Third Circuit have observed that "attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation." *In re Remeron Direct Purchaser Antitrust Litigation, 2005 WL 3008808 (D.N.J. 2005) (Hochberg, J.); Lucent, 327 F. Supp. 2d at 442 (*"[t]he 17% fee is also considerably less than what is typically earned in contingent fee arrangements and negotiated and non-class action litigation. If this were a non-class action case, the customary contingent fee would likely range between 30% and 40% over the recovery")*; In re Ikon Office Solutions, Inc., 194 F.R.D. 166, 194 (E.D. PA 2000)* ("In private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.") Measured against the private market as observed by these district courts, the fee award requested by the Schering Co-Lead Plaintiffs compares favorably.

It is well-established that "courts may give some of these *[Gunter/Prudential]* factors less weight in evaluating a fee award." *AT&T, 455 F.3d at 166.* Given the significant differences in the risk and reward considerations between representing a client in private non-

class action contingent litigation and serving as lead counsel in a PSLRA securities class action, we would accord this factor much less weight.[24]

### 10. The Tenth Factor: Any Innovative Terms in Settlement

The settlement in the Schering Action is plain vanilla – cash in exchange for releases and is a neutral factor.

### 11. An Additional Factor: The Views of Lead Plaintiff Group Members

We take additional comfort that the fee award requested by Schering Co-Lead Counsel is reasonable from the strong support expressed by each of the four members of the Schering Lead Plaintiff Group. As attested in the Schering Declaration and the underlying Declarations submitted on behalf of each member of the Schering Lead Plaintiff Group, "Lead Plaintiffs – each of which was substantially involved in the prosecution and negotiation of the settlement – considered the size of the recovery obtained particularly in light of the considerable risks of litigation and collectively agreed to allow co-lead counsel to apply for 16.92% of the settlement fund." (Schering Decl. ¶ 140; see Exhibits 2, 3, 4, 5A and 5B.) All the members are "sophisticated institutional investors . . . [who] have evaluated the Fee and Expense Application and believe it to be fair, reasonable and warranting consideration *and approval by the Court*." (Schering Decl. ¶ 140; emphasis supplied.) Each of the Declarations by members of the Schering Lead Plaintiff Group confirm that they unanimously support Co-Lead Counsel's fee application: "Arkansas Teachers fully supports Co-Lead Counsel's Motion for an Award of

---

[24] In individual contingency cases, the lawyer need communicate only with her clients, often a single individual, and they are able together to definitively decide to accept a settlement. Under the PLSRA securities class action regime, lead counsel must keep the entire class informed of any settlement, which is subject to judicial review and to objections by absent class members. In private contingent litigation, the fee agreement is enforceable subject to ethical limitations *(see M.R.P.C. 1.5)*, while fee agreements in PLSRA securities class actions receive a mild "presumption" but are always subject to judicial review and "the court's duty to act as a fiduciary guarding the rights of absent class members". *AT&T, 455 F.3d at 169.*