UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| |
|---|
| IN RE MERCK & CO., INC. VYTORIN/ZETIA SECURITIES LITIGATION |

Civil Action No. 08-2177 (DMC) (JAD)

## SUPPLEMENTAL REPORT AND RECOMMENDATION RELATING TO LITIGATION EXPENSES

In our Report and Recommendations filed on August 28, 2013 (the "Report"), we

deferred "our recommendation with respect to the motion by Co-Lead Counsel to be reimbursed

for expenses in the amount of $4,367,376.95, pending receipt of supplemental information

requested no later than September 6, 2013." (Report at 96.)[1]  As reflected in the Report, while

the litigation expenses were significant measured by some criteria, they "appear to be well within

the 2.7% - 2.8% 'mean' or average of the recovery for class actions. . . .:" (Report at 92.)  We

also observed that the Third Circuit had approved significantly higher expenses in *AT&T* where

the hours devoted were a fraction of those devoted to the Merck Action:

> We note that in *AT&T*, where the lodestar was only $21.25 million based on
> 48,000 hours devoted to the case (*455 F.3d at 169, 172*), the district court
> "approved class counsels' request for reimbursement of expenses in the amount of
> $5,465,996.79 finding the expenses were reasonably and appropriately incurred
> during the prosecution of this case, and sufficiently documented in the
> declarations." *455 F.3d at 160.*

(Report at 92.)  In this same vein, we also took comfort in the approval of the litigation expenses

by the members of the Merck Lead Plaintiff Group and the lack of any objection to them by the

Class.  (Report at 91.)

---

[1]    Unless otherwise noted, references in this Supplemental Report to defined terms are to those previously defined in the Report.  References in this Supplemental Report to cases with abbreviated citations are to those cases the full citations for which are found in the Report.

As we explained, however, we deferred our recommendation concerning the amount of litigation expenses because we were "concerned by the incongruity between the significantly higher amount of expenses incurred in the Merck Action compared to the much lower expenses incurred in the Schering Action, which had a significantly higher lodestar." (Report at 92.) We, therefore, requested "Merck Co-Lead Counsel to submit by September 6, 2013 a supplemental declaration containing additional information addressing the reason for the disparity and providing additional support for the request." (Report at 93.) At the same time, we also requested "the supplemental declaration contain confirmation from Co-Lead Counsel that they have carefully reviewed the expenses from all the other law firms included in the lodestar and that none of the Merck expenses for which reimbursement is sought were incurred in connection with activities that under *Cendant II* are not appropriately charged to the Class as opposed to individual clients." (Report at 93-94.)

On September 6, 2013, as requested, Co-Lead Counsel in the Merck Action submitted a Supplemental Declaration by Daniel L. Berger, Esq. and Salvatore J. Graziano, Esq. (the "Supplemental Declaration") directly addressing the issues relating to the reimbursement of litigation expenses issue raised by the Report.

A.      **The Disparity in the Expenses in the Schering and Merck Actions.**

Our concern with the litigation expenses was prompted by the seeming incongruity between the higher expenses generated in the Merck Action and the Schering Action, which involved higher hours but lower expenses. Given the close coordination of discovery and overlap in counsel, this raised the specter that costs may have been inadvertently shifted from the Schering Action to the Merck Action:

> In light of the close coordination of discovery between the Merck and Schering
> Actions, the overlap of lead counsel, and the shared litigation expense funds, we

2

are unable to rule out at least the possibility that some expenses that were properly attributable to the Schering Action inadvertently were shifted to the Merck Action.

(Report at 93.)

In addressing the disparity between the expenses in the Schering and Merck Actions, Co-Lead Plaintiffs attest that "[w]e, and attorneys acting under our direct supervision, have carefully and thoroughly re-examined the requests for expense reimbursement submitted in this Action and the Schering Action." (Supplemental Declaration at ¶ 6.) The Co-Lead Plaintiffs explain, "[T]he approximately $700.000 expense disparity between this Action and the Schering Action is chiefly accounted for by certain categories for which the expenses incurred in prosecuting the Merck Action were – legitimately – substantially more than the expenses incurred in prosecuting in the Schering Action." (Supplemental Declaration at 7.)

The specific expense categories identified in the Supplemental Declaration as the major sources of the disparity are the following:

1. $191,835.74 in expenses incurred on behalf of Lead Plaintiff ABP for legal fees by Proskauer Rose LLP retained by investment advisors of ABP which was subpoenaed by Defendants and had an indemnification agreement with ABP. (Supplemental Declaration ¶ 8.)

2. $368,961.03 additional expenses incurred for trial and jury consultants in the Merck Action due to the more difficult and complex proof issues. (Supplemental Declaration ¶¶ 9-10.)

3. $93,865.10 for private investigators which was deemed necessary to build a stronger *scienter* case for the Merck Action and included locating potential confidential witnesses who "proved to be useful and beneficial to the Merck Action" and appeared to have assisted in overcoming Defendants' dismissal motion. (Supplemental Declaration ¶ 11.)

4. $287,933 more in photocopying charges. (Supplemental Declaration ¶ 9.)

In total, these additional expenses incurred in the Merck Action, but not the Schering Action, total more than $942,000. In the course of reviewing the photocopying

expenses, Co-Lead Counsel identified $94,380.14 they determined might be arguably characterized as Firm overhead, rather than out-of-pocket expenses, and voluntarily reduced the amount of reimbursement sought by this amount:

> [I]n reviewing its in-house copying expenses, Co-Lead Counsel G&E uncovered certain charges that were billed as in-house duplication costs that, arguably, could be characterized as firm overhead, rather than out-of-pocket expenses incurred strictly in connection with document duplication in the Action. These expenses total $94,380.14. Co-Lead Counsel no longer seek reimbursement for them.

(Supplemental Declaration ¶ 12.)

Based on our review of the Supplemental Declaration, we are satisfied that the higher expenses incurred in the Merck Action are attributable to (i) the increased complexity and difficulty presented by that case, which we described in the Report, including proof of *scienter* and causation (requiring additional jury consultant expenses and private investigator expenses); or (ii) otherwise directly related to normal litigation expenditures (outside counsel fees to respond to subpoena required by ABP indemnity agreement, and additional copying costs).

In the Supplemental Declaration, Co-Lead Counsel also specifically addressed, and ruled out, the possibility that costs properly chargeable to the Schering Action inadvertently had leaked into the Merck Action: "As requested, we re-examined the requests for expense reimbursement submitted in this Action and the Schering Action, and confirm that no expenses properly attributable to the Schering Action have been inadvertently shifted to the Merck Action." (Supplemental Declaration ¶ 13.) Specifically, they state "[C]o-Lead Counsel have reviewed all expenses for which reimbursement is sought – those paid for by the Merck Litigation Fund, those paid for by the Joint Merck-Schering Litigation Fund, and those paid for by all firms individually – and confirm that no expenses properly attributable to the Schering Action have been inadvertently allocated to the Merck Action, as set forth below."

(Supplemental Declaration ¶ 14.)

The Supplemental Declaration obviates the concern we had expressed and convinces us that no expenses properly chargeable to the Schering Action inadvertently were shifted to the Merck Action. We take particular comfort from the Supplemental Declaration because Co-Lead Counsel who submitted it have every reason to assure that the litigation expenses are charged to the correct action. Indeed, Daniel L. Berger, a director of Co-Lead Counsel G&E, which has no role in the Schering Action, has undivided loyalty to the Merck Class to keep the costs in that case as low as possible and Salvatore Graziano, a partner in BLB&G, which is Co-lead Counsel in both cases, has every reason to properly allocate the charges.

In all events, even if there were any residual doubts, Co-Lead Counsel would have dispelled them by determining to substantially shrink the expense disparity between the Merck Action and the Schering Actions even further by unilaterally reducing the copying charges for which reimbursement is being sought by an additional $177,037.09. (M.ECF 345.) *See Lucent, 327 F. Supp.2d at 445.* (In approving reimbursement of $3.5 million in expenses where cumulative lodestar hours were 61,354 (as opposed to 105,341.76 in the Merck Action) "lead counsel represent that they have incurred more than $3.74 million in expenses.")

**B.    Expenses Properly Charged to the Class Under *Cendant II***

In applying the lodestar "cross-check" to confirm the reasonableness of the POR fee award, we observed that the Labaton firm, which is Co-Lead Counsel in the Schering Action, also had devoted a substantial amount of time to the Merck Action at least some of which appeared under *Cendant II* to be more properly billed to its individual client than to the Merck Class. Although it did not impact our view that the lodestar "cross-check" confirmed the

5

reasonableness of the suggested POR fee award,[2] we expressed concern that any <u>expenses</u> incurred while performing tasks for which compensation is foreclosed under *Cendant II* "no matter how small would adversely impact the Merck Class dollar for dollar." (Report at 94, n.48.) Accordingly, we requested Co-Lead Counsel to confirm by Supplemental Declaration "that they have carefully reviewed the expenses from all the other law firms included in the lodestar and that none of the Merck expenses for which reimbursement is sought were incurred in connection with activities that under *Cendant II* are not appropriately charged to the Class as opposed to individual clients." (Report at 93-94.)

In their Supplemental Declaration, Co-Lead Counsel also addressed our request that they confirm they had reviewed all of the expenses incurred by non-lead counsel for which reimbursement is being requested and that they were properly chargeable to the Merck Class under *Cendant II*. Specifically, Co-Lead Counsel state in their Supplemental Declaration that "We, or attorneys acting directly under our supervision, have carefully reviewed each of these additional firms' submissions and have confirmed, with minor adjustments set forth below, that the expenses charged were for activities properly chargeable to the Class." (Supplemental Declaration ¶ 21.)

In the Supplemental Declaration, Co-Lead Counsel confirm that both Carella Byrne and Seeger Weiss were appointed by the Court as Liaison Counsel, neither had any individual client and, most significantly, "the expenses incurred by Court approved liaison counsel were all for activities that benefitted the class a whole, not any particular client." (Supplemental Declaration ¶ 22.)

---

2    When stress tested by removing all Labaton's time from the lodestar, the multiplier still was extremely modest and well within Third Circuit's norms. (*See* Report at 85, n.44)

In reviewing the expenses incurred by the Labaton firm in accordance with *Cendant II*, Co-Lead Counsel confirm that the expenses incurred by Labaton were for projects undertaken "at the behest of co-lead counsel," which, as noted in the Report, we believe would be appropriate under *Cendant II*. (Report at 85, n.44.) In the process of scrutinizing these expenses, however, Co-Lead Counsel did identify $3,100.17 of "Labaton's expenses that arguably are not recoverable under *Cendant II*, because they relate to expenses incurred in the time period prior to selection of lead counsel, are *de minimus*, or are otherwise related to expenses incurred by a non-lead counsel, not strictly and exclusively for the benefit of [the] Merck Class." (Supplemental Declaration ¶ 27.) Accordingly, Co-Lead Counsel "elected to write-off" this amount. (*Id.*)

Finally, Co-Lead Counsel state that the expenses incurred by the Klausner firm, which served as additional counsel to Lead Plaintiff Jacksonville (Supplemental Decl. ¶ 28), were incurred in connection with activities it "was specifically invited to participate in . . . by Co-Lead Counsel and Co-Lead Plaintiff Jacksonville, so that Co-Lead Counsel and the Class could benefit from their additional participation." (Supplemental Decl. ¶ 28.) Here, both Co-Lead Counsel, Lead Plaintiff member Detroit, as well as Jacksonville, specifically support the expense portion of the Fee Award Motion, which would include the expenses incurred by Klausner. (Merck. Decl. Ex. E, ¶ 48.) ("Detroit General fully supports Co-Lead Counsel's Motion for Fee Award of Attorneys' Fees and Reimbursement of Litigation Expenses.")

Once the court has appointed a lead plaintiff and lead counsel, we think that they have the discretion to determine how to manage the litigation, including making decisions about which law firms to call upon to assist the Class in various aspects of the case, and that these determinations carry a presumption of validity. *See Cendant II*, "The paramount goal here, as in

7

*Cendant I*, is to give the Lead Plaintiff, not the Court, authority over class counsel." We have no reason to question, much less second guess, the decisions of Lead Plaintiff or Co-Lead Counsel to request assistance from other law firms, including the Klausner or Labaton firms. *See Tracinda Corp. v. DaimlerChrysler, A.G., 602 F.3d at 246* (Sustaining reliance on credibility of declaration summarizing, among other things, miscellaneous expenses incurred.)

## RECOMMENDATION

We recommend the Court **GRANT** Co-Lead Counsel's Motion for Reimbursement of Litigation Expenses, as modified, in the amount of $4,079,435.55.

Dated:   September 1, 2013

STEPHEN M. GREENBERG                    JONATHAN J. LERNER


/s/: Stephen M. Greenberg                   /s/:  Jonathan J. Lerner

SPECIAL MASTER                              SPECIAL MASTER